No. 22-50337

# In the United States Court of Appeals for the Fifth Circuit

———————

NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION; TEXAS PRESS ASSOCIATION; JOSEPH PAPPALARDO,

*Plaintiffs-Appellees/Cross-Appellants*,

*v.*

STEVEN MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE TEXAS DEPARTMENT OF PUBLIC SAFETY; DWIGHT MATHIS IN HIS OFFICIAL CAPACITY AS CHIEF OF THE TEXAS HIGHWAY PATROL; WES MAU, IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF HAYS COUNTY, TEXAS,

*Defendants-Appellants/Cross-Appellees.*

———————

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

———————

**BRIEF FOR PLAINTIFFS-APPELLEES/CROSS-APPELLANTS**

———————

Leah M. Nicholls
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
lnicholls@publicjustice.net

James A. Hemphill
GRAVES DOUGHERTY HEARON &
  MOODY, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
(512) 480-5762
jhemphill@gdhm.com

*Counsel for Plaintiffs-Appellees/Cross-Appellants*

*(Additional Counsel Listed on Inside Cover)*

Mickey H. Osterreicher
General Counsel
NATIONAL PRESS PHOTOGRAPHERS
  ASSOCIATION
FINNERTY OSTERREICHER & ABDULLA
70 Niagara Street Buffalo, NY 14202
(716) 983-7800
lawyer@nppa.org

Alicia Wagner Calzada
Deputy General Counsel
NATIONAL PRESS PHOTOGRAPHERS
  ASSOCIATION
ALICIA WAGNER CALZADA, PLLC
12023 Radium Street, Suite B1
San Antonio, TX 78216
(210) 825-1449
alicia@calzadalegal.com

David A. Schulz
Kelsey Eberly (*Admission Pending*)
MEDIA FREEDOM AND INFORMATION
  ACCESS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
(212) 850-6103
david.schulz@yale.edu
kelsey.eberly@yale.edu

## CERTIFICATE OF INTERESTED PERSONS

No. 22-50337

National Press Photographers Association; Texas Press Association;
Joseph Pappalardo,

*Plaintiffs-Appellees/Cross-Appellants,*

*v.*

Steven McCraw, in his official capacity as Director of the Texas Department of
Public Safety; Dwight Mathis in his official capacity as Chief of the Texas High-
way Patrol; Wes Mau, in his official capacity as District Attorney of Hays County,
Texas,

*Defendants-Appellants/Cross-Appellees.*

The undersigned counsel of record certifies that the following listed persons
and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the
outcome of this case. These representations are made in order that the judges of this
court may evaluate possible disqualification or recusal.

1. Plaintiffs-Appellees/Cross-Appellants:

   National Press Photographers Association
   Texas Press Association
   Joseph Pappalardo

2. Defendants-Appellants/Cross-Appellees:

   Steven McCraw, in his official capacity as Director of the Texas Department
      of Public Safety
   Dwight Mathis, in his official capacity as Chief of the Texas Highway Patrol
   Wes Mau, in his official capacity as District Attorney of Hays County,
      Texas

i

3.  Counsel for Plaintiffs-Appellees/Cross-Appellants:

    Mickey H. Osterreicher, general counsel for Plaintiff-Appellee/Cross-Appellant National Press Photographers Association
    Alicia Wagner Calzada, deputy general counsel for Plaintiff-Appellee/Cross-Appellant National Press Photographers Association
    Graves Dougherty Hearon & Moody, PC (James A. Hemphill)
    Media Freedom & Information Access Clinic (David A. Schulz, Kelsey Eberly)
    Public Justice (Leah M. Nicholls)

4.  Counsel for Defendants-Appellants/Cross-Appellees:

    McGinnis Lochridge LLP, counsel for Defendant-Appellant/Cross-Appellee Wes Mau (Michael A. Shaunessy, Eric A. Johnston, and Ian M. Davis)
    Office of the Texas Attorney General, counsel for Defendants-Appellants/Cross-Appellees Steve McCraw and Dwight Mathis (Heather L. Dyer, Eric J. Hamilton, Christopher D. Hilton, Cody Rutowski, Lanora Pettit)

5.  Amici in Support of Plaintiffs-Appellees/Cross-Appellants:

    The Texas Association of Broadcasters and Reporters Committee for Freedom of the Press, as well as over 40 Amici co-signers, who are listed on ROA22-50337.1190
    The Association for Unmanned Vehicle Systems International ("AUVSI") and the Consumer Technology Association ("CTA"). ROA.271.

6.  Counsel for Texas Association of Broadcasters, Reporters Committee for Freedom of the Press, et al.:

    Jackson Walker L.L.P. (Paul C. Watler, Eric D. Wong)

7.  Counsel for AUVSI, CTA, et al.:

    Terry L. Scarborough
    Wiley Rein LLP, counsel for amicus curiae the Association for Unmanned Vehicle Systems International (Joshua S. Turner, Sara M. Baxenberg, Boyd Garriott)

Wilkinson Barker Knauer, LLP, counsel for the Consumer Technology Association (Robert G. Kirk)

8.  Amici in Support of Defendants-Appellants/Cross-Appellees:

East Texas Ranch, L.P.

9.  Counsel for East Texas Ranch, L.P.:

Lovins Trosclair, P.L.L.C. (Michael E. Lovins)

*/s/ James A. Hemphill*
James A. Hemphill
*Counsel of Record for*
*Plaintiffs-Appellees/Cross-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

While the First Amendment and standing issues in this case are well-settled, Plaintiffs-Appellees National Press Photographers Association, Texas Press Association, and Joseph Pappalardo (collectively, "Plaintiffs" or "Journalists") concur in the request for oral argument by Defendants-Appellants Steven McCraw and Dwight Mathis ("State Defendants") and Defendant-Appellant Wes Mau ("Mau") (collectively "the Government" or "Defendants"). This case presents important First Amendment issues that bear on the ability of journalists to engage in newsgathering activities within the State of Texas and the public's ability to reap the benefits of a vigorous press. Moreover, whether federal regulations preempt the field of aviation safety and bar state laws regulating the safety of drone flight is an issue of first impression in this Circuit. Plaintiffs thus respectfully suggest that oral argument is likely to aid the Court.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................ iv

INTRODUCTION .................................................................................................1

JURISDICTIONAL STATEMENT ........................................................................2

COUNTERSTATEMENT OF ISSUES PRESENTED.............................................3

COUNTERSTATEMENT OF THE CASE...............................................................3

    A.  The Importance of Drones to Plaintiffs' Newsgathering .......................3

    B.  The Texas Law Restricting Drone Use and Its Impact on Journalists ....6

    C.  Procedural History.................................................................................10

    D.  The Impact of the District Court's Ruling ...........................................12

SUMMARY OF THE ARGUMENT ....................................................................15

STANDARD OF REVIEW ..................................................................................18

ARGUMENT ........................................................................................................18

   I.  Plaintiffs Have Standing...............................................................................18

    A.  Plaintiff Pappalardo and Members of NPPA and TPA Demonstrated Their Article III Standing ....................................................................19

    B.  Plaintiffs NPPA and TPA Have Standing on Behalf of Their Members and in Their Own Right.........................................................24

  II.  Defendants Are Not Immune From This Suit ..............................................25

 III.  The District Court Correctly Held That Chapter 423 Violates the First Amendment..................................................................................................30

    A.  Chapter 423 Restricts Speech and Newsgathering Protected by the First Amendment ................................................................................30

    B.  Chapter 423 Is Subject to Strict Scrutiny Because It Imposes Content- and Speaker-Based Restrictions ...........................................37

    C.  Chapter 423 Fails Strict Scrutiny Because the Challenged Provisions Are Neither Necessary nor Narrowly Tailored .....................................42

D.  Chapter 423 Also Fails Intermediate Scrutiny ......................................49

E.  Chapter 423 Is Unconstitutionally Overbroad .....................................54

IV. Chapter 423 Is Unconstitutionally Vague ...................................................58

V.  The No-Fly Provisions Are Preempted by Federal Law ...........................63

A.  Field Preemption Preempts the No-Fly Provisions..............................63

B.  The No-Fly Provisions Pose an Obstacle to Federal Objectives ..........68

CONCLUSION .................................................................................................70

CERTIFICATE OF COMPLIANCE.......................................................................72

CERTIFICATE OF SERVICE ...............................................................................73

ADDENDUM: The challenged "surveillance" and "no fly" provisions of Chapter 423, Texas Government Code

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Abdullah v. Am. Airlines, Inc.*,
181 F.3d 363 (3d Cir. 1999) ...............................................................64

*ACLU v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) .......................................................*passim*

*Allegheny Airlines v. Vil. of Cedarhurst*,
238 F.2d 812 (2d Cir. 1956) ...............................................................64

*Allied Artists Picture Corp. v. Rhodes*,
679 F.2d 656 (6th Cir. 1982) ..............................................................28

*Americans for Prosperity Foundation v. Bonta*,
141 S.Ct. 2373 (2021)..........................................................................56

*Animal Legal Def. Fund v. Wasden*,
878 F.3d 1184 (9th Cir. 2018) .......................................................31, 32

*Ariz. Broads. Ass'n v. Brnovich*,
No. CV-22-01431, 2022 WL 4121198 (D. Ariz. Sept. 9, 2022) .......22

*Arnold v. Williams*,
979 F.3d 262 (5th Cir. 2020) ..............................................................18

*Ashcroft v. ACLU*,
542 U.S. 656 (2004).................................................................42, 43, 46

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002).............................................................................55

*Babbitt v. United Farm Workers Nat. Union*,
442 U.S. 289 (1979).......................................................................20, 26

*Barilla v. City of Houston*,
13 F.4th 427 (5th Cir. 2021) .......................................................20, 22, 24

*Billups v. City of Charleston*,
961 F.3d 673 (4th Cir. 2020) ..............................................................50

*Boardley v. U.S. Dep't of the Interior*,
   615 F.3d 508 (D.C. Cir. 2010)............................... …………………………………53

*Bolger v. Youngs Drug Prods. Corp.*,
   463 U.S. 60 (1983)...............................................................................54

*Brackeen v. Haaland*,
   994 F.3d 249 (5th Cir. 2021) ...............................................................23

*Branzburg v. Hayes*,
   408 U.S. 665 (1972)............................................................................35

*Brewer v. City of Albuquerque*,
   18 F.4th 1205 (10th Cir. 2021) ...........................................................50

*Brown v. Ent. Merchs. Ass'n*,
   564 U.S. 786 (2011)....................................................................*passim*

*Citizens United v. FEC*,
   558 U.S. 310 (2010)............................................................................37

*City of Austin v. Paxton*,
   943 F.3d 993 (5th Cir. 2019) ..............................................27, 28, 29

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
   142 S.Ct. 1464 (2022)..................................................................*passim*

*City of Burbank v. Lockheed Air Terminal Inc.*,
   411 U.S. 624 (1973)....................................................................65, 67, 68

*City of Cincinnati v. Discovery Network, Inc.*,
   507 U.S. 410 (1993)..................................................................40, 48

*City of Ladue v. Gilleo*,
   512 U.S. 43 (1994)......................................................................41, 49

*Collins v. Yellen*,
   141 S.Ct. 1761 (2021)........................................................................22

*Consol. Edison Co. v. Pub. Serv. Comm'n*,
   447 U.S. 530 (1980)............................................................................47

*Davis v. E. Baton Rouge Par. Sch. Bd.*,
    78 F.3d 920 (5th Cir. 1996) ................................................................. 41

*Dyer v. Smith*,
    No. 3:19-CV-921, 2021 WL 694811 (E.D. Va. Feb. 23, 2021) ........................ 36

*English v. Gen. Elec. Co.*,
    496 U.S. 72 (1990) ........................................................................... 63

*Ent. Software Ass'n v. Blagojevich*,
    469 F.3d 641 (7th Cir. 2006) .............................................................. 26

*In re Express-News Corp.*,
    695 F.2d 807 (5th Cir. 1982) ....................................................... *passim*

*Expressions Hair Design v. Schneiderman*,
    137 S.Ct. 1144 (2017) ....................................................................... 33

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ......................................................................... 58

*Fields v. City of Philadelphia*,
    862 F.3d 353 (3d Cir. 2017) ......................................................... 31, 36

*First Nat'l Bank of Bos. v. Bellotti*,
    435 U.S. 765 (1978) ..................................................................... 35, 36

*French v. Pan Am Express, Inc.*,
    869 F.2d 1 (1st Cir. 1989) .................................................................. 64

*Gericke v. Begin*,
    753 F.3d 1 (1st Cir. 2014) .................................................................. 35

*Glik v. Cunniffe*,
    655 F.3d 78 (1st Cir. 2011) .......................................................... 31, 36

*Globe Newspaper Co. v. Super. Ct.*,
    457 U.S. 596 (1982) ......................................................................... 41

*Greene v. B.F. Goodrich Avionics Sys., Inc.*,
    409 F.3d 784 (6th Cir. 2005) .............................................................. 64

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010).................................................................................51

*Hous. Chron. Pub. Co. v. City of League City*,
    488 F.3d 613 (5th Cir. 2007) ....................................................19, 22

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)...........................................................................25

*Indus. Found. v. Tex. Indus. Accident Bd.*,
    540 S.W.2d 668 (Tex. 1976) ...........................................................44

*Int'l Aerobatics Club Chapter 1 v. City of Morris*,
    76 F.Supp.3d 767 (N.D. Ill. 2014) .................................................65

*Int'l Soc'y for Krishna Consciousness v. Lee*,
    505 U.S. 672 (1992)...........................................................................53

*Irizarry v. Yehia*,
    38 F.4th 1282 (10th Cir. 2022) .......................................................31

*Justice v. Hosemann*,
    771 F.3d 285 (5th Cir. 2014) ...........................................................20

*Keenan v. Tejeda*,
    290 F.3d 252 (5th Cir. 2002) ...........................................................21

*Kolender v. Lawson*,
    461 U.S. 352 (1983)...........................................................................62

*U.S.* ex rel *Lam v. Tenet Healthcare Corp.*,
    481 F.Supp.3d 673 (W.D. Tex. 2006) ............................................12

*Larson v. Valente*,
    456 U.S. 228 (1982)...........................................................................23

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)....................................................................19, 21

*McCullen v. Coakley*,
    573 U.S. 464 (2014)....................................................................*passim*

*McKinley v. Abbott*,
    643 F.3d 403 (5th Cir. 2011) ...............................................................26

*McMahon v. Fenves*,
    946 F.3d 266 (5th Cir. 2020) ...............................................................20

*Meese v. Keene*,
    481 U.S. 465 (1987) ...............................................................................22

*Mi Familia Vota v. Abbott*,
    977 F.3d 461 (5th Cir. 2020) ...............................................................30

*Minn. RFL Republican Farmer Lab. Caucus v. Freeman*,
    33 F.4th 985 (8th Cir. 2022) ................................................................26

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983) ...............................................................................33

*Montalvo v. Spirit Airlines*,
    508 F.3d 464 (9th Cir. 2007) ...............................................................64

*N.H. Right to Life PAC v. Gardner*,
    99 F.3d 8 (1st Cir. 1996) .......................................................................20

*NAACP v. City of Kyle*,
    626 F.3d 233 (5th Cir. 2010) ...............................................................25

*Ness v. City of Bloomington*,
    11 F.4th 914 (8th Cir. 2021) ................................................................31

*NetChoice, LLC. v. Paxton*,
    49 F.4th 439 (5th Cir. 2022) ................................................................52

*OCA-Greater Hous. v. Texas*,
    867 F.3d 604 (5th Cir. 2017) ...............................................................24

*Okpalobi v. Foster*,
    244 F.3d 405 (5th Cir. 2001) ...............................................................29

*Perez v. McCreary, Veselka, Bragg & Allen, P.C.*,
    45 F.4th 816 (5th Cir. 2022) ................................................................44

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
   460 U.S. 37 (1983) ........................................................................53, 54

*Planned Parenthood v. Wasden*,
   376 F.3d 908 (9th Cir. 2004) ................................................................26

*Project Veritas Action Fund v. Rollins*,
   982 F.3d 813 (1st Cir. 2020) ................................................................45

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ...................................................................*passim*

*Richardson v. Flores*,
   28 F.4th 649 (5th Cir. 2022) ................................................................28

*Roark & Hardee LP v. City of Austin*,
   522 F.3d 533 (5th Cir. 2008) ........................................................58, 62

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*,
   547 U.S. 47 (2006) ...............................................................................19

*Seals v. McBee*,
   898 F.3d 587 (5th Cir. 2018) ................................................................56

*SEIU, Local 5 v. City of Houst.*,
   595 F.3d 588 (5th Cir. 2010) ................................................................58

*Singer v. City of Newton*,
   284 F.Supp.3d 125 (D. Mass. 2017) ....................................................69

*Smith v. City of Cumming*,
   212 F.3d 1332 (11th Cir. 2000) ...........................................................31

*Smith v. Goguen*,
   415 U.S. 566 (1974) ......................................................................61, 62

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) .........................................................31, 33, 39, 54

*Speech First, Inc. v. Fenves*,
   979 F.3d 319 (5th Cir. 2020) ......................................................*passim*

*State v. Boyd*,
  No. 17-1735J12 (Tex. Cnty. Ct. Hays Cnty. Jan. 24, 2018).........................28, 44

*Steffel v. Thompson*,
  415 U.S. 452 (1974).....................................................................20, 28

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014)............................................................................19

*Tex. All. for Retired Ams. v. Scott*,
  28 F.4th 669 (5th Cir. 2022) ........................................................*passim*

*Tex. Democratic Party v. Abbott* (*TDP*),
  978 F.3d 168 (5th Cir. 2020) .......................................................28, 29

*Ex parte Thompson*,
  442 S.W.3d 325 (Tex. Crim. App. 2014) ...........................................32

*Thornhill v. Alabama*,
  310 U.S. 88 (1940)..............................................................................57

*Time Warner Cable, Inc. v. Hudson*,
  667 F.3d 630 (5th Cir. 2012) .............................................................52

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994).....................................................................37, 38

*Turner v. Lieutenant Driver*,
  848 F.3d 678 (5th Cir. 2017) ......................................................31, 35

*Tweed-New Haven Airport Auth. v. Tong*,
  930 F.3d 65 (2d Cir. 2019) ................................................................64

*United Food & Commer. Workers Union Local 751 v. Brown Grp.*,
  517 U.S. 544 (1996)..................................................................... 24-25

*United States v. Alvarez*,
  567 U.S. 709 (2012)............................................................................42

*United States v. O'Brien*,
  391 U.S. 367 (1968).....................................................................51, 52

*United States v. Playboy Ent. Grp., Inc.*,
  529 U.S. 803 (2000) ......................................................................43

*United States v. Sineneng-Smith*,
  140 S.Ct. 1575 (2020) ...................................................................45

*United States v. Stevens*,
  559 U.S. 460 (2010) .........................................................54, 55, 56

*United States v. Wallington*,
  889 F.2d 573 (5th Cir. 1989) ........................................................55

*US Airways, Inc. v. O'Donnell*,
  627 F.3d 1318 (10th Cir. 2010) ....................................................64

*Utah v. Evans*,
  536 U.S. 452 (2002) .......................................................................23

*Valenzuela v. Aquino*,
  853 S.W.2d 512 (Tex. 1993) .........................................................44

*Valle del Sol, Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ......................................................26

*Virginia v. Am. Booksellers Ass'n, Inc.*,
  484 U.S. 383 (1988) .......................................................................26

*W. Watersheds Project v. Michael*,
  869 F.3d 1189 (10th Cir. 2017) ....................................................32

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) .......................................................................54

*Witty v. Delta Air Lines, Inc.*,
  366 F.3d 380 (5th Cir. 2004) .............................................63, 65, 68

*Women's Med. Ctr. v. Bell*,
  248 F.3d 411 (5th Cir. 2001) .............................................58, 60, 62

*Women's Med. Pro. Corp. v. Voinovich*,
  130 F.3d 187 (6th Cir. 1997) ........................................................26

*Xizmo Media Prods. LLC v. City of New York*,
No. 21-CV-2160, slip op. (E.D.N.Y Aug. 29, 2022)....................................69, 70

*Young. Whole Women's Health v. Jackson*,
142 S.Ct. 522 (2021)........................................................................26

*Ex parte Young*,
209 U.S. 123 (1908)...................................................................*passim*

*Zemel v. Rusk*,
381 U.S. 1 (1965).................................................................................34

**Constitutional Provisions, Statutes, and Regulations**

First Amendment........................................................................*passim*

Eleventh Amendment.................................................................10, 16

Fourteenth Amendment ...................................................................10

28 U.S.C. §1291 ..................................................................................2

28 U.S.C. §1331 ..................................................................................2

28 U.S.C. §1343(a)(3).........................................................................2

49 U.S.C. §40103 ..............................................................................64

49 U.S.C. §44802(a)(1)................................................................65, 68

Tex. Code Crim. Proc. art. 2.01 .......................................................28

Tex. Code Crim. Proc. arts. 2.13(4), 14.01 .....................................27

Tex. Gov't Code §44.205(b)..............................................................28

Tex. Gov't Code §411.002(a)............................................................27

Tex. Gov't Code §411.006(a)(1) .......................................................27

Tex. Gov't Code §411.006(a)(5) .......................................................27

Tex. Gov't Code §411.031.................................................................27

Tex. Gov't Code §411.032, .022(a) ..................................................27

Tex. Gov't Code §423 ....................................................................*passim*

Tex. Gov't Code §§424.051 ........................................................47

Tex. Penal Code §§21.15-.17 ......................................................44

Texas Penal Code §30.05(a) .......................................................43

Tex. Penal Code §38.114 ............................................................47

14 C.F.R. §§91-107 .....................................................................64

14 C.F.R. §91.119 .......................................................................69

14 C.F.R. §§91.137-138 ..............................................................66

14 C.F.R. §§107.1-.205 ................................................4, 41, 49, 61

14 C.F.R. §§107.11-.51, 107.53-.79 ..........................................65

14 C.F.R. §107.51(b) .......................................................7, 34, 70

81 Fed. Reg. 42063, 42093 (June 28, 2016) ............................69

Fed. R. Evid. 201(b) ...................................................................12

**Other Authorities**

Alan K. Chen, *Cheap Speech Creation*, 54 U.C. Davis L. Rev. 2405
    (2021).......................................................................................34

American Heritage Dictionary (2019) ......................................59

Andy Duehren, *New Texas Law Criminalizes Drone Use Near Animal
    Farms* ......................................................................................47

Aviation Safety, *Where Drones Are*, (Oct. 29, 2019).............68

Black's Law Dictionary (11th ed. 2019) ..................................59

Fed. Aviation Admin., *Emergency Situations*, (June 3, 2022), ..............66

Fed. Aviation Admin. Order No. JO 7210.3CC §21-5-4
    (Sept. 6, 2021)..........................................................................66

Fed. Aviation Admin., *Fact Sheet* 3 (Dec. 17, 2015) .............................................67

Fed. Aviation Admin., *Emergency Situations*, (June 3, 2022), ...............................66

David Goldberg, *Dronalism: Journalism, Remotely Piloted Aircraft, Law and Regulation,* 10 FIU L. Rev. 405 (2015)...............................................33

Macmillan Dictionary .............................................................................................59

Tom Standage, *Taking Flight: Civilian Drones*, Economist (June 8, 2017)......................................................................................................33

**INTRODUCTION**

Texas Government Code Chapter 423 ("Chapter 423") criminalizes drone journalism across ninety-five percent of the State. The statute outlaws the use of unmanned aerial vehicles—commonly known as "UAVs" or "drones"—to capture any images of private property and to capture any images while flying above "critical infrastructure." These drones are lightweight, relatively inexpensive "flying cameras" that are essential to newsgathering in the twenty-first century. Yet, in Texas, their use for newsgathering is a crime.

Through this action, Texas journalists and their organizational representatives sought to enjoin Texas law enforcement officials from enforcing the severe restrictions Chapter 423 imposed on their First Amendment-protected activities. The district court had little trouble concluding that Plaintiffs had standing to protect their rights and correctly declared the law's challenged provisions unconstitutional in multiple respects. Chapter 423 purports to protect privacy and private property but criminalizes photography that threatens neither. The law is riddled with discriminatory exceptions that leave the asserted state interests unprotected. And the ambiguity of its prohibition on undefined drone "surveillance," along with its permission for undefined "commercial" drone uses, leave journalists guessing at whether law enforcement will deem their newsgathering criminal.

1

The district court properly entered declaratory and injunctive relief after finding, on the undisputed record, that the challenged portions of Chapter 423 failed to survive strict scrutiny and unconstitutionally chilled Plaintiffs' speech and news-gathering. As a result of its ruling, journalists throughout Texas have taken to the air to gather news and Texans have a greater understanding of many newsworthy events best captured by drone photography. This Court should affirm.

On cross-appeal, Plaintiffs appeal the district court's dismissal at the pleading stage of their claim that Chapter 423 also violates the Supremacy Clause. The Texas law invades a field that the Federal Aviation Act has fully occupied and stands as an obstacle to accomplishing the Act's objectives. This provides an additional ground for upholding the judgment below.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§1331 and 1343(a)(3). ROA.20. It entered final judgment on April 13, 2022. ROA.1264. The State Defendants filed a notice of appeal on April 28, 2022, ROA.1388-89, and Defendant Mau filed a notice of appeal on May 13, 2022, ROA.1400-01. Plaintiffs timely filed a notice of cross-appeal on May 12, 2022, ROA.1397. This Court has jurisdiction under 28 U.S.C. §1291.

## COUNTERSTATEMENT OF ISSUES PRESENTED

1.  Whether Plaintiffs established Article III standing to challenge a state criminal law that substantially restricts their First Amendment rights.

2.  Whether the district court was permitted under *Ex parte Young* to adjudicate a constitutional challenge to a state criminal law in a lawsuit brought against government officials responsible for enforcing that law.

3.  Whether the challenged provisions of Chapter 423 facially violate the First Amendment.

4.  Whether the challenged provisions of Chapter 423 are unconstitutionally vague.

5.  Whether portions of Chapter 423 are preempted by federal regulation of the nation's airspace.

## COUNTERSTATEMENT OF THE CASE

### A.    The Importance of Drones to Plaintiffs' Newsgathering

Plaintiffs are an independent journalist who owns and uses a drone in Texas and two organizations that represent the interests of journalists:

Plaintiff Joseph Pappalardo is an award-winning freelance journalist and author who has worked for newspapers across Texas and as a contributing editor for *Popular Mechanics.* ROA.668. He owns an FAA-registered drone, and he maintains

a Part 107 Remote Pilot's Certificate.[1] ROA.669. Due to fear of prosecution under Chapter 423, he avoided using his drone in covering such newsworthy stories as the impact of Hurricane Harvey, the removal of homeless encampments, urban sprawl, and the routine dumping of dead and unwanted animals. ROA.672.

Plaintiff National Press Photographers Association ("NPPA") is the nation's leading professional organization for visual journalists. ROA.676. Its membership includes news photographers from print, television, and electronic media, including some 300 members in Texas. *Id.*

Plaintiff Texas Press Association ("TPA") is "the voice of the Texas newspaper industry." ROA.641. Its members include the *San Antonio Express-News*, the *Dallas Morning News*, the *Fort Worth Star-Telegram*, and approximately 400 other newspapers across the State. *Id.* Chapter 423 caused some of those newspapers "to avoid the use of drone photography" altogether. *Id.*

The drone photography criminalized by Chapter 423 is essential to Plaintiffs because modern journalism is increasingly visual and dependent on "strong, unique imagery." ROA.671. Some of the best and most informative images can only be captured through aerial photography, for which "[t]he adage 'a picture is worth a

---

[1] Part 107 refers to the FAA regulation concerning the operation of small drones. 14 C.F.R. §107.1(a). Federal law requires those who wish to fly a drone for non-recreational purposes to have a current Part 107 remote pilot's certificate in order to operate in the national airspace.

thousand words' is especially apt." ROA.644; *see also* ROA.676-77, 685. Drone photography enhances the written word, "particularly where, for example, a story covers a large area that would be difficult to visualize or understand without an aerial perspective." ROA.684; *see also* ROA.652, 658-62. Drone reporting helps citizens better understand their communities. The images below, taken by NPPA members, demonstrate drone photography's powerful impact.





ROA.655 (dam failure)                    ROA.658 (apartment fire)



ROA.690 (stadium construction)[2]        ROA.697 (community garden)

---

[2] https://www.instagram.com/p/BuZ0czmHtmJ/.

Drones have an extreme cost and safety advantage over other aerial photography options. Helicopters or airplanes are too expensive for a typical story. ROA.652 (helicopter costs at least $800 an hour), 671-72, 684. But helicopters are not just expensive—they are also dangerous. Multiple journalists have died in helicopter crashes while attempting to make pictures for news stories. ROA.652-53, 677.

### B.     The Texas Law Restricting Drone Use and Its Impact on Journalists

Chapter 423 contains two sets of provisions that directly curtail the use of drones by journalists. Both carry criminal penalties and create civil liability.

*Surveillance Provisions.* Sections 423.002, 423.003, 423.004, and 423.006 (collectively, the "Surveillance Provisions") directly target drone photography, including for newsgathering purposes. Specifically, section 423.003 makes it a crime to use a drone "to capture an image of an individual or privately owned real property in this state with the intent to conduct surveillance on the individual or property captured in the image." Tex. Gov't Code §423.003(a). Section 423.004(b)-(c) makes it a crime to publish any such images captured with a drone, while section 423.006 creates parallel civil remedies for taking or publishing such images.

The law nowhere defines the "surveillance" it prohibits. According to Defendants, journalism "may or may not constitute 'surveillance' as used in Chapter 423." ROA.579, 593. Unable to offer any clarity, they contend that whether taking a particular image constitutes "surveillance" is "a question of law for the Court and, in

the context of an individual criminal proceeding, dependent on factual determinations by a jury." ROA.579, 593.

Section 423.002 exempts certain favored individuals from its ambiguous restriction on drone photography. The exemptions apply to, among others, professors, college students, real estate brokers, pipeline operators, land surveyors, engineers, and insurance underwriters. Gov't §423.002(a). There is no exemption for journalists. As a result, if a journalist and a professor took the same drone photographs while researching the same matter of public concern, the journalist would commit a crime but the professor would not.

*No-Fly Provisions.* Sections 423.0045 and 423.0046 (the "No-Fly Provisions") make it unlawful to fly a drone below 400 feet over a broad range of facilities, including sports arenas, correctional facilities, animal feedlots, oil and gas drilling sites and pipelines, and refineries. Read alongside FAA regulations that prohibit flying drones *higher* than 400 feet above the ground, the No-Fly Provisions bar any drone photography over the sites they single out. Gov't §§423.0045(b)(1), 423.0046(b); 14 C.F.R. §107.51(b). The No-Fly Provisions allow the use of a drone over the designated sites only for "commercial" purposes, but again fail to define what "commercial" drone use is. Defendants offer no clarification. ROA.581, 595, 608. In the photography industry, "commercial" photography excludes photojournalism. ROA.676, 685.

7

The Texas legislators who passed Chapter 423 knew these provisions would impede journalists. Plaintiff NPPA testified in hearings and met with lawmakers to warn of the bill's impact on journalists. ROA.678-79. The House's analysis acknowledged the concerns that it would "hinder free speech and a free press" because drones have become "an increasingly practical and inexpensive way to take aerial photographs for news gathering purposes." Bill Analysis, HB 912 (May 7, 2013), at 6.[3] The record on this appeal confirms that Chapter 423 had just that chilling impact on journalists.

NPPA member Brandon Wade is an experienced drone operator and freelance news photographer whose clients include TPA member newspapers *The Dallas Morning News* and the *Fort Worth Star-Telegram.* ROA.683. He became unable to use his drone for news assignments due to the risk of Chapter 423 enforcement and lost thousands of dollars in income. ROA.686, 691. Among other things, he was unable to use a drone to document construction of the new Texas Rangers ballpark for the *Star-Telegram* even though the baseball team hired him to do the exact same type of drone photography for its own promotional purposes. ROA.690-91. Due to the threat posed by Chapter 423, the *Morning News* refused to publish any drone images or video captured by Wade and barred him from shooting drone photos while on assignment for it. ROA.686-87. Another of his clients, the Center for

---

[3] https://hro.house.texas.gov/pdf/ba83r/hb0912.pdf.

Investigative Reporting, decided not to publish video from Wade's drone and instructed him to limit his drone photography. ROA.647, 692.

Another NPPA member, Guillermo Calzada, is a professional photojournalist and an employee of TPA member the *San Antonio Express-News.* ROA.641, 649. He was threatened with arrest for using his drone while on assignment for the *Express-News* to document the scene after an apartment fire in Hays County killed five people. ROA.650-51. Calzada, who has a Part 107 certificate, flew his FAA-registered drone for three or four minutes from a sidewalk, and it never crossed the airspace above the fire site or the yellow perimeter tape around it. *Id.* Despite his caution, San Marcos police approached Calzada and said he had "violated state law by taking pictures" and if he "published the photos, [he] would be violating state law again." ROA.651. One of the photos he took was published the next day on the front page of the *Express-News*, and it has been republished repeatedly in connection with follow-up stories on the fire's aftermath.[4] ROA.651-52. Calzada continued to worry that he would be "arrested, fined or sued" as a result of the photo, and he subsequently limited his use of drones for newsgathering. ROA.652-53.

---

[4] As an employee, Calzada does not control whether the newspaper publishes his photos. ROA.651.

### C.     Procedural History

On September 26, 2019, the Journalists filed a complaint for declaratory and injunctive relief challenging the constitutionality of the Surveillance and No-Fly Provisions. ROA.46. The Complaint contended that both provisions violate the First Amendment because they impermissibly burden protected speech and newsgathering and are overbroad, that the provisions are vague in violation of the Due Process Clause of the Fourteenth Amendment, and that the No-Fly Provisions violate the Supremacy Clause. ROA.19.

The State Defendants moved to dismiss the claims for lack of standing and for failure to state a claim under Rule 12(b)(6). ROA.109. Mau also claimed sovereign immunity under the Eleventh Amendment. ROA.209. On November 30, 2020, the district court ruled that the Journalists had sufficiently pleaded facts demonstrating their standing, that Mau was not immune, and that the Journalists had pleaded valid First and Fourteenth Amendment claims. ROA.396-419.

The court dismissed the Journalists' preemption claim, however, finding that the Journalists had not adequately demonstrated that the No-Fly Provisions fall into a field of aviation regulation that the federal government intended to completely occupy, nor that they are so broad as to interfere with the federal goal of integrating drones into the national airspace. ROA.420-24.

Following discovery, on cross motions for summary judgment the district court declared the Surveillance and No-Fly Provisions unconstitutional and enjoined their enforcement. ROA.1249-50. The court first held that the Journalists proved their standing because they and their members were chilled from engaging in protected speech and newsgathering activities by the threat of Chapter 423's enforcement against them, and NPPA and TPA met the requirements for associational standing. ROA.1227-30. The court next held that the Defendants are not immune from suit because the Journalists had established the Defendants' authority and duty to enforce Chapter 423, and sufficient connection to that enforcement, to satisfy the *Ex parte Young* exception to sovereign immunity. ROA.1230-33.

On the merits, the court held that Chapter 423's challenged provisions burden First Amendment-protected speech (capturing and publishing photographs) and newsgathering (drone photojournalism), triggering heightened constitutional scrutiny. ROA.1233-36. The court applied strict scrutiny after finding that the law's many exceptions impose content- and speaker-based distinctions and held that Chapter 423 could not meet that high bar. The court found the Surveillance and No-Fly Provisions neither actually necessary nor narrowly tailored to achieving the State's asserted interests of protecting private property, individual privacy, and the safety of critical infrastructure—even assuming they were compelling. ROA.1236-42. Fi-

11

nally, the court held that Chapter 423's vagueness as to the undefined terms "surveillance" and "commercial purposes" separately rendered it unconstitutional, given the terms' ambiguity and potential for arbitrary enforcement.[5] ROA.1242-47. The district court declared the challenged provisions of Chapter 423 unconstitutional and enjoined the Government from enforcing them. ROA.1249-50.

The Government appealed the summary judgment order, and the Journalists cross-appealed the dismissal of their preemption claim. ROA.1388-89, 1400-1402.

### D.    The Impact of the District Court's Ruling

The district court's order had an immediate impact on the Journalists. On June 13, 2022, the *Express-News* republished Calzada's aforementioned fire photo in a follow-up story,[6] but this time, because of the district court's ruling and injunction, Calzada was protected from arrest by the Texas Department of Public Safety or Texas Highway Patrol, and from prosecution by Defendant Mau.

Following the district court ruling, *The Dallas Morning News* reversed its ban on drone journalism and began permitting its staff photographers, including NPPA

---

[5] The court also denied East Texas Ranch, L.P.'s motion to intervene, which that party did not appeal. ROA.1249.

[6] https://www.expressnews.com/news/local/article/San-Marcos-fire-documentary-17239321.php#photo-22594049. Courts can "take judicial notice of the coverage and existence of newspaper articles." *U.S. ex rel Lam v. Tenet Healthcare Corp.*, 481 F.Supp.3d 673, 680 (W.D. Tex. 2006); Fed. R. Evid. 201(b).

member Smiley Pool, to use drones for photojournalism.[7] Wade has also covered a

wildfire,[8] flood,[9] threatened railroad strike,[10] and an internet access story[11] for the

*Morning News* using drone photography. This has resulted in more robust coverage

of the news in Dallas. Plaintiff Pappalardo featured drone photographs in his recent

book, *Red Sky Morning: The Epic True Story of Texas Ranger Company F*, pub-

lished June 28, 2022.

---

[7] *See, e.g.*, https://www.dallasnews.com/news/commentary/2022/10/28/why-dallas-loop-trails-victory-design-district-link-stalled-out-despite-city-council-ok/.

[8] https://www.dallasnews.com/news/2022/07/25/drone-video-shows-balch-springs-grass-fire-engulfing-neighborhood/.

[9] https://www.dallasnews.com/news/2022/08/22/photos-north-texas-floods-after-record-setting-rainfall/.

[10] https://www.dallasnews.com/business/2022/09/14/5-things-to-know-about-fridays-potential-railroad-strike/.

[11] https://www.dallasnews.com/opinion/commentary/2022/09/12/internet-connectivity-is-essential-for-dallas-students-and-free-access-is-possible/.



An aerial photograph captured by a drone shows the devastation at an apartment building in San Marcos where five people were killed after someone deliberately set a fire there at 4:27 a.m. on July 20, 2018. All five victims were staying in upstairs apartments of the same building at iconic Village Apartments when the inferno erupted. Nearly four years later, the crime remains unsolved.
Billy Calzada / Staff photographer

**'There will be answers'**

Frizzell's parents, Brian and Michele Frizzell, also Texas State graduates, were overwhelmed with pride as they discussed his documentary during a family gathering at a San Marcos restaurant later Sunday. Neither of them had seen the film before the advance screening.

https://www.expressnews.com/news/local/article/San-Marcos-fire-documentary-17239321.php#photo-22594049



NEWS

## Drone video shows Balch Springs grass fire engulfing neighborhood

Monday's fire burned 26 homes and destroyed nine, leaving families homeless.



Fire fighters battle a grass fire that destroyed several homes in the 14000 block of Broadview Dr. in Balch Springs, Monday, July 25, 2022. (Brandon Wade / Special Contributor)

By The Dallas Morning News
8:02 PM on Jul 25, 2022

https://www.dallasnews.com/news/2022/07/25/drone-video-shows-balch-springs-grass-fire-engulfing-neighborhood/



BUSINESS

## 5 things to know about Friday's potential railroad strike

Unions and railroad companies appear far from a compromise to keep tr running.

An aerial view of the Union Pacific Intermodal Facility in Hutchins, Monday, September 12, 2022. Railway workers could potential go on strike this week after months of failed negotiations. (Brandon Wade / Special Contributor)

By Kyle Arnold
1:19 PM on Sep 14, 2022

https://www.dallasnews.com/business/2022/09/14/5-things-to-know-about-fridays-potential-railroad-strike/



OPINION

## Internet connectivity is essential for Dallas students, and free access is possible

13% of DISD students don't have high-speed internet at their homes



Dallas ISD installed a tall Wi-Fi antenna at Lincoln High School to broadcast an internet signal to homes in the nearby neighborhoods in Dallas, Friday, May 27, 2022. (Brandon Wade / Special Contributor)

By Leslie Ward
1:30 AM on Sep 12, 2022

https://www.dallasnews.com/opinion/commentary/2022/09/12/internet-connectivity-is-essential-for-dallas-students-and-free-access-is-possible/





 

https://www.dallasnews.com/news/2022/08/22/photos-north-texas-floods-after-record-setting-rainfall/

https://www.dallasnews.com/news/commentary/2022/10/28/why-dallas-loop-trails-victory-design-district-link-stalled-out-despite-city-council-ok/

## SUMMARY OF THE ARGUMENT

1. Plaintiff Journalists established their Article III standing. The record demonstrates that Chapter 423 prevented them from capturing images with drones in their newsgathering and from publishing those images. This significant restriction on Journalists' First Amendment-protected activity flows directly from their reasonable fear of prosecution under Chapter 423 by Defendants, who have statutory responsibilities for enforcement of Texas's criminal laws. The district court's order barring enforcement of Chapter 423 relieved the Journalists' constitutional injury

and allowed them to resume their drone journalism. NPPA and TPA also have standing based on injury that the threatened enforcement of Chapter 423 inflicted on them as organizations.

2. This suit properly proceeded against Defendants under *Ex parte Young*. The Eleventh Amendment does not bar declaratory and injunctive relief in this federal constitutional challenge to a state criminal statute, where Defendants are state officials deputized to enforce the state's criminal laws. The inapposite authority cited by Defendants applies *Young* outside the criminal context, in situations where the proper enforcer and enforcement mechanism was far less certain.

3. Chapter 423 on its face violates the First Amendment for multiple, independent reasons.

a. Chapter 423 regulates the creation of speech and substantially burdens the ability of journalists to gather the news. The district court correctly subjected the statute to strict scrutiny because Chapter 423 discriminates based on both the creator and the content of an image captured with a drone. The law cannot survive such scrutiny because it is neither necessary nor narrowly tailored to achieve the State's asserted interest in protecting privacy and property. Myriad other laws already adequately protect those interests, and the State has demonstrated no need to impose substantial new burdens on First Amendment rights.

b. Even viewed as a regulation of conduct, Chapter 423 would be subject to intermediate scrutiny because it burdens the places and manners of creating speech. Chapter 423 also fails this standard because it is not a narrowly tailored time, place, and manner restriction. Moreover, the burdens it imposes on First Amendment freedoms are not incidental and are far greater than necessary to protect any governmental interest unrelated to the suppression of expression. The "reasonableness" standard of review for restrictions of speech in a nonpublic governmental forum advocated by Defendants does not apply, as Chapter 423 is not limited to the use of drones on government property.

c. Chapter 423 is also unconstitutionally overbroad. It prohibits disfavored speakers from recording, possessing, or distributing certain images taken with drones, and prohibits anyone not acting with a "commercial purpose"—whatever that means—from recording any drone images over certain sites. These restrictions are not limited to drone photography that invades privacy or harms property, and they contain no carveout for images on matters of public concern. Chapter 423's potential constitutional applications to drone photography that invades privacy or threatens private property are dwarfed by the universe of protected First Amendment activity the law burdens without adequate justification.

4. Chapter 423 is void for vagueness. The Surveillance Provisions fail to provide reasonable notice of what constitutes prohibited "surveillance," and the No-

Fly Provisions do not make clear what constitutes a permitted "commercial purpose" for drone operation. This lack of clarity gives law enforcement impermissibly broad discretion to determine what conduct violates the law, which especially threatens the exercise of First Amendment rights.

5. Finally, the No-Fly Provisions are preempted by federal regulations that govern the national airspace, under both field and obstacle preemption. The Federal Aviation Act gives the federal government exclusive sovereignty over the national airspace and creates a uniform and exclusive system of federal air safety regulation. Six Circuits have held that federal law occupies the field of aviation regulation, and this Court should follow. Even if the No-Fly Provisions were not field preempted, they would be preempted because they serve as an obstacle to the federal intent to integrate drones into the national airspace in a safe and efficient manner.

## STANDARD OF REVIEW

This Court reviews grants of summary judgment and dismissals on a motion to dismiss de novo. *Arnold v. Williams*, 979 F.3d 262, 266, 271 (5th Cir. 2020).

## ARGUMENT

## I.    PLAINTIFFS HAVE STANDING

The district court properly found that Plaintiffs have Article III standing. They "(1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision."

*Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). While each Plaintiff here established their standing, a federal court has jurisdiction so long as at least one plaintiff has standing to pursue the claim. *See Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

### A.   Plaintiff Pappalardo and Members of NPPA and TPA Demonstrated Their Article III Standing

#### 1.   *The Journalists suffer injury-in-fact from the potential threat of prosecution under Chapter 423*

This Court has "repeatedly held, in the pre-enforcement context, that '[c]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement.'" *Speech First*, 979 F.3d at 330-31 (quoting *Hous. Chron. Pub. Co. v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007)). The undisputed record establishes that the Government's ability to enforce Chapter 423 against the Journalists caused them to restrict their newsgathering. *See, e.g.*, ROA.650-52, 672-73, 686-87, 692.

A plaintiff suffers an injury when she has an "'intention to engage in a course of conduct arguably affected with a constitutional interest [but] proscribed by'" a law, and faces a "credible threat of enforcement." *Speech First*, 979 F.3d at 331, 335 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014)). When a statute facially restricts expressive activity, this Court has instructed that a credible

threat of prosecution should be assumed "in the absence of compelling contrary evidence." *Id.* at 335 (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)). A plaintiff need not "first expose himself to actual arrest or prosecution" to have standing. *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)); *see also Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979); *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021).

Because Chapter 423 facially restricts First Amendment-protected activity, *see infra*, pp. 31-36, the Court can assume a credible threat of prosecution. The Government has done nothing to rebut this assumption (such as committing not to enforce Chapter 423, ROA.1233), and the Journalists have affirmatively demonstrated their injury-in-fact. Plaintiff Pappalardo stopped flying his drone to report on any news story in Texas after learning of the statute "for fear of facing criminal or civil liability" under Chapter 423. ROA.670-72. But for this fear, Pappalardo would have used his drone to report on several newsworthy events. ROA.672. Pappalardo's evidence of harm is uncontradicted and effectively conceded by Defendants.

Confusing the concepts of injury and traceability, Mau incorrectly insists that Pappalardo must establish a particularized injury with respect to Defendant Mau. Mau Br. 14-15. The relevant inquiry is simply whether an injury "affect[s] *the plaintiff* in a personal and individual way." *McMahon v. Fenves*, 946 F.3d 266, 271 (5th

Cir. 2020) (emphasis added) (quoting *Lujan*, 504 U.S. at 560 n.1). Pappalardo's injury is personal. His drone reporting was chilled throughout Texas, which includes Hays County, where Mau controls prosecution decisions.

The record establishes "multiple independent injuries" to NPPA and TPA members. ROA.649-56, 683-92. Until the district court enjoined Chapter 423, NPPA member Wade had also limited his drone photography out of fear of liability under Chapter 423 and lost a series of paid assignments. ROA.686-87, 689-91. The fear of prosecution likewise caused TPA member *The Dallas Morning News* to adopt a policy against drone use by its photographers and to avoid publishing certain drone-captured photos. ROA.686-87. As the district court held, "any one of these injuries is sufficient to satisfy the injury-in-fact requirement." ROA.1228.

NPPA member Calzada's newsgathering activities, too, were chilled after he was approached in Hays County by San Marcos police and told he was violating Chapter 423 by using a drone to photograph the aftermath of an apartment fire. ROA.650-52. Defendants claim that past injury does not entitle a plaintiff to future relief, State Br. 24, and that Calzada was not chilled because the drone photos he took in Hays County were published, Mau Br. 18-19. But this Court does not demand that a plaintiff wholly refrain from speech in order to establish a chill. *See, e.g.*, *Keenan v. Tejeda*, 290 F.3d 252, 259 (5th Cir. 2002) (partial chill sufficient to allege First Amendment injury). The record is that the Journalists, including Calzada, self-

censored for fear of *future* enforcement. That fear was credible, not speculative, and the chilling effect objective, not subjective. *See Hous. Chron.*, 488 F.3d at 618-19; *Meese v. Keene*, 481 U.S. 465, 473 (1987). Mau has admitted that there has been an arrest and prosecution for drone-related activity in Hays County. ROA.606.

### 2. *The Journalists' injury is traceable to Defendants' conduct*

As the district court observed, Defendants "overcomplicate" the issue of trace-ability. ROA.1228. The Journalists' injuries are traceable to Defendants because they stem from a fear of enforcement of Chapter 423 by them, not simply from "the provision of law" itself. *Collins v. Yellen*, 141 S.Ct. 1761, 1779 (2021).

The State Defendants argue without basis that they have no "particular duty" to enforce Chapter 423. State Br. 20. As demonstrated *infra*, pp. 27-28, they are Texas law enforcement officers with the indisputable power and duty to enforce Chapter 423. That authority caused the Journalists to self-censor. ROA.1228. While the State Defendants argue vociferously that they haven't enforced the law, they have made no binding agreement not to, and their vigorous defense of the law con-tradicts any notion that they would not enforce it. *See Barilla*, 13 F.4th at 433.[12]

---

[12] If Defendants were truly uninterested in enforcing the law, they could have filed a Notice of Non-Opposition, or taken no position on the prospective relief requested. *See, e.g.*, *Ariz. Broads. Ass'n v. Brnovich*, No. CV-22-01431, 2022 WL 4121198, at *1 (D. Ariz. Sept. 9, 2022) (granting requested relief to journalism plaintiffs after state attorney general, county attorney, and county sheriff declined to defend a law that violated the First Amendment).

Nor is Defendant Mau aided by the fact that his office has never threatened prosecution against any of the Journalists, Mau Br. 17, given the absence of binding assurances that he won't enforce Chapter 423. ROA.1233. Mau does not dispute that he has prosecutorial authority, Mau Br. 19, and the fact that his authority is limited to Hays County is immaterial to the standing analysis. The Journalists report wherever the news leads them, including Hays County. *See, e.g.*, ROA.650-52. Mau's argument also ignores that section 423.004 makes it a crime not only to use a drone to take certain images, but also to publish any such images.[13] Before the district court's injunction, Calzada and the *Express-News* faced a risk of prosecution each time the San Marcos fire photo was published.

### 3. *The Journalists' injury was redressed by the district court's grant of injunctive and declaratory relief*

An injury is redressable when the "practical consequences" of the relief sought would be to "'significant[ly] increase . . . the likelihood' of relief" for the injury the plaintiff has suffered. *Brackeen v. Haaland*, 994 F.3d 249, 372 (5th Cir. 2021) (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)). Full redressability is not required. *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). And when potential enforcement of a challenged rule causes the injury of self-censorship, that injury is necessarily redressed by enjoining enforcement of the rule. *Speech First*, 979 F.3d

---

[13] Section 423.004 makes it a potential offense each time an impermissible drone image is "disclose[d], display[ed], distribute[d] or otherwise use[d]."

at 338; *Barilla*, 13 F. 4th at 431 n.1 (causation and redressability easily resolved in such cases). That is exactly what happened here. The district court's judgment directly alleviated the Journalists' chill. Thanks to it, the Journalists can engage in their drone journalism—and have done so—without fear of prosecution under Chapter 423. *Supra*, pp. 12-15.

Mau claims the Journalists "offered no evidence that they refrained from engaging in drone-related activities *specifically in Hays County, Texas*" and belittles the relief requested as "meaningless." Mau Br. 22. Far from meaningless, the district court's judgment enabled the Journalists to cover the news using drones throughout Texas—including in Hays County—without fear of arrest or prosecution.

In short, Pappalardo and members of NPPA and TPA satisfy each requirement of Article III standing.

### B.    Plaintiffs NPPA and TPA Have Standing on Behalf of Their Members and in Their Own Right

NPPA and TPA independently established their own standing. *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610-14 (5th Cir. 2017).

*First*, these Plaintiffs proved their associational or representational standing: (a) as demonstrated above, their members would otherwise have standing to sue in their own right; (b) the interests the organizations seek to protect are germane to their purposes, ROA.641, 678; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See United Food &*

*Commer. Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The Journalists have met the first prong, and the Government does not challenge the other two, which are also met. ROA.1230.

*Second*, NPPA and TPA also established standing to sue in their own right by demonstrating that the threat of Chapter 423's enforcement has caused a "diversion of [their] resources" to counteract the harm that enforcement posed to their mission and activities. *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010); ROA.642, 680-81.

## II.    DEFENDANTS ARE NOT IMMUNE FROM THIS SUIT

None of the Defendants is immune from suit. *Ex parte Young*, 209 U.S. 123, 155-56 (1908), recognizes an exception to sovereign immunity for lawsuits brought against state officers seeking injunctive or declaratory relief to stop ongoing violations of federal law, so long as the defendant has "some connection" to enforcing the allegedly unconstitutional law. *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (quoting *Young*, 209 U.S. at 157). Because no party contests that the Journalists seek prospective relief, Mau Br. 25-26, and because Defendants—all law enforcement officials—each have the required connection to enforcement of the challenged criminal statute, they are not immune.

In cases challenging the threat of enforcement of a criminal statute, a defendant with general law enforcement authority almost always has the necessary "connection [to] . . . enforcement" to satisfy *Young*. 209 U.S. at 157. *See, e.g.*, *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988) (county police chief was proper defendant); *Babbitt*, 442 U.S. 289 (state attorney general); *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) (county attorneys and county sheriff); *ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) (state's attorney); *McKinley v. Abbott*, 643 F.3d 403, 406 (5th Cir. 2011) (Texas Attorney General). Indeed, the Supreme Court recently reiterated that a state official who "may or must" respond to violations of a challenged law by taking "enforcement action[]" can be subject to suit under *Young*. *Whole Women's Health v. Jackson*, 142 S.Ct. 522, 535-36 (2021). Neither the Supreme Court nor this Court has ever held that a state prosecutor or peace officer with enforcement authority is immune from a federal constitutional challenge to a criminal law. Decisions in other Circuits reflect this same understanding.[14]

Defendants here, "by virtue of [their] office," undeniably have "some connection" to the enforcement of Chapter 423. *Young*, 209 U.S. at 157. Their enforcement authority need not "be declared" in Chapter 423 but is "equally efficacious" so long

---

[14] *See, e.g.*, *Minn. RFL Republican Farmer Lab. Caucus v. Freeman*, 33 F.4th 985, 987, 992 (8th Cir. 2022); *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 645 (7th Cir. 2006); *Planned Parenthood v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004); *Women's Med. Pro. Corp. v. Voinovich*, 130 F.3d 187, 211 (6th Cir. 1997).

as it "otherwise exist[s]," even if it "arises out of the general law." *Id.*; *City of Austin v. Paxton*, 943 F.3d 993, 997-98 (5th Cir. 2019). No Defendant disclaims the power and authority to enforce Chapter 423. Each plainly has the power to respond to violations of the state's criminal laws, including Chapter 423, by taking enforcement action.

1.   The Texas Department of Public Safety is required by statute to "enforce the laws protecting the public safety." Tex. Gov't Code §411.002(a). Defendant McCraw supervises the department's thousands of peace officers and is "directly responsible . . . for the conduct of the department's affairs." *Id.* §411.006(a)(1). McCraw's agency has warned and cited individuals seen operating drones. ROA.591-92.

2.   In Texas, all peace officers have both the power and duty to arrest anyone who commits a crime in front of them, including those who commit misdemeanors. Tex. Code Crim. Proc. arts. 2.13(4), 14.01. The Texas Highway Patrol has the "powers and duties of sheriffs" and is expressly deputized to make arrests. Gov't §§411.032, .022(a). As Chief of the Texas Highway Patrol, Defendant Mathis is executive officer of the patrol, *id.* §411.031, in addition to being a peace officer himself, Crim. Proc. art. 2.12(4); Gov't §411.006(a)(5).

3.   Defendant Mau concedes having "prosecution authority," ROA.718, and as a district attorney, is charged with "exclusively represent[ing] the state in

all criminal matters." Gov't §44.205(b); Crim. Proc. art. 2.01. Indeed, his of-

fice has prosecuted drone-related activities. ROA.606.[15]

*Young* requires nothing more. It does not depend on a specific threat of imminent

prosecution; otherwise, a plaintiff would be placed "between the Scylla of intention-

ally flouting state law and the Charybdis of forgoing what he believes to be consti-

tutionally protected activity." *Steffel*, 415 U.S. at 462; *see also Allied Artists Picture*

*Corp. v. Rhodes*, 679 F.2d 656, 665 n.5 (6th Cir. 1982) (affirming that *Young* permits

suits *before* a criminal proceeding is initiated).

The Government simply confuses the issues in pointing to inapposite author-

ity concerning *Young*'s application in challenges to civil statutes—laws not enforced

through arrest or prosecution, and often not even "enforced" in the traditional sense

of the word. *See, e.g.*, *Richardson v. Flores*, 28 F.4th 649, 653-54 (5th Cir. 2022)

(challenge to Texas's signature verification process for mail-in ballots); *Tex. All.*, 28

F.4th at 672-73 (removal of "straight-ticket" voting option); *Tex. Democratic Party*

*v. Abbott* (*TDP*), 978 F.3d 168, 179-80 (5th Cir. 2020) (absentee ballot eligibility);

*City of Austin*, 943 F.3d at 996, 1000 n.1 (defense to civil suit under local ordinance).

Where the "enforcer" is not obvious, this Court has articulated the "guideposts" on

which the Government relies. *Tex. All.*, 28 F.4th at 672.

---

[15] The prosecution resulted in a deferred disposition, *see State v. Boyd*, No. 17-1735J12 (Tex. Cnty. Ct. Hays Cnty. Jan. 24, 2018).

Although the run-of-the-mill application of *Young* in this case does not depend on "defin[ing] the outer bounds" of the doctrine, *City of Austin*, 943 F.3d at 1000, nor require the guideposts discussed in the Government's authorities, there is no doubt Defendants satisfy them anyway.

*First*, Defendants' authority to arrest or prosecute anyone who violates Chapter 423 is unlike a "general . . . responsibility to see that all of the laws of the state be faithfully executed." *Okpalobi v. Foster*, 244 F.3d 405, 416 (5th Cir. 2001); *see also Tex. All.*, 28 F.4th at 674 (distinguishing general duties, such as that to "obtain and maintain uniformity" in the law, from authority to enforce specific provisions of the law) (citation omitted).

*Second*, Defendants have the "duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Tex. All.*, 28 F.4th at 672 (quoting *TDP*, 978 F.3d at 179). In other words, they "enforce 'the particular statutory provision'" at issue. *Id.* A mere "scintilla of 'enforcement' by the relevant state official," such as Defendants' warnings against and prosecution of drone-related activities, ROA.591-92, 606, is enough. *City of Austin*, 943 F.3d at 1002.

*Third*, conducting a "provision-by-provision" *Young* analysis does nothing to alter this conclusion. In cases challenging Election Code laws, which allocate authority for compliance with differing provisions among various officials, a court must determine who has the power to enforce the *particular* provision challenged.

*Tex. All.*, 28 F.4th at 672. Unlike cases involving state officials with "no authority" and no "role to play" in enforcing the challenged law, *Mi Familia Vota v. Abbott*, 977 F.3d 461, 467 (5th Cir. 2020), Defendants here have specific enforcement authority and a clear role to play.

There can simply be no serious dispute that Defendants possess enforcement authority to "compel or constrain [Plaintiffs] to obey the challenged law." *Tex. All.*, 28 F.4th at 672. Under *Ex parte Young*, they are not immune.

## III.   THE DISTRICT COURT CORRECTLY HELD THAT CHAPTER 423 VIOLATES THE FIRST AMENDMENT

Chapter 423 triggers First Amendment scrutiny because it facially regulates the creation of speech—the right to "capture . . . image[s]," §423.003—and substantially burdens the ability of journalists to gather the news, ROA.1236. The district court rightly applied strict scrutiny because Chapter 423 discriminates based on the photographer and subject of photography. *Id.* And because the Government cannot establish that the law's restrictions on speech and newsgathering are necessary to protect the alleged state interests—privacy, property, and safety—it fails *any* level of scrutiny.

### A.    Chapter 423 Restricts Speech and Newsgathering Protected by the First Amendment

The Government attempts to recast Chapter 423 as a restriction on conduct, calling it "the right to pilot a drone," State Br. 27, but Chapter 423 undeniably

restricts two forms of First Amendment-protected activity: speech and newsgathering.

### 1. *Chapter 423 restricts speech*

This Court, like many others, has held that the First Amendment protects photography and video recording as forms of speech. *Turner v. Lieutenant Driver*, 848 F.3d 678, 689 (5th Cir. 2017) (recognizing "the First Amendment's protection of the broader right to film").[16] The Government cannot excise from Chapter 423 the direct regulation of protected speech simply by labeling it a restriction on "piloting a drone." State Br. 16.

Chapter 423 targets photography and video recording, not the mere conduct of flying a drone. The Surveillance Provisions criminalize "captur[ing] an image," §§423.002(a), .003(a), as well as publishing, displaying, "or otherwise us[ing] that image," §423.004(a)(2). Steps in the creation of speech "*are speech* within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (emphasis added); *see also Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011) ("Whether government regulation applies to creating, distributing, or consuming speech makes no difference.").

---

[16] *See also Irizarry v. Yehia*, 38 F.4th 1282, 1289 (10th Cir. 2022); *Ness v. City of Bloomington*, 11 F.4th 914, 923 (8th Cir. 2021); *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018); *Fields v. City of Philadelphia*, 862 F.3d 353, 358 (3d Cir. 2017); *Alvarez*, 679 F.3d at 595; *Glik v. Cunniffe*, 655 F.3d 78, 83 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000).

The right to *publish* a recording would be meaningless "if the antecedent act of *making* the recording is wholly unprotected." *Alvarez*, 679 F.3d at 595. Thus, disaggregating the creation of photo or video from the photo or video itself would "def[y] common sense." *Wasden*, 878 F.3d at 1203; *see W. Watersheds Project v. Michael*, 869 F.3d 1189, 1192 (10th Cir. 2017) (noting that the First Amendment applies to statutes that "target the 'creation' of speech").

The State Defendants are off-base in arguing that the intent-to-surveil requirement somehow cabins the Surveillance Provisions to regulating conduct outside the First Amendment's purview. State Br. 41. Even they recognize that the required intent is simply to "capture images." *Id.* The law criminalizes using "an unmanned aircraft to *capture an image* of an individual or privately owned real property . . . with the intent to conduct surveillance on the individual or property *captured in the image*." Gov't §423.003 (emphasis added). Chapter 423's "legal sanction is directly leveled against the expressive element of an expressive activity" (photography), and as such, "the statute burdens First Amendment rights directly, not incidentally." *Alvarez*, 679 F.3d at 602-03.

The No-Fly Provisions likewise restrict speech by prohibiting the "operation" of drones, which necessarily prohibits the recording of images. §§423.0045, .0046. Virtually all consumer drones are equipped with cameras, making them "inherently expressive" tools for creating speech. *Ex parte Thompson*, 442 S.W.3d 325, 336-37

(Tex. Crim. App. 2014) ("The camera is essentially the photographer's pen or paintbrush."); Tom Standage, *Taking Flight: Civilian Drones*, Economist (June 8, 2017), https://www.economist.com/technology-quarterly/2017-06-08/civilian-drones (the main consumer use of drones is as "flying cameras"); David Goldberg, *Dronalism: Journalism, Remotely Piloted Aircraft, Law and Regulation*, 10 FIU L. Rev. 405, 405 (2015) (drones "are simply twenty-first century flying cameras"). Just as First Amendment scrutiny applies to a law inhibiting the use of precursors to the creation of a newspaper, like ink and paper, such scrutiny applies to a law chilling the use of an expressive tool to create speech. *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582 (1983); *see also Sorrell*, 564 U.S. at 571.

Though the No-Fly Provisions say "nothing about speech on [their] face," First Amendment scrutiny is required because the law's effect makes clear that it regulates protected speech. *See McCullen v. Coakley*, 573 U.S. 464, 476-77 (2014) ("no doubt" that law restricting "access to public ways and sidewalks" effectively restricted speech) (cleaned up); *see also Expressions Hair Design v. Schneiderman*, 137 S.Ct. 1144, 1151 (2017) (First Amendment applied to law against credit card surcharges whose "primary effect" was to "regulat[e] the communication of prices rather than prices themselves"). The practical effect of the No-Fly Provisions is to bar photographers from operating their drones above or near water treatment plants, dams, and sports venues, and thus to prohibit journalists from capturing newsworthy

subjects. §§423.0045, .0046. In proposing to add feedlots to Chapter 423's list of

critical infrastructure, the bill's author emphasized the need to stop drone operators

from "videoing [cows], trying to show that they're under distress." *Hearing on H.B.*

*1643 Before the H. Comm. on Homeland Security & Public Safety*, 2017 Leg., 85th

Sess. (Tex. 2017) (statement of Rep. Drew Springer).[17]

The Government portrays the No-Fly Provisions as simply regulating "the

height at which drones may be piloted." State Br. 33. But they effectively ban *all*

drone photography over many facilities engaged in activity of legitimate public

concern—subject only to a handful of content- and speaker-based exceptions, *see*

*infra*, pp. 39-41—because the provisions require drone photographers to operate

"higher than 400 feet above ground level," while FAA regulations *prohibit* doing so.

§§423.0045(b)(1), .0046(b); 14 C.F.R. §107.51(b).[18]

The Government finally cites *Zemel v. Rusk*, 381 U.S. 1 (1965), to argue that

"[a]t *most*, Chapter 423 inhibits certain means of gathering information that might

someday ripen into expressive activity." State Br. 28. But *Zemel* involved a generally

applicable travel restriction that was not targeted at expressive activity at all. 381

[17] https://tlchouse.granicus.com/MediaPlayer.php?view_id=40&clip_id=13383   (at 30:52-31:55).

[18] Even a height rule below the FAA's 400-foot limit would trigger First Amendment scrutiny because it would restrict (at minimum) the places and manners in which photographers can create speech with their "flying cameras." Alan K. Chen, *Cheap Speech Creation*, 54 U.C. Davis L. Rev. 2405, 2426 (2021).

U.S. at 13. In contrast, Chapter 423 directly targets speech. *See, e.g.*, *Alvarez*, 679 F.3d at 602-03. Simply labeling the law a regulation of drone operation, State Br. 28, does not insulate it from First Amendment scrutiny.

### 2. *Chapter 423 also restricts journalists' First Amendment right to gather and publish newsworthy information*

Chapter 423 raises constitutional concern for another, independent reason: it burdens First Amendment-protected newsgathering. The Supreme Court long ago cautioned that "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). This Court has thus held that the First Amendment limits the extent to which a court rule can "restrict the journalistic right to gather news." *In re Express-News Corp.*, 695 F.2d 807, 810 (5th Cir. 1982). In *Turner*, this Court again recognized that newsgathering is "entitled to first amendment protection" and that newsgathering about government officials "serves a cardinal First Amendment interest." 848 F.3d at 688-89 (internal citations omitted); *see also Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014); *Alvarez*, 679 F.3d at 597.

Moreover, the First Amendment "prohibit[s] government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978). Thus, for example, "banning photography or note-taking at a public event would raise serious First Amendment

35

concerns" and "obviously affect the right to publish the resulting photograph or disseminate a report derived from the notes." *Alvarez*, 679 F.3d at 595-96.

Drones, like smartphones and other portable recording devices, have become quintessential tools for documenting newsworthy events. *Glik*, 655 F.3d at 84 (noting "many of our images of current events" are recorded using a "cell phone or digital camera"); *see also, e.g.*, *Dyer v. Smith*, No. 3:19-CV-921, 2021 WL 694811, at *7 (E.D. Va. Feb. 23, 2021) ("Because a cell phone video captured George Floyd's death, the world watched."). "[T]o record is to see and hear more accurately." *Fields*, 862 F.3d at 359. Recording that "leads to citizen discourse on public issues" occupies "the highest rung of the hierarchy of First Amendment values." *Id.* Thus, as the district court rightly found, the "use of drones to document the news by journalists is protected expression" under the First Amendment. ROA.1236.

The Government does not dispute that "budgetary and other constraints may make drones the only option for recording certain events" and that "drones are central to [Plaintiffs'] journalistic pursuits." ROA.1235-36. Chapter 423 thus criminalizes a core newsgathering activity and restricts the "stock of information from which members of the public may draw." *Bellotti*, 435 U.S. at 783. For this reason, too, it is subject to heightened First Amendment scrutiny.

## B.    Chapter 423 Is Subject to Strict Scrutiny Because It Imposes Content- and Speaker-Based Restrictions

By allowing only favored categories of photographers to capture drone images of favored subjects and for favored purposes, Chapter 423 imposes content- and speaker-based restrictions on protected expression. A law is facially content based "if it targets speech based on its communicative content—that is, if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S.Ct. 1464, 1471 (2022) (cleaned up). Such a law "is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015) (internal citation omitted). In addition, "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994); *see also Citizens United v. FEC*, 558 U.S. 310, 340 (2010).

### 1.    *The Surveillance Provisions are facially content and speaker based because they disfavor certain subjects and certain photographers*

The Surveillance Provisions are content and speaker based on their face.

*First*, they are content based because they allow (certain) photographers to capture and publish photos of "public real property or a person on that property," but not photos that depict "an individual or privately owned real property." Gov't

§§423.002(a)(15); 423.003(a). Whether a photo triggers a criminal penalty thus "depend[s] entirely on the communicative content of the [image]." *Reed*, 576 U.S. at 164.

Ignoring the plain text, the Government claims the Surveillance Provisions are content neutral because they "do not single out any topic or subject matter for differential treatment" but merely "distinguish based on location." State Br. 34-35. That is wrong. The Surveillance Provisions do not regulate *where* an image is created, but *what* is in it—prohibiting a drone operator from taking "an image *of* an individual or privately owned real property," even when doing so from a public place. §423.003(a) (emphasis added). The provisions are like a sign ordinance that regulates the "substantive message" conveyed, *not* an "ordinary time, place, or manner" restriction that regulates a sign's physical "location." *Reagan Nat'l Advert.*, 142 S.Ct. at 1472-73. The provisions thus do not apply "evenhandedly" to all content but impose "an obvious subject-matter distinction" on speech. *Id.* at 1473-74.

*Second*, the Surveillance Provisions also discriminate based on the photographer's identity and the category of images created. They permit certain photographers, such as a "professor" at "an institution of higher education," to take pictures of certain subjects—namely, private property—for certain reasons, like "scholarly research." *See* §423.002(a)(1). Further confirming that its "speaker preference reflects a content preference," *Turner*, 512 U.S. at 658, the law exempts "real estate

broker[s]" who create photos for "marketing . . . of real property"—but not journalists or photojournalism. *See* §423.002(a). These are precisely the speaker-based distinctions the Supreme Court deemed impermissible in *Sorrell*, where a law allowed "journalists" and "researchers," but not "marketers," to use pharmaceutical data. *See* 564 U.S. at 563-64, 573 ("marketing" is "speech with a particular content").

The Surveillance Provisions do not become content neutral by permitting "any speaker" to take photos "below a certain height"—"eight feet," per §423.002(a)(14)—or with "the consent of the subject being photographed." State Br. 35. The law forces journalists to seek out countless landowners for permission that the law's preferred photographers—such as researchers and real estate marketers—need not obtain. *See* §423.002(a)(1), (6), (13). This discriminatory treatment demands strict scrutiny because "[l]awmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell*, 564 U.S. at 566.

2. ***The No-Fly Provisions are facially content and speaker based because they treat speech "for a commercial purpose" differently from noncommercial content and speakers***

The No-Fly Provisions, too, are facially content based. By allowing one to "operate[]"—take pictures with—a drone over certain facilities for a "commercial purpose" but not for a noncommercial one, *see* §§423.0045(b)(1), (c)(1)(E); 423.0046(c)(5), they target speech "communicating a message or ideas for noncommercial purposes." *Reagan Nat'l Advert.*, 142 S.Ct. at 1474 (quoting *Reed*, 576 U.S.

39

at 159); *see also City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993). Like the regulation in *Reed*, the No-Fly Provisions swap "an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *Reagan Nat'l Advert.*, 142 S.Ct. at 1474.

The No-Fly Provisions are also speaker based because they favor some drone photographers over others. For example, a "governmental" entity or contractor, and the "owner or operator" of a "critical infrastructure" facility, can use drones to record images for any purpose. §§423.0045(c)(1)(A-B), (c)(2)(A); 423.0046(c)(6). Photo-journalists cannot, if their purpose is viewed as "noncommercial."[19] As explained *supra*, p. 34, this discrimination is not coincidental, but aimed at suppressing disfavored speech about certain facilities. And it has had the intended impact. Wade was able to document construction of the publicly funded Globe Life Field for the marketing purposes of the Texas Rangers but prohibited under section 423.0046 from using the same drone to document construction of the same stadium for reporting purposes for his client, the *Fort Worth Star-Telegram*. ROA.689-91, 700 ("[W]e are not permitting any drone filming by individual media outlets.").

The Government cannot negate this facial content discrimination by contending that "the exception for flights made for 'commercial purpose[s]' is designed to

---

[19] It is unclear whether newsgathering and photojournalism are "commercial" or noncommercial purposes. *See infra*, pp. 59-60.

prevent conflict with federal law by incorporating FAA standards." State Br. 34 (alteration in original). The term "commercial" is not even used in the regulations the Government cites, *see* State Br. 45 (citing 14 C.F.R. §§107.1-.205), and in any event "an innocuous justification cannot transform a facially content-based law into one that is content neutral."[20] *Reed*, 576 U.S. at 166.

### 3. *Chapter 423 is independently subject to strict scrutiny because it substantially burdens newsgathering*

Chapter 423 is also subject to strict scrutiny because, as outlined *supra*, pp. 35-36, it substantially burdens the ability of journalists to gather the news. *See In re Express-News Corp.*, 695 F.2d at 810. Laws that directly inhibit newsgathering "must be . . . necessitated by a compelling governmental interest, and . . . narrowly tailored to serve that interest." *Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 607 (1982). This Court has twice vacated court orders that blocked journalists from gathering the news. *Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 928-29 (5th Cir. 1996); *In re Express-News Corp.*, 695 F.2d at 808-09. By banning a critical avenue of newsgathering, Chapter 423 threatens even more newsgathering than did the court orders at issue in *Express-News Corp.* and *Davis*.

---

[20] Defendants' suggestion to sever the commercial-purpose exemption, State Br. 45 n.18, might make the No-Fly Provisions content neutral, but such a revision of law would only exacerbate its overbreadth. The provisions would still "prohibit[] too much speech." *City of Ladue v. Gilleo*, 512 U.S. 43, 53 (1994).

**C.     Chapter 423 Fails Strict Scrutiny Because the Challenged Provisions Are Neither Necessary nor Narrowly Tailored**

Because Chapter 423 is a content-based restriction, it is presumptively unconstitutional. *Reed*, 576 U.S. at 163. The district court rightly found that Chapter 423 fails under strict scrutiny's "demanding standard," which requires speech and newsgathering restrictions to be "actually necessary" and narrowly tailored to advance a compelling state interest. *Brown*, 564 U.S. at 799.

To show a compelling state interest, the Government had to "specifically identify an 'actual problem' in need of solving" that makes the law "actually necessary" to achieve its interest, *id.*, and show "a direct causal link between the restriction imposed and the injury to be prevented," *United States v. Alvarez*, 567 U.S. 709, 725 (2012). The law must be "neither seriously underinclusive nor seriously overinclusive," *Brown*, 564 U.S. at 805, and must be "the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). The Government did not do so. ROA.1239-42.

*Surveillance Provisions.* Even accepting that the Government's asserted interests—protecting privacy, property, and safety—are "compelling," *see* State Br. 41, nothing in the record shows why Chapter 423's restrictions are "actually necessary" to protect those interests. The Government presented no evidence of any drone photographer violating pre-existing Texas laws against intrusion upon seclusion and

42

invasions of privacy before Chapter 423 was enacted. Although "a 10,000-page record [need not] be compiled in every case," the record here is devoid of *any* facts showing an "actual problem" that could justify the Surveillance Provisions' restrictions on First Amendment activities. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822 (2000).

In the absence of such a record, the Government suggests that drones present special "privacy concerns because they are difficult to detect," speculates that existing anti-voyeurism laws and common-law privacy torts are somehow "insufficient," and worries that existing trespass laws "may" not apply to drones. State Br. 42-43 & n.17. Such "anecdote and supposition" does not suffice. *Playboy*, 529 U.S. at 822.

Even had an actual problem been established, the Surveillance Provisions are not "the least restrictive means" to protect privacy and property. *Ashcroft*, 542 U.S. at 666. No evidence shows that Texas tried "seriously addressing the problem through alternatives" that do not target protected speech and newsgathering. *McCullen*, 573 U.S. at 497. In fact, the record shows that other laws are working just fine. In each of the five instances since September 2015 when the Texas Highway Patrol and Texas Department of Public Safety had to address potentially improper drone use, they relied on a criminal trespass statute, Texas Penal Code §30.05(a), or the Texas Transportation or Administrative Codes rather than Chapter 423 to address the concerning behavior. ROA.577-78, 591-92. And the State has not shown why

other privacy laws on the books are insufficient. ROA.1240; *see, e.g.*, Tex. Penal

Code §§21.16-.17 (proscribing invasive visual recording, unlawful disclosure or

promotion of intimate visual material, and voyeurism); *Valenzuela v. Aquino*, 853

S.W.2d 512, 513 (Tex. 1993) (intrusion upon seclusion).[21]

The provisions are also "seriously overinclusive" because they prohibit a vast

amount of photography—much of it related to newsgathering—that does not impli-

cate any privacy concern. *Brown*, 564 U.S. at 805. Although the Government ap-

pears to concede that its interest is limited to restricting photography "that under-

mines an expectation of privacy," State Br. 41, the Surveillance Provisions do far

more. Drone photography of "an individual or privately owned real property" visible

from a public street or adjacent building would not violate any reasonable expecta-

tion of privacy. *See, e.g.*, *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th

816, 826 (5th Cir. 2022) (finding that intrusion upon seclusion requires highly of-

fensive intrusion upon solitude or seclusion of another). Texas prohibited "nearly

all" drone photography without consent—including "recording that implicates *no*

privacy interests at all." *Alvarez*, 679 F.3d at 606. The First Amendment does not

---

[21] The Government misleadingly contends that "common-law invasion of privacy torts are narrower in Texas than similar laws in other States," State Br. 42 n.17, but only cites an irrelevant case on false light, which is not recognized in Texas because of its similarities to defamation. The Texas Supreme Court has not narrowed the torts of intrusion upon seclusion and public disclosure of private facts. *See, e.g.*, *Valenzuela*, 853 S.W.2d at 513; *Indus. Found. v. Tex. Indus. Accident Bd.*, 540 S.W.2d 668 (Tex. 1976).

permit such a "blunderbuss prohibitory approach." *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 839 (1st Cir. 2020) (holding that ban on nonconsensual recording was not tailored to "core set of situations" raising heightened privacy interests).

The provisions are overinclusive in protecting private property as well. As the district court noted, the law is violated "by documenting private real property or a person on that property," even if the drone is over *public* property. ROA.1241. Yet taking photos while hovering over public property poses *no* risk to others' property.[22]

The Surveillance Provisions are likewise "seriously underinclusive" because they exempt many categories of photography and photographers. *Brown*, 564 U.S. at 805. Under the law, "the same drone image taken legally by a professor would constitute a misdemeanor if captured by a journalist," yet the impact on privacy and property would be the same. ROA.1238. Such underinclusivity "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802. Moreover, the provisions do not prohibit people from capturing images of private property

---

[22] Although amicus curiae East Texas Ranch, L.P., argues that the decision below violates the Takings Clause, none of the parties have argued or briefed this issue, and it should be disregarded. *See United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020).

from helicopters or planes, *see* State Br. 43, and thus leave "appreciable damage to [the State's] supposedly vital interest unprohibited." *Reed*, 576 U.S. at 172.

The Government argues that the provisions are adequately tailored because they require an "intent to conduct surveillance on the individual or property captured in the image." §423.003(a); *see* State Br. 41. But "surveillance" is hopelessly vague, *see infra*, pp. 59-61, so the intent requirement does not narrow the statute. Instead, it chills journalists who are unsure whether their drone photography would be considered "surveillance." ROA.1245; *see* ROA.654-55, 669, 685. Nor does the Government's belated attempt to define "surveillance" tailor the law. If, as claimed, "the Surveillance Provisions only capture conduct that has long been the subject of state tort law," State Br. 41, then they are neither "actually necessary" to protect individual privacy, *Brown*, 564 U.S. at 799, nor "the least restrictive means among available, effective alternatives," *Ashcroft*, 542 U.S. at 666.

*No-Fly Provisions.* The Government likewise failed to show that the No-Fly Provisions are necessary to prevent a litany of hypothetical harms that might involve drones, State Br. 7-8, or that existing laws "fail to achieve the government's interests," *McCullen*, 573 U.S. at 495.

The Government argued, for example, that the No-Fly Provisions are needed to "protect against the risk that drones could be used to smuggle contraband or explosives into an empty stadium," State Br. 39, but cited nothing remotely similar

happening before Chapter 423's enactment. Similarly, the author of the bill's provision banning drone photography over feedlots was unable to point to a single "example of a specific threat or complaint about spreading diseases through drones," even as he cited such hypothetical "security risks" as justification for the measure. Andy Duehren, *New Texas Law Criminalizes Drone Use Near Animal Farms*, Texas Tribune (Sept. 28, 2017, 12:00 AM), https://www.texastribune.org/2017/09/28/new-law-criminalizes-drone-use-near-animal-farms/. "Mere speculation of harm does not constitute a compelling state interest" and cannot justify a law that burdens speech. *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 543 (1980).

Regardless, existing laws already protect against the imagined harms. It is a felony in Texas to damage, impair, or interrupt critical infrastructure facilities. Tex. Gov. Code §§424.051, .052. And "smuggling contraband" or "explosives," "facilitat[ing] an attack . . . [on] a mass gathering," or "attempt[ing] to assassinate" a public figure, State Br. 7-8, 39, are all already crimes, *see* Tex. Pen. Code §38.114; *id.* §§46.03, .05-.06; *id.* §§19.01-.03. The Government argues that these existing laws are insufficient because they only "help punish the conduct after the fact," State Br. 44, but Chapter 423 is no different. Moreover, it is not enough to show that the State's "chosen route is easier"—the Government must demonstrate that existing laws "fail to achieve the government's interests." *McCullen*, 573 U.S. at 495. Defendants have not done so, and they cannot.

The No-Fly Provisions are also both underinclusive and overinclusive. They are overinclusive because they prohibit all drone operations—and thus all drone photography—over the covered facilities, even when those operations would pose no safety risk. Ironically, the law's burden on newsgathering threatens to undermine public safety because the inability to use drones to report on infrastructure failures impedes public understanding of infrastructure problems. *See, e.g.*, ROA.655 (reporting on high hazard dam failure).

The No-Fly Provisions are underinclusive because they exempt drone operation for a "commercial purpose" even though such operations do not inherently pose any less risk than do noncommercial operations. The exemption thus "bears no relationship *whatsoever*" to Texas's purported interests. *Discovery Network*, 507 U.S. at 424. As the district court observed, these "interests were threatened no more when Wade was hired by the Texas Rangers to take drone images of their new baseball stadium for commercial purposes than when he tried to do the same thing for journalism purposes." ROA.1242.

The Government finally argues that the No-Fly Provisions cannot be underinclusive because they merely incorporate the FAA's distinction between commercial

and noncommercial drone use. State Br. 44-45. But, again, the FAA drone regulations never mention "commercial" operations. *See* 14 C.F.R. §§107.1-.205.[23] In any event, narrow tailoring requires the No-Fly Provisions to align with the State's asserted interests—not with federal regulations or interests. Without this necessary tailoring, the law fails strict scrutiny.

## D.     Chapter 423 Also Fails Intermediate Scrutiny

The Government argues that Chapter 423 is subject, at most, to intermediate scrutiny, either as a regulation of conduct or as a regulation of a nonpublic forum. State Br. 30 & n.11, 36. Even if Chapter 423 did not trigger strict scrutiny, it cannot survive any of the established constitutional standards the Government asks this Court to apply.

### 1.     *Chapter 423 is not a narrowly tailored time, place, or manner restriction*

Time, place, or manner restrictions on speech survive intermediate scrutiny only if they are "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." State Br. 30 n.11 (quoting *McCullen*, 573 U.S. at 477).[24] Chapter 423 does neither.

---

[23] The State cites to two FAA webpages, State Br. 47, but neither has legal force—and neither is incorporated into Chapter 423.

[24] Although *McCullen* involved a public forum, the standard it announced is not limited to government fora. *See, e.g.*, *Reagan Nat'l Advert.*, 142 S.Ct. at 1473; *Gilleo*, 512 U.S. at 56.

To meet this bar, the Government must identify "real" harms that Chapter 423 will alleviate "in a direct and material way," *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1235 (10th Cir. 2021), and show, with "actual evidence," that it "seriously undertook to address [a] problem with less intrusive tools," *McCullen,* 573 U.S. at 494; *Billups v. City of Charleston*, 961 F.3d 673, 688 (4th Cir. 2020). It made no such showing.

As discussed *supra*, pp. 42-49, the Government has not shown that restricting speech and newsgathering is necessary to alleviate "any real, non-speculative harms." *Brewer*, 18 F.4th at 1226. Chapter 423 is not a valid prophylactic measure, even though drones are allegedly hard to detect, because Texas "has available to it a variety of approaches that appear capable of serving its interests" without hindering journalists' First Amendment rights, *McCullen*, 573 U.S. at 494, 496. The record contains no "actual evidence" that Texas "tried or considered less-speech-restrictive alternatives" and found them inadequate. *Billups*, 961 F.3d at 688.

Further, Chapter 423 does not leave open "ample alternative channels" for aerial photography and newsgathering. *McCullen*, 573 U.S. at 477. The district court found that "drones are central to [the Journalists'] journalistic pursuits" and that the Government "cannot dispute the extreme price and safety differences between" hel-

icopters and drones. ROA.1236. "It is uncontested that budgetary and other constraints may make drones the only option for recording certain events." ROA.1235. Thus, Chapter 423 fails intermediate scrutiny.

### 2. *Chapter 423 fails the* O'Brien *test by significantly burdening protected speech and newsgathering*

*O'Brien* is not the correct standard for reviewing a content-based regulation of speech. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010). But even under *O'Brien*, a regulation is only justified if it "furthers an important or substantial governmental interest; . . . is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968); *Holder*, 561 U.S. at 26-27. Chapter 423 fails each prong:

a. Chapter 423 does not further the Government's asserted privacy, property, and safety interests because those interests are already protected by existing law. *See supra*, pp. 43-44, 47. If there were a truly unmet need, which the Government failed to establish, the law would be woefully underinclusive in addressing it. *See id.*

b. Texas's purported interests are not "unrelated to the suppression of free expression." *O'Brien*, 391 U.S. at 377. The Government admits that the Surveillance Provisions are intended to prevent individuals from "captur[ing] images." State Br. 41. The interest of the No-Fly Provisions is likewise to prevent use of

drones, whose primary purpose is to capture images. *See supra*, pp. 32-33. Thus, protected expression is integral to the conduct the provision restricts. Chapter 423's distinctions between the content, purposes, and creators of drone images only bolster this conclusion.

c. Chapter 423 burdens "substantially more speech than is necessary" to protect privacy or safety. *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 641 (5th Cir. 2012). As explained *supra*, pp. 43-44, 47, other privacy, trespass, and safety laws offer "less restrictive alternative[s] that would similarly advance Texas's interest[s]." *NetChoice, LLC v. Paxton*, 49 F.4th 439, 484 (5th Cir. 2022). Further, these claimed interests "bear[] no relationship to the problematic exclusions [of content and speakers] at issue here." *Time Warner*, 667 F.3d at 641. This "lack of 'fit'" between the law's exemptions and the State's interests confirm that Chapter 423 fails under *O'Brien. Id.* at 642.

Although the Government claims photographers can simply gain "the consent of the subject of plaintiffs' photographs," they admit that a subject's ability to withhold consent "may implicate the First Amendment." State Br. 39. Thus, Chapter 423's burden on speech is plainly "greater than is essential," especially where a subject has no heightened privacy interest. *O'Brien*, 391 U.S. at 377. Further, most drone images include multiple individual properties, and it is often impossible for a

journalist to obtain consent from all of them. ROA.653, 662, 671; *see also supra*, pp. 14-15.

### 3. *Chapter 423 is not subject to a reasonableness review because it is not limited to speech in a nonpublic forum*

Because Chapter 423 fails both strict and intermediate scrutiny, the Government tries to shift the goalposts. It asks the Court to adopt the deferential scrutiny reserved for speech restrictions within nonpublic fora. *See* State Br. 32, 36. In a nonpublic forum, a speech restriction need only be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). But Chapter 423 is not limited to speech on government property, making that test wholly inapplicable.

The Supreme Court has repeatedly explained that forum analysis applies to *government* property. *See, e.g.*, *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678 (1992). A "nonpublic forum" does not refer to *private* property but rather to *government* property that the government has not "opened for use by the public as a place for expressive activity." *Perry*, 460 U.S. at 45, 49.

The Government wrongly tries to extend the reasonableness standard to "time, place, and manner restrictions that apply to *private property*." State Br. 36 (emphasis added). As explained *supra*, p. 49 n.24, such laws are subject to the same level of heightened scrutiny as time, place, or manner restrictions on public fora. And even

if the nonpublic forum test somehow applied, Chapter 423 would fail it because the law is both viewpoint based and unreasonable in light of the alleged forum's purpose. *See Perry*, 460 U.S. at 46. Chapter 423 requires disfavored drone photographers to gain consent of the owner or operator of the property in their images. *See* §§423.002(a)(6), .0045(c)(2)(C). This impermissibly prohibits speech with which property owners and infrastructure operators disagree. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 80 (1983) (Rehnquist, J., concurring) ("First Amendment freedoms would be of little value if speakers had to obtain permission of their audiences before advancing particular viewpoints."); *cf. Sorrell*, 564 U.S. at 574. Chapter 423 is unreasonable because, as explained *supra*, pp. 45, 48, there is no privacy, property, or safety basis for distinguishing journalists from researchers or real estate marketers, and commercial from noncommercial photography.

In sum, Chapter 423 fails any level of First Amendment scrutiny. Though the district court properly applied strict scrutiny, ROA.1238, the outcome would be no different under any of the tests that the Government places before the Court.

### E.     Chapter 423 Is Unconstitutionally Overbroad

The district court was also correct in finding Chapter 423 overbroad because "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442,

449 n.6 (2008)); *see* ROA.1241. The overbreadth doctrine is well established in Supreme Court jurisprudence and in this Circuit. *See, e.g.*, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002); *United States v. Wallington,* 889 F.2d 573, 576 (5th Cir. 1989). Chapter 423 violates it.

### 1. *Chapter 423 covers a vast amount of speech*

The first step in an overbreadth analysis "is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Stevens*, 559 U.S. at 474.

The Surveillance Provisions broadly criminalize drone photography of private property—which covers over 95% of the state, ROA.1241—and individuals on such property "with the intent to conduct surveillance on the individual or property captured in the image," §423.003, subject to certain content-based exceptions, §423.002. They bar journalists, but also environmental organizations, from using drone photography to document runoff from a factory into a local river, or visual artists from capturing aerial images of skylines. The Surveillance Provisions cover drone photography in myriad locations where individuals have no reasonable expectation of privacy, such as when visible from a public street, or when showing nothing more than what is visible on satellite images of cities and towns.

The No-Fly Provisions likewise prohibit all drone photography over "critical infrastructure"—broadly defined—unless for an ambiguous "commercial purpose."

§§423.0045, .0046. They forbid flying and recording over packed stadiums on game day, but also over an empty stadium in the middle of the week. They bar drone photography over correctional facilities, power plants, manufacturing facilities, water treatment plants, dams, ports, and concentrated animal feeding operations, among other places—even if the captured photograph is of something other than the critical infrastructure. *Id.*; ROA.533, 655.

> ### 2.  *Chapter 423's unconstitutional applications dwarf its constitutional ones*

Having established the reach of the statute, the Court must then weigh its "constitutional and unconstitutional applications." *Seals v. McBee*, 898 F.3d 587, 597 (5th Cir. 2018). A "statute's plainly legitimate sweep," *Stevens*, 559 U.S. at 473, cannot be assumed: it must be proven. In *Americans for Prosperity Foundation v. Bonta*, for example, the Supreme Court had "no trouble" concluding that a requirement that charitable organizations disclose the identities of their major donors was facially overbroad. 141 S.Ct. 2373, 2387 (2021). Because "[t]he lack of tailoring to the State's investigative goals is categorical—present in every case—as is the weakness of the State's interest in administrative convenience," the Court found that "[e]very demand that might chill association therefore fails exacting scrutiny." *Id.* This Court has done the same. *See Seals*, 898 F.3d at 590 (invalidating law that criminalized "use of violence, force, or threats" to influence public officer's conduct

because "threat" was "broad enough to sweep in threats to take lawful, peaceful actions").

Chapter 423's criminal sweep is far from limited to drone photography that invades privacy or harms property. Any need for such constitutional applications of the Surveillance Provisions—for example, where photographing invaded someone's reasonable expectation of privacy—is minuscule compared to the law's sweep and could easily be addressed with a more narrowly tailored statute. Neither does the provisions' intent requirement narrow their reach to unprotected speech, because "surveillance" is undefined and vague. *Infra*, pp. 59-61.

The No-Fly Provisions are the same. Because nearly all drones are equipped with cameras, most such flights are undertaken for photography whose criminal prohibition the State cannot justify. As the district court found, the provisions proscribe drone flight even when it "indisputably do[es] not pose the risks that the State claims." ROA.1241. The instances in which the No-Fly Provisions can be constitutionally applied are vanishingly rare.

The law's overbreadth, and thus its chill, is especially acute because neither the Surveillance nor the No-Fly Provisions include a carveout for speech about matters of public concern—a threat that overbreadth doctrine is intended to address. *See Thornhill v. Alabama*, 310 U.S. 88, 97 (1940). The record shows that Chapter 423

has chilled broad swaths of speech and newsgathering. *See* ROA.672-73, 686-87, 689-92.

## IV.    CHAPTER 423 IS UNCONSTITUTIONALLY VAGUE

Both the Surveillance and No-Fly Provisions are unconstitutionally vague. As the district court correctly determined, they fail to provide reasonable notice of what constitutes impermissible "surveillance" under the Surveillance Provisions or permitted "commercial" use under the No-Fly Provisions. ROA.1243-47; *see* Gov't §§423.003, .0045, .0046.

Due process entitles parties to "fair notice of conduct that is forbidden." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). But the test for vagueness is "more stringent" where, as here, a statute "threatens to inhibit the exercise of" First Amendment rights. *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008); *see also SEIU, Local 5 v. City of Houst.*, 595 F.3d 588, 596 (5th Cir. 2010) ("Because the First Amendment needs 'breathing space,' government regulation must be drawn with some specificity."). A statute is unconstitutionally vague if it "(1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Women's Med. Ctr. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001). Chapter 423 is both.

Texas criminalizes capturing drone images with an "intent to conduct surveillance." Gov't §423.003(a). The statute does not define that term, and the Government is no help—refusing to provide a clear definition or to indicate whether it applies to journalism. ROA.1244-45. Dictionary definitions differ and can be read to include routine newsgathering activities. Surveillance can involve "[c]lose observation or listening of a person or place in the hope of gathering evidence." *Surveillance*, Black's Law Dictionary (11th ed. 2019). Or it might broadly be the simple "act of observing or the condition of being observed." *Surveillance*, American Heritage Dictionary (2022), https://www.ahdictionary.com/word/search.html?q=surveillance (last visited Nov. 14, 2022). Either of these definitions could be construed to include journalism. In Senate committee testimony, a task force including the Texas Department of Public Safety confirmed the ambiguity, offering that "it can be argued that anything not specifically listed" in the exemptions provided in section 423.002, such as journalism, "would be conducting surveillance in violation of 423.003." ROA.616.

Similarly, the No-Fly Provisions exempt drone operation for a "commercial purpose" but do not define "commercial." §§423.0045(c)(1)(E), .0046(c)(5). Dictionary definitions also fail to provide sufficient guidance. "Commercial" might refer merely to the "buying and selling of goods," *Commercial*, Black's Law Diction-

ary (11th ed. 2019), or it might refer to any moneymaking enterprise, *see, e.g.*, *Commercial*, Macmillan Dictionary, https://www.macmillandictionary.com/us/dictionary/american/commercial_1 (last visited Nov. 12, 2022). The former would likely exclude newsgathering from the commercial exemption, but the latter may include it. Moreover, within the industry, photojournalism is expressly excluded from "commercial" photography and is instead considered "editorial" photography. ROA.676, 685. There is no common understanding of "commercial purpose" that divides the prohibited from the permitted drone operation.

The Government argues that the provisions cannot be unconstitutionally vague because "surveillance" and "commercial" are "common terms." State Br. 46. But it also consistently declines to provide an affirmative definition, or to take a position on whether "surveillance" or "commercial purposes" encompass drone photojournalism. ROA.580-81, 594-95, 607-08.

The Government makes the conclusory assertion on this appeal that "surveillance" "definitionally contemplates clandestine behavior," but that definition still fails to inform regulated parties "what conduct is prohibited." State Br. 46 (quoting *Bell*, 248 F.3d at 421). As the district court explained, the Government's various

vague answers "only highlight[] the vagueness in the word's meaning, for it in no way clarifies whether journalism is covered." ROA.1244.[25]

Nor does the law's intent requirement clarify the meaning of "surveillance." *See* State Br. 46. As the district court recognized, if Plaintiffs and other journalists cannot know whether their *intended* behavior constitutes "surveillance" under the statute, an exception for unintentional or inadvertent behavior does nothing to "save a fatally vague statutory term." ROA.1245.

The Government's attempt to clarify the meaning of "commercial purpose" by pointing to FAA regulations is also unavailing. The No-Fly Provisions mention FAA rules, but not in a way that helps the Government. The provisions exempt "commercial purpose" operators, but only if they are also operating in compliance with FAA rules. *See* §§423.0045(c)(1)(E), .0046(c)(5). The requirement of FAA compliance is separate from the requirement that operators fly with a "commercial purpose," and it does not clarify what "commercial purpose" Chapter 423 requires. And as noted, the FAA provisions cited by the Government do not use the term "commercial," much less define it. 14 C.F.R. §§107.1-.205.

At bottom, Defendants cannot say whether drone journalism constitutes "surveillance" or is for a "commercial purpose" even though they are responsible for

---

[25] The State Defendants also seem to suggest that drone flights are, by their nature, necessarily clandestine. *See* State Br. 5. If this were so, it is doubly unclear what special import "surveillance" is meant to carry.

enforcing Chapter 423's criminal penalties. ROA.580-81, 594-95, 607-08. The terms are not merely "imprecise." *Smith v. Goguen*, 415 U.S. 566, 578 (1974). Rather, they are "so vague that persons 'of common intelligence must necessarily guess at [their] meaning and differ as to [their] application.'" *Bell*, 248 F.3d at 421 (quoting *Goguen*, 415 U.S. at 572 n.8) (alterations in original).

The evidence is "uncontroverted" that this lack of clarity in what Chapter 423 prohibits has chilled the Journalists' speech and newsgathering activities. ROA.1245. This chill precisely illustrates how vague statutes "threaten to inhibit" First Amendment activity. *Roark & Hardee*, 522 F.3d at 552. As Wade explained, "surveillance" could be construed "broad[ly] enough to include [his] work as a journalist." ROA.685. Pappalardo likewise had "not flown [his] drone to report any stories in Texas, including many that would have carried great urgency or public importance." ROA.671. Calzada, moreover, believes he could be subjected to liability under the No-Fly Provisions for covering infrastructure and sports facility stories based on the photography industry's use of the term "commercial" and the statute's failure to clarify its meaning. ROA.654-55.

This uncertainty threatens "arbitrary and discriminatory enforcement" by vesting unfettered discretion in law enforcement officers to determine when and how the statute applies to their activities. *Bell*, 248 F.3d at 421; *see also Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (noting that vagueness can vest indefinite discretion

in law enforcement). The Government's persistent refusal to take a position on whether the challenged provisions encompass photojournalism "lends credence to Plaintiffs' fears of arbitrary enforcement." ROA.1247.

## V.    THE NO-FLY PROVISIONS ARE PREEMPTED BY FEDERAL LAW

The No-Fly Provisions are preempted by federal aviation law both because Congress occupies the field of state aviation safety regulations and because they impede the objectives of federal aviation safety law.

Federal law impliedly preempts state law through the doctrines of field preemption and obstacle preemption. *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 384 (5th Cir. 2004). Field preemption exists where a scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, or where an Act of Congress touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (cleaned up). Obstacle preemption invalidates state laws that "interfere[] with the achievement of federal objectives." *Witty*, 366 F.3d at 384. The No-Fly Provisions are preempted under both doctrines.

### A.    Field Preemption Preempts the No-Fly Provisions

The federal air safety regulatory scheme is so pervasive, and the federal interest in uniform aviation safety regulations so dominant, that it preempts the field. The

Federal Aviation Act "was enacted to create a uniform and exclusive system of federal regulation in the field of air safety. It was passed by Congress for the purpose of centralizing in a single authority the power to frame rules for the safe and efficient use of the nation's airspace." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 74 (2d Cir. 2019) (cleaned up). The Act grants to the federal government "exclusive sovereignty of airspace of the United States." 49 U.S.C. §40103(a)(1). It vests the Federal Aviation Administration (FAA) with the authority to regulate aviation safety, "develop plans and policy for the use of the navigable airspace," and "establish security provisions that will encourage and allow maximum use of the navigable airspace by civil aircraft." 49 U.S.C. §40103(b). Under this authority, the FAA has enacted comprehensive regulations that "prescribe[] rules governing the operation of aircraft within the United States." 14 C.F.R. §91.1. *See generally* 14 C.F.R. §§91-107.

This pervasive scheme of federal regulation has led six Circuit Courts to conclude that the Federal Aviation Act preempts the entire field of aviation safety regulation. *See Tweed-New Haven*, 930 F.3d at 74; *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1326 (10th Cir. 2010); *Montalvo v. Spirit Airlines*, 508 F.3d 464, 473 (9th Cir. 2007); *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 795 (6th Cir. 2005); *Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 371 (3d Cir. 1999); *French v. Pan Am Express, Inc.*, 869 F.2d 1, 5 (1st Cir. 1989). And courts have done so in

the context of preempting state laws intended to protect people on the ground from low-flying aircraft—not unlike the purported purpose of the No-Fly Provisions here. *See Allegheny Airlines v. Vil. of Cedarhurst*, 238 F.2d 812 (2d Cir. 1956) (height of flights over villages); *Int'l Aerobatics Club Chapter 1 v. City of Morris*, 76 F.Supp.3d 767 (N.D. Ill. 2014) (regulation of aerobatic activities, even where regulation was identical to federal regulations); State Br. 12 (No-Fly Provisions for "public safety").

Both the Fifth Circuit and the Supreme Court have held that federal law requires "a uniform and exclusive system of federal regulation" to achieve the "delicate balance between safety and efficiency, and the protection of persons on the ground," contemplated by the Act. *Witty*, 366 F.3d at 385 (quoting *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 638-39 (1973)).

Federal drone safety regulations are part of this pervasive scheme of federal regulation. These federal regulations squarely govern where drones can safely fly without threatening public safety or infrastructure. Congress directed the Secretary of Transportation to "develop a *comprehensive* plan to safely accelerate the integration of civil unmanned aircraft systems into the national airspace system," 49 U.S.C. §44802(a)(1) (emphasis added), and empowered the Secretary to promulgate rules on such systems, *id.* §44802(b). This includes the authority to "define the acceptable standards for operation . . . of civil unmanned aircraft systems." *Id.*

§44802(a)(2)(A)(i). The FAA has used this authority to issue regulations that dictate operating rules, pilot qualifications, and pilot certifications for UAVs. *See* 14 C.F.R. §§107.11-.51, 107.53-.79.

Importantly, FAA regulations directly address UAV flight in airspace where drones could pose a threat to public safety and infrastructure. FAA regulations restrict flight near aircraft, *id*. §107.37, over people, *id.* §107.39, in controlled airspace, *id.* §107.41, near airports, *id.* §107.43, in prohibited or restricted areas, *id.* §107.45, and near areas designated by a notice to airmen, *id.* §107.47. Under these regulations, the FAA restricts flights over natural disaster areas, 14 C.F.R. §§91.137-138, public figures such as the president, *id*. §91.141, sporting events, *id*. §91.145, and other temporary restrictions as needed, *id.* §91.137. *See also, e.g.*, Fed. Aviation Admin., NOTAM No. 0/0367 (2020) (temporary flight restrictions during sporting events). Those restrictions provide an exemption for journalists to fly when the aircraft is carrying or flown by "properly accredited news representatives," 14 C.F.R. §91.137(c)(5), or by a waiver for, among other things, "Media Coverage Providing Crucial Information to the Public."[26]

The No-Fly Provisions' prohibition on flight less than 400 feet over critical infrastructure facilities and sports venues is preempted because it aims to address the

---

[26] *Emergency Situations*, Fed. Aviation Admin. (June 3, 2022), https://www.faa.gov/uas/advanced_operations/emergency_situations; *see* FAA Order No. JO 7210.3CC §21-5-4 (Sept. 6, 2021).

same issue that the federal air safety laws already exclusively govern. Gov't §§423.0045(b)(1), .0046(b). As the Government concedes, Texas's purposes in enacting the statute included safety and security. State Br. 12. But the FAA has already regulated where drones can safely and securely fly. *See* 14 C.F.R. §§91.137-145, 99.7, 107.37-47. By seeking to further restrict where drone pilots may fly, Texas attempts to second-guess federal law's exclusive judgment about the "balance between safety and efficiency, and the protection of persons on the ground." *Lockheed Air Terminal*, 411 U.S. at 638-39 (citations omitted).

Local authorities are not constrained by preemption doctrine from adopting privacy laws. But the No-Fly Provisions go further. They are "[o]perational UAS restrictions on flight altitude [or] flight paths . . . [and] regulation[s] of the navigable airspace," which the FAA recognizes are particularly likely to be preempted.[27] They restrict flights over areas where there is no reasonable expectation of privacy, such as sports venues with a capacity of over 30,000 people, publicly owned or funded infrastructure and facilities, industrial facilities, dams, and concentrated animal feeding operations. Gov't §§423.0045(a), .0046(a).

---

[27] *See* Office of the Chief Counsel, Fed. Aviation Admin., *State and Local Regulation of Unmanned Aircraft Systems (UAS): Fact Sheet* 3 (Dec. 17, 2015), https://www.faa.gov/uas/public_safety_gov/public_safety_toolkit/media/UAS_Fact_Sheet_Final.pdf.

### B.    The No-Fly Provisions Pose an Obstacle to Federal Objectives

The No-Fly Provisions are also preempted for interfering with the achieve-

ment of two principal federal objectives underlying the Federal Aviation Act: na-

tional uniformity of air safety regulations and safely integrating drone use into the

national airspace. First, "a uniform and exclusive system of federal regulation" is

necessary to fulfill "the congressional objectives [of safety and efficiency] underly-

ing the Federal Aviation Act." *Lockheed Air Terminal*, 411 U.S. at 639; *accord*

*Witty*, 366 F.3d at 385. And Congress made clear that drones are part of this uniform

and exclusive system when it directed the Secretary of Transportation to plan for the

"integration of civil unmanned aircraft systems *into the national airspace system*."

49 U.S.C. §44802(a)(1) (emphasis added). Allowing states to impose their own reg-

ulations necessarily impedes this uniformity and exclusivity. The FAA has explained

that "[s]ubstantial air safety issues are raised when state or local governments at-

tempt to regulate the operation or flight of aircraft" such as UAVs. Fed. Aviation

Admin., *supra*, n.29, at 2. If various states and municipalities each enacted their own

drone-flight laws, this "'patchwork quilt' of differing restrictions could severely

limit the flexibility of FAA in controlling the airspace and flight patterns, and ensur-

ing safety and an efficient air traffic flow. A navigable airspace free from incon-

sistent state and local restrictions is essential to the maintenance of a safe and sound

air transportation system." *Id.*[28]

Given this backdrop, the only other two district courts to have considered the

question of whether local drone-flight prohibitions are obstacle preempted have held

that they are. *Singer v. City of Newton*, 284 F.Supp.3d 125, 132 (D. Mass. 2017)

(statute requiring property owner consent for flights under 400 feet was effective

ban on drone flights and was preempted); *Xizmo Media Prods. LLC v. City of New

York*, No. 21-CV-2160, slip op. at 13 (E.D.N.Y Aug. 29, 2022)[29] (plaintiff plausibly

pleaded that statute limiting drone take-off and landing sites greatly restricted drone

use and was preempted). Both cases reasoned that the federal scheme requires the

integration of drones into the airspace; local ordinances that prohibit drone flights,

full stop, interfere with that federal scheme and purpose.

---

[28] Operation and Certification of Small Unmanned Aircraft Systems, 81 Fed. Reg. 42063, 42093 (June 28, 2016) (because of altitude and other limits, drones "will avoid busy flight paths and are unlikely to encounter high-speed aircraft that would be difficult for the remote pilot to see-and-avoid"). This safety motivation and conflict is further outlined in the drone industry amicus brief at ROA.283-85. *See also Where the Drones Are*, Aviation Safety (Oct. 29, 2019), https://www.aviationsafetymagazine.com/features/where-the-drones-are/ (advising general aviation pilots to adhere to 14 C.F.R. §91.119's altitude requirements to avoid the "drone zone").

[29] https://storage.courtlistener.com/recap/gov.uscourts.nyed.462956/gov.uscourts.nyed.462956.24.0.pdf.

As was the case in *Singer*, the No-Fly Provisions here restrict drone flights full stop in certain locations, interfering with the federal goal of integrating drones into the national airspace and maintaining uniformity regarding their use. The No-Fly Provisions prohibit flights under 400 feet over certain facilities, while the FAA requires drone flights to remain under 400 feet, effectively prohibiting all drone flights where the No-Fly Provisions apply. *Compare* Gov't §§423.0045(b)(1), .0046(b), *with* 14 C.F.R. §107.51(b). Indeed, even if, as in *Xizmo*, the Plaintiffs here were to obtain a waiver from the FAA to fly drones over a sporting venue or other critical infrastructure, they would still be prohibited from doing so under Texas law. *See* ROA.654. Such a conflict cannot stand.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's summary judgment order on the Journalists' First Amendment claims, reverse the district court's order dismissing the Journalists' preemption claim, and render a favorable judgment on preemption.

Dated: November 16, 2022

Respectfully Submitted,

*/s/ James A. Hemphill*

Leah M. Nicholls
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
lnicholls@publicjustice.net

James A. Hemphill
GRAVES DOUGHERTY HEARON &
  MOODY, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
(512) 480-5762
jhemphill@gdhm.com

Mickey H. Osterreicher
General Counsel
NATIONAL PRESS PHOTOGRAPHERS
  ASSOCIATION
FINNERTY OSTERREICHER & ABDULLA
70 Niagara Street, Buffalo, NY 14202
(716) 983-7800
lawyer@nppa.org

Alicia Wagner Calzada
Deputy General Counsel
NATIONAL PRESS PHOTOGRAPHERS
  ASSOCIATION
ALICIA WAGNER CALZADA, PLLC
12023 Radium Street, Suite B1
San Antonio, TX 78216
(210) 825-1449
alicia@calzadalegal.com

David A. Schulz
Kelsey Eberly (*Admission Pending*)
MEDIA FREEDOM &
  INFORMATION ACCESS CLINIC[30]
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06520
(203) 436-5824
david.schulz@yale.edu
kelsey.eberly@yale.edu

*Counsel for Plaintiffs-Appel-
  lees/Cross-Appellants*

---

[30] This brief has been prepared in part by law students Raquel Leslie, Tim Tai, and Hannah Vester, in a clinic at Yale Law School, but does not purport to represent the institutional views of Yale Law School, if any.

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P.

28.1(e)(2)(B)(i) because it contains 15,138 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. 32(a)(5)

and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been

prepared in a proportionally spaced typeface using Microsoft Word in 14-

point Times New Roman.

*/s/ James A. Hemphill*

James A. Hemphill
*Attorney for Plaintiffs-Appellees/Cross-
Appellants*

Date: November 16, 2022

**CERTIFICATE OF SERVICE**

On November 16, 2022, this document was served via CM/ECF on all regis-
tered counsel and transmitted to the Clerk of the Court.


*/s/ James A. Hemphill*
James A. Hemphill

# **ADDENDUM**

The challenged "surveillance" and "no fly" provisions of Chapter 423,

Texas Government Code

---

Vernon's Texas Statutes and Codes Annotated
   Government Code (Refs & Annos)
      Title 4. Executive Branch (Refs & Annos)
         Subtitle B. Law Enforcement and Public Protection
            Chapter 423. Use of Unmanned Aircraft

V.T.C.A., Government Code § 423.001

## § 423.001. Definition

Effective: September 1, 2013
Currentness

In this chapter, "image" means any capturing of sound waves, thermal, infrared, ultraviolet, visible light, or other electromagnetic waves, odor, or other conditions existing on or about real property in this state or an individual located on that property.

**Credits**

Added by Acts 2013, 83rd Leg., ch. 1390 (H.B. 912), § 2, eff. Sept. 1, 2013.

V. T. C. A., Government Code § 423.001, TX GOVT § 423.001

Current through legislation effective June 4, 2021, of the 2021 Regular Session of the 87th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

| Vernon's Texas Statutes and Codes Annotated |
| --- |
| Government Code (Refs & Annos) |
| Title 4. Executive Branch (Refs & Annos) |
| Subtitle B. Law Enforcement and Public Protection |
| Chapter 423. Use of Unmanned Aircraft |

V.T.C.A., Government Code § 423.002

§ 423.002. Nonapplicability

Effective: September 1, 2017
Currentness

(a) It is lawful to capture an image using an unmanned aircraft in this state:

(1) for the purpose of professional or scholarly research and development or for another academic purpose by a person acting on behalf of an institution of higher education or a private or independent institution of higher education, as those terms are defined by Section 61.003, Education Code, including a person who:

(A) is a professor, employee, or student of the institution; or

(B) is under contract with or otherwise acting under the direction or on behalf of the institution;

(2) in airspace designated as a test site or range authorized by the Federal Aviation Administration for the purpose of integrating unmanned aircraft systems into the national airspace;

(3) as part of an operation, exercise, or mission of any branch of the United States military;

(4) if the image is captured by a satellite for the purposes of mapping;

(5) if the image is captured by or for an electric or natural gas utility or a telecommunications provider:

(A) for operations and maintenance of utility or telecommunications facilities for the purpose of maintaining utility or telecommunications system reliability and integrity;

(B) for inspecting utility or telecommunications facilities to determine repair, maintenance, or replacement needs during and after construction of such facilities;

(C) for assessing vegetation growth for the purpose of maintaining clearances on utility or telecommunications easements; and

(D) for utility or telecommunications facility routing and siting for the purpose of providing utility or telecommunications service;

(6) with the consent of the individual who owns or lawfully occupies the real property captured in the image;

(7) pursuant to a valid search or arrest warrant;

(8) if the image is captured by a law enforcement authority or a person who is under contract with or otherwise acting under the direction or on behalf of a law enforcement authority:

(A) in immediate pursuit of a person law enforcement officers have reasonable suspicion or probable cause to suspect has committed an offense, not including misdemeanors or offenses punishable by a fine only;

(B) for the purpose of documenting a crime scene where an offense, not including misdemeanors or offenses punishable by a fine only, has been committed;

(C) for the purpose of investigating the scene of:

(i) a human fatality;

(ii) a motor vehicle accident causing death or serious bodily injury to a person; or

(iii) any motor vehicle accident on a state highway or federal interstate or highway;

(D) in connection with the search for a missing person;

(E) for the purpose of conducting a high-risk tactical operation that poses a threat to human life;

(F) of private property that is generally open to the public where the property owner consents to law enforcement public safety responsibilities; or

(G) of real property or a person on real property that is within 25 miles of the United States border for the sole purpose of ensuring border security;

(9) if the image is captured by state or local law enforcement authorities, or a person who is under contract with or otherwise acting under the direction or on behalf of state authorities, for the purpose of:

(A) surveying the scene of a catastrophe or other damage to determine whether a state of emergency should be declared;

(B) preserving public safety, protecting property, or surveying damage or contamination during a lawfully declared state of emergency; or

(C) conducting routine air quality sampling and monitoring, as provided by state or local law;

(10) at the scene of a spill, or a suspected spill, of hazardous materials;

(11) for the purpose of fire suppression;

(12) for the purpose of rescuing a person whose life or well-being is in imminent danger;

(13) if the image is captured by a Texas licensed real estate broker in connection with the marketing, sale, or financing of real property, provided that no individual is identifiable in the image;

(14) from a height no more than eight feet above ground level in a public place, if the image was captured without using any electronic, mechanical, or other means to amplify the image beyond normal human perception;

(15) of public real property or a person on that property;

(16) if the image is captured by the owner or operator of an oil, gas, water, or other pipeline for the purpose of inspecting, maintaining, or repairing pipelines or other related facilities, and is captured without the intent to conduct surveillance on an individual or real property located in this state;

(17) in connection with oil pipeline safety and rig protection;

(18) in connection with port authority surveillance and security;

(19) if the image is captured by a registered professional land surveyor in connection with the practice of professional surveying, as those terms are defined by Section 1071.002, Occupations Code, provided that no individual is identifiable in the image;

(20) if the image is captured by a professional engineer licensed under Subchapter G, Chapter 1001, Occupations Code[1], in connection with the practice of engineering, as defined by Section 1001.003, Occupations Code, provided that no individual is identifiable in the image; or

(21) if:

(A) the image is captured by an employee of an insurance company or of an affiliate of the company in connection with the underwriting of an insurance policy, or the rating or adjusting of an insurance claim, regarding real property or a structure on real property; and

(B) the operator of the unmanned aircraft is authorized by the Federal Aviation Administration to conduct operations within the airspace from which the image is captured.

(b) This chapter does not apply to the manufacture, assembly, distribution, or sale of an unmanned aircraft.

**Credits**

Added by Acts 2013, 83rd Leg., ch. 1390 (H.B. 912), § 2, eff. Sept. 1, 2013. Amended by Acts 2015, 84th Leg., ch. 360 (H.B. 2167), § 1, eff. Sept. 1, 2015; Acts 2017, 85th Leg., ch. 583 (S.B. 840), § 1, eff. Sept. 1, 2017.

Footnotes

1        V.T.C.A., Occupations Code § 1001.301 et seq.

V. T. C. A., Government Code § 423.002, TX GOVT § 423.002

Current through legislation effective June 4, 2021, of the 2021 Regular Session of the 87th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 4. Executive Branch (Refs & Annos)
      Subtitle B. Law Enforcement and Public Protection
        Chapter 423. Use of Unmanned Aircraft

---

V.T.C.A., Government Code § 423.003

## § 423.003. Offense: Illegal Use of Unmanned Aircraft to Capture Image

Effective: September 1, 2013
Currentness

(a) A person commits an offense if the person uses an unmanned aircraft to capture an image of an individual or privately owned real property in this state with the intent to conduct surveillance on the individual or property captured in the image.

(b) An offense under this section is a Class C misdemeanor.

(c) It is a defense to prosecution under this section that the person destroyed the image:

   (1) as soon as the person had knowledge that the image was captured in violation of this section; and

   (2) without disclosing, displaying, or distributing the image to a third party.

(d) In this section, "intent" has the meaning assigned by Section 6.03, Penal Code.

**Credits**
Added by Acts 2013, 83rd Leg., ch. 1390 (H.B. 912), § 2, eff. Sept. 1, 2013.

V. T. C. A., Government Code § 423.003, TX GOVT § 423.003
Current through legislation effective June 4, 2021, of the 2021 Regular Session of the 87th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Government Code (Refs & Annos)
        Title 4. Executive Branch (Refs & Annos)
            Subtitle B. Law Enforcement and Public Protection
                Chapter 423. Use of Unmanned Aircraft

V.T.C.A., Government Code § 423.004

§ 423.004. Offense: Possession, Disclosure, Display, Distribution, or Use of Image

Effective: September 1, 2013
Currentness

(a) A person commits an offense if the person:

(1) captures an image in violation of Section 423.003; and

(2) possesses, discloses, displays, distributes, or otherwise uses that image.

(b) An offense under this section for the possession of an image is a Class C misdemeanor. An offense under this section for the disclosure, display, distribution, or other use of an image is a Class B misdemeanor.

(c) Each image a person possesses, discloses, displays, distributes, or otherwise uses in violation of this section is a separate offense.

(d) It is a defense to prosecution under this section for the possession of an image that the person destroyed the image as soon as the person had knowledge that the image was captured in violation of Section 423. 003.

(e) It is a defense to prosecution under this section for the disclosure, display, distribution, or other use of an image that the person stopped disclosing, displaying, distributing, or otherwise using the image as soon as the person had knowledge that the image was captured in violation of Section 423.003.

**Credits**
Added by Acts 2013, 83rd Leg., ch. 1390 (H.B. 912), § 2, eff. Sept. 1, 2013.

V. T. C. A., Government Code § 423.004, TX GOVT § 423.004
Current through legislation effective June 4, 2021, of the 2021 Regular Session of the 87th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    1

Vernon's Texas Statutes and Codes Annotated
   Government Code (Refs & Annos)
      Title 4. Executive Branch (Refs & Annos)
         Subtitle B. Law Enforcement and Public Protection
            Chapter 423. Use of Unmanned Aircraft

V.T.C.A., Government Code § 423.0045

## § 423.0045. Offense: Operation of Unmanned Aircraft over Correctional Facility, Detention Facility, or Critical Infrastructure Facility

Effective: September 1, 2019
Currentness

(a) In this section:

  (1) "Correctional facility" means:

    (A) a confinement facility operated by or under contract with any division of the Texas Department of Criminal Justice;

    (B) a municipal or county jail;

    (C) a confinement facility operated by or under contract with the Federal Bureau of Prisons; or

    (D) a secure correctional facility or secure detention facility, as defined by Section 51.02, Family Code.

  (1-a) "Critical infrastructure facility" means:

    (A) one of the following, if completely enclosed by a fence or other physical barrier that is obviously designed to exclude intruders, or if clearly marked with a sign or signs that are posted on the property, are reasonably likely to come to the attention of intruders, and indicate that entry is forbidden:

      (i) a petroleum or alumina refinery;

      (ii) an electrical power generating facility, substation, switching station, or electrical control center;

      (iii) a chemical, polymer, or rubber manufacturing facility;

(iv) a water intake structure, water treatment facility, wastewater treatment plant, or pump station;

(v) a natural gas compressor station;

(vi) a liquid natural gas terminal or storage facility;

(vii) a telecommunications central switching office or any structure used as part of a system to provide wired or wireless telecommunications services;

(viii) a port, railroad switching yard, trucking terminal, or other freight transportation facility;

(ix) a gas processing plant, including a plant used in the processing, treatment, or fractionation of natural gas;

(x) a transmission facility used by a federally licensed radio or television station;

(xi) a steelmaking facility that uses an electric arc furnace to make steel;

(xii) a dam that is classified as a high hazard by the Texas Commission on Environmental Quality; or

(xiii) a concentrated animal feeding operation, as defined by Section 26.048, Water Code; or

(B) if enclosed by a fence or other physical barrier obviously designed to exclude intruders:

(i) any portion of an aboveground oil, gas, or chemical pipeline;

(ii) an oil or gas drilling site;

(iii) a group of tanks used to store crude oil, such as a tank battery;

(iv) an oil, gas, or chemical production facility;

(v) an oil or gas wellhead; or

(vi) any oil and gas facility that has an active flare.

(2) "Dam" means any barrier, including any appurtenant structures, that is constructed for the purpose of permanently or temporarily impounding water.

(3) "Detention facility" means a facility operated by or under contract with United States Immigration and Customs Enforcement for the purpose of detaining aliens and placing them in removal proceedings.

(b) A person commits an offense if the person intentionally or knowingly:

(1) operates an unmanned aircraft over a correctional facility, detention facility, or critical infrastructure facility and the unmanned aircraft is not higher than 400 feet above ground level;

(2) allows an unmanned aircraft to make contact with a correctional facility, detention facility, or critical infrastructure facility, including any person or object on the premises of or within the facility; or

(3) allows an unmanned aircraft to come within a distance of a correctional facility, detention facility, or critical infrastructure facility that is close enough to interfere with the operations of or cause a disturbance to the facility.

(c) This section does not apply to:

(1) conduct described by Subsection (b) that involves a correctional facility, detention facility, or critical infrastructure facility and is committed by:

(A) the federal government, the state, or a governmental entity;

(B) a person under contract with or otherwise acting under the direction or on behalf of the federal government, the state, or a governmental entity;

(C) a law enforcement agency;

(D) a person under contract with or otherwise acting under the direction or on behalf of a law enforcement agency; or

(E) an operator of an unmanned aircraft that is being used for a commercial purpose, if the operation is conducted in compliance with:

(i) each applicable Federal Aviation Administration rule, restriction, or exemption; and

(ii) all required Federal Aviation Administration authorizations; or

(2) conduct described by Subsection (b) that involves a critical infrastructure facility and is committed by:

(A) an owner or operator of the critical infrastructure facility;

(B) a person under contract with or otherwise acting under the direction or on behalf of an owner or operator of the critical infrastructure facility;

(C) a person who has the prior written consent of the owner or operator of the critical infrastructure facility; or

(D) the owner or occupant of the property on which the critical infrastructure facility is located or a person who has the prior written consent of the owner or occupant of that property.

(d) An offense under this section is a Class B misdemeanor, except that the offense is a Class A misdemeanor if the actor has previously been convicted under this section or Section 423.0046.

**Credits**
Added by Acts 2015, 84th Leg., ch. 1033 (H.B. 1481), § 1, eff. Sept. 1, 2015. Amended by Acts 2017, 85th Leg., ch. 824 (H.B. 1643), §§ 1, 2, eff. Sept. 1, 2017; Acts 2017, 85th Leg., ch. 1010 (H.B. 1424), §§ 1 to 3, eff. Sept. 1, 2017; Acts 2019, 86th Leg., ch. 467 (H.B. 4170), §§ 8.011, 8.012, eff. Sept. 1, 2019; Acts 2019, 86th Leg., ch. 1297 (H.B. 3557), §§ 3, 4, eff. Sept. 1, 2019.

V. T. C. A., Government Code § 423.0045, TX GOVT § 423.0045
Current through legislation effective June 4, 2021, of the 2021 Regular Session of the 87th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

```
Vernon's Texas Statutes and Codes Annotated
    Government Code (Refs & Annos)
        Title 4. Executive Branch (Refs & Annos)
            Subtitle B. Law Enforcement and Public Protection
                Chapter 423. Use of Unmanned Aircraft
```

V.T.C.A., Government Code § 423.0046

## § 423.0046. Offense: Operation of Unmanned Aircraft over Sports Venue

Effective: September 1, 2017
Currentness

(a) In this section, "sports venue" means an arena, automobile racetrack, coliseum, stadium, or other type of area or facility that:

  (1) has a seating capacity of 30,000 or more people; and

  (2) is primarily used for one or more professional or amateur sports or athletics events.

(b) A person commits an offense if the person intentionally or knowingly operates an unmanned aircraft over a sports venue and the unmanned aircraft is not higher than 400 feet above ground level.

(c) This section does not apply to conduct described by Subsection (b) that is committed by:

  (1) the federal government, the state, or a governmental entity;

  (2) a person under contract with or otherwise acting under the direction or on behalf of the federal government, the state, or a governmental entity;

  (3) a law enforcement agency;

  (4) a person under contract with or otherwise acting under the direction or on behalf of a law enforcement agency;

  (5) an operator of an unmanned aircraft that is being used for a commercial purpose, if the operation is conducted in compliance with:

    (A) each applicable Federal Aviation Administration rule, restriction, or exemption; and

    (B) all required Federal Aviation Administration authorizations;

(6) an owner or operator of the sports venue;

(7) a person under contract with or otherwise acting under the direction or on behalf of an owner or operator of the sports venue; or

(8) a person who has the prior written consent of the owner or operator of the sports venue.

(d) An offense under this section is a Class B misdemeanor, except that the offense is a Class A misdemeanor if the actor has previously been convicted under this section or Section 423.0045.

**Credits**

Added by Acts 2017, 85th Leg., ch. 1010 (H.B. 1424), § 4, eff. Sept. 1, 2017.

V. T. C. A., Government Code § 423.0046, TX GOVT § 423.0046

Current through legislation effective June 4, 2021, of the 2021 Regular Session of the 87th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 4. Executive Branch (Refs & Annos)
      Subtitle B. Law Enforcement and Public Protection
        Chapter 423. Use of Unmanned Aircraft

V.T.C.A., Government Code § 423.005

## § 423.005. Illegally or Incidentally Captured Images Not Subject to Disclosure

Effective: September 1, 2013
Currentness

(a) Except as otherwise provided by Subsection (b), an image captured in violation of Section 423.003, or an image captured by an unmanned aircraft that was incidental to the lawful capturing of an image:

  (1) may not be used as evidence in any criminal or juvenile proceeding, civil action, or administrative proceeding;

  (2) is not subject to disclosure, inspection, or copying under Chapter 552; and

  (3) is not subject to discovery, subpoena, or other means of legal compulsion for its release.

(b) An image described by Subsection (a) may be disclosed and used as evidence to prove a violation of this chapter and is subject to discovery, subpoena, or other means of legal compulsion for that purpose.

**Credits**

Added by Acts 2013, 83rd Leg., ch. 1390 (H.B. 912), § 2, eff. Sept. 1, 2013.

V. T. C. A., Government Code § 423.005, TX GOVT § 423.005
Current through legislation effective June 4, 2021, of the 2021 Regular Session of the 87th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

Vernon's Texas Statutes and Codes Annotated
   Government Code (Refs & Annos)
     Title 4. Executive Branch (Refs & Annos)
       Subtitle B. Law Enforcement and Public Protection
         Chapter 423. Use of Unmanned Aircraft

---

V.T.C.A., Government Code § 423.006

## § 423.006. Civil Action

Effective: September 1, 2013
Currentness

(a) An owner or tenant of privately owned real property located in this state may bring against a person who, in violation of Section 423.003, captured an image of the property or the owner or tenant while on the property an action to:

   (1) enjoin a violation or imminent violation of Section 423.003 or 423. 004;

   (2) recover a civil penalty of:

     (A) $5,000 for all images captured in a single episode in violation of Section 423.003; or

     (B) $10,000 for disclosure, display, distribution, or other use of any images captured in a single episode in violation of Section 423.004; or

   (3) recover actual damages if the person who captured the image in violation of Section 423.003 discloses, displays, or distributes the image with malice.

(b) For purposes of recovering the civil penalty or actual damages under Subsection (a), all owners of a parcel of real property are considered to be a single owner and all tenants of a parcel of real property are considered to be a single tenant.

(c) In this section, "malice" has the meaning assigned by Section 41.001, Civil Practice and Remedies Code.

(d) In addition to any civil penalties authorized under this section, the court shall award court costs and reasonable attorney's fees to the prevailing party.

(e) Venue for an action under this section is governed by Chapter 15, Civil Practice and Remedies Code.

(f) An action brought under this section must be commenced within two years from the date the image was:

(1) captured in violation of Section 423.003; or

(2) initially disclosed, displayed, distributed, or otherwise used in violation of Section 423.004.

**Credits**

Added by Acts 2013, 83rd Leg., ch. 1390 (H.B. 912), § 2, eff. Sept. 1, 2013.

V. T. C. A., Government Code § 423.006, TX GOVT § 423.006

Current through legislation effective June 4, 2021, of the 2021 Regular Session of the 87th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

End of Document                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.