No. 22-50337

———————————————————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————————————————

National Press Photographers Association;
Texas Press Association; Joseph Pappalardo,

*Plaintiffs-Appellees/Cross-Appellants*,

v.

Steven McCraw, in his official capacity as Director of the
Texas Department of Public Safety; Dwight Mathis, in his official capacity as
Chief of the Texas Highway Patrol; Wes Mau, in his official capacity as District
Attorney of Hays County, Texas,

*Defendants-Appellants/Cross-Appellees*.

———————————————————————

On Appeal from the United States District Court for the
Western District of Texas, Austin Division
Case No. 1:19-cv-0946 (Hon. Robert L. Pitman)

———————————————————————

## BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE FOR
## FREEDOM OF THE PRESS, TEXAS ASSOCIATION OF
## BROADCASTERS, AND 27 NEWS MEDIA ORGANIZATIONS IN
## SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

[Caption continued on next page]

Paul C. Watler
State Bar No. 20931600
pwatler@jw.com
Emily M. Rhine
State Bar No. 24110812
erhine@jw.com
Alexander V. Leseny
State Bar No. 24131456
aleseny@jw.com
JACKSON WALKER L.L.P.
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone: (214) 953-6000
Fax: (214) 953-5822

Bruce D. Brown
*Counsel of Record for Amici Curiae*
Katie Townsend
Gabe Rottman
Grayson Clary
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that, in addition to the persons and entities listed in Plaintiffs-Appellees' Certificate of Interested Persons, the following listed persons and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification.

**Amici Curiae:**

**Reporters Committee for Freedom of the Press.** The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

**Texas Association of Broadcasters.** The Texas Association of Broadcasters has no parent corporation and issues no stock.

**Atlantic Monthly Group.** The Atlantic Monthly Group LLC is a privately-held media company, owned by Emerson Collective and Atlantic Media, Inc. No publicly held corporation owns 10% or more of its stock.

**Cable News Network, Inc.** Cable News Network, Inc. ("CNN") is a Delaware corporation that owns and operates numerous news platforms and services. CNN is ultimately a wholly-owned subsidiary of AT&T Inc., a publicly traded corporation. AT&T Inc. has no parent company and, to the best of CNN's

knowledge, no publicly held company owns ten percent or more of AT&T Inc.'s stock.

**California Broadcasters Association.**  The California Broadcasters Association is an incorporated nonprofit trade association with no stock.

**Center for Investigative Reporting (d/b/a Reveal).**  The Center for Investigative Reporting (d/b/a Reveal) is a California non-profit public benefit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

**E.W. Scripps Company.**  The E.W. Scripps Company is a publicly traded company with no parent company. No individual stockholder owns more than 10% of its stock.

**First Amendment Coalition.**  First Amendment Coalition is a nonprofit organization with no parent company.  It issues no stock and does not own any of the party's or amicus' stock.

**Fort Worth Report.**  The Fort Worth Report is a 501(c)(3) organization with no parent company and no stock.

**Fox Television Stations.**  Fox Television Stations, LLC (FTS) is an indirect subsidiary of Fox Corporation, a publicly held company.  No other publicly held company owns 10% or more of the stock of Fox Corporation.

**Freedom of Information Foundation of Texas.**  The Freedom of Information Foundation of Texas ("FOIFT") is a 501(c)(3) organization. It has no parent corporation, no affiliates, and no publicly held company owns 10 percent or more of its stock.

**Gannett Co., Inc.**  Gannett Co., Inc. is a publicly traded company and has no affiliates or subsidiaries that are publicly owned.  BlackRock, Inc. and the Vanguard Group, Inc. each own ten percent or more of the stock of Gannett Co., Inc.

**International Documentary Association.**  The International Documentary Association is a not-for-profit organization with no parent corporation and no stock.

**Media Institute.**  The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

**National Association of Broadcasters.**  The National Association of Broadcasters is a nonprofit, incorporated association that has not issued any shares or debt securities to the public, and has no parent companies, subsidiaries, or affiliates that have issued any shares or debt securities to the public.

**National Public Radio, Inc.**  National Public Radio, Inc. is a privately supported, not-for-profit membership organization that has no parent company and issues no stock.

iv

**New York Times Company.**  The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock.

**News Leaders Association.**  The News Leaders Association has no parent corporation and does not issue any stock.

**News/Media Alliance.**  News/Media Alliance is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia.  It has no parent company.

**Pro Publica, Inc.**  Pro Publica, Inc. ("ProPublica") is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code.  It has no statutory members and no stock.

**Radio Television Digital News Association.**  Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

**Sinclair Broadcast Group, Inc.**  Sinclair Broadcast Group, Inc. is a Maryland corporation which is publicly traded on NASDAQ under the symbol SBGI.

**Society of Environmental Journalists.**  The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization.  It has no parent corporation and issues no stock.

v

**Society of Professional Journalists.**  Society of Professional Journalists is a non-stock corporation with no parent company.

**TEGNA Inc.**  TEGNA Inc. has no parent company, and no publicly-held company has a 10% or greater ownership interest in TEGNA, Inc.

**Tully Center for Free Speech.**  The Tully Center for Free Speech is a subsidiary of Syracuse University.

**Vox Media, LLC.**  Vox Media, LLC has no parent corporation. NBC Universal Media, LLC, a publicly held corporation, owns at least 10% of Vox's stock.

**WNET.**  WNET is a not-for-profit organization, supported by private and public funds, that has no parent company and issues no stock.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................... ii

TABLE OF AUTHORITIES.................................................................................. viii

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ................. 1

SOURCE OF AUTHORITY TO FILE ................................................................... 2

FED. R. APP. P. 29(A)(4)(E) STATEMENT ......................................................... 2

SUMMARY OF ARGUMENT................................................................................ 3

ARGUMENT .......................................................................................................... 4

I.     The use of drones in journalism delivers crucial public benefits. .................... 4

II.    Texas's drone regulations impermissibly discriminate against the press. ......... 9

     A.   A restriction on drone photography, like any other restriction on the right to gather news and information, implicates the First Amendment. ......................................................................................... 10

     B.   The "Surveillance Provisions" trigger strict scrutiny because they favor select professions over journalists capturing identical images................................................................................................ 13

     C.   The "No-Fly Provisions" trigger strict scrutiny because they favor photographers with narrowly commercial purposes over photographers with journalistic reasons for capturing identical images................................................................................................ 15

     D.   Texas has no valid justification for discriminating against the press.................................................................................................. 16

CONCLUSION ..................................................................................................... 17

CERTIFICATE OF COMPLIANCE ..................................................................... 19

CERTIFICATE OF SERVICE............................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Arcara v. Cloud Books, Inc.*,
 478 U.S. 697 (1986) ................................................................4, 12, 15

*Ark. Writers' Project, Inc. v. Ragland*,
 481 U.S. 221 (1987) ........................................................................14

*Ashcroft v. Am. C.L. Union*,
 535 U.S. 564 (2002) ........................................................................16

*Branzburg v. Hayes*,
 408 U.S. 665 (1972) ........................................................................10

*Brown v. Ent. Merchants Ass'n*,
 564 U.S. 786 (2011) ..................................................................11, 16

*CBS, Inc. v. Lieberman*,
 439 F. Supp. 862 (N.D. Ill. 1976) ..................................................11

*Citizens United v. Fed. Election Comm'n*,
 558 U.S. 310 (2010) ........................................................................13

*Dorfman v. Meiszner*,
 430 F.2d 558 (7th Cir. 1970) ..........................................................11

*First Nat'l Bank of Bos. v. Bellotti*,
 435 U.S. 765 (1978) ..........................................................................9

*Grosjean v. Am. Press Co.*,
 297 U.S. 233 (1936) ........................................................................14

*In re Express-News Corp.*,
 695 F.2d 807 (5th Cir. 1982) ..........................................................11

*Leathers v. Medlock*,
 499 U.S. 439 (1991) ........................................................................15

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
 460 U.S. 575 (1983) ................................................................4, 13, 14

*Morgan v. Swanson*,
    659 F.3d 359 (5th Cir. 2011) ......................................................................... 14, 15

*Morse v. Frederick*,
    551 U.S. 393 (2007) .......................................................................................... 15

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) .................................................................................... 10, 13

*Nat'l Press Photographers Ass'n v. McCraw*,
    No. 1:19-CV-946-RP, 2022 WL 939517 (W.D. Tex. Mar. 28, 2022) .... 14, 15, 16

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) .................................................................................... 15, 16

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) .......................................................................................... 12

*Turner v. Lieutenant Driver*,
    848 F.3d 678 (5th Cir. 2017) ....................................................................... 3, 11

*United States v. CBS, Inc.*,
    497 F.2d 102 (5th Cir. 1974) ............................................................................ 11

*United States v. Stevens*,
    559 U.S. 460 (2010) .......................................................................................... 16

*W. Watersheds Project v. Michael*,
    869 F.3d 1189 (10th Cir. 2017) ........................................................................ 11

**Statutes**

Tex. Gov't Code § 423.002 ........................................................................... 3, 10, 14

Tex. Gov't Code § 423.003 ........................................................................... 3, 10, 11

Tex. Gov't Code § 423.004 ............................................................................... 3, 10

Tex. Gov't Code § 423.0045 ............................................................................ 4, 10, 15

Tex. Gov't Code § 423.0046 ............................................................................ 4, 10, 15

Tex. Gov't Code § 423.006 ................................................................................ 3, 10

## Other Authorities

*'We're Not Done With This:' Harvey Floodwaters Continue to Wreak Havoc as Forecast Brightens*, CBC News (Aug. 29, 2017),
https://perma.cc/G347-8KKV ...................................................................8

*3 Killed, At Least 20 Injured After Tornado Rips Through Onalaska in Polk County*, KSAT (Apr. 23, 2020),
https://perma.cc/E54W-ATZQ ..............................................................5

*Aerial Video: Central Texas Flooding Devastation From Above*,
KXAN (Oct. 19, 2018),
https://perma.cc/NH3W-WNVS ...........................................................5

Amanda McCoy, *Drone Footage Shows Cleanup Effort to Remove Dozens of Vehicles Involved in Massive Pile-Up*, Fort Worth Star-Telegram
(Feb. 11, 2021),
https://www.star-telegram.com/news/local/fort-worth/article249187560.html ................................................................5

*Amazing Drone Video Over Site of Massive Houston Explosion at Watson Grinding and Manufacturing*, KHOU 11 News (Jan. 24, 2020),
https://perma.cc/4KRL-QCCU.............................................................6

Anders Hagstrom & Bill Melugin, *Drone Footage Shows Streams of Migrants Cross Border into Texas 'With No Resistance'*, Fox News
(Nov. 7, 2022),
https://perma.cc/AV7W-C77Z ...............................................................8

Avery E. Holton et al., *News from Above: First Amendment Implications of the Federal Aviation Administration Ban on Commercial Drones*,
21 B.U. J. Sci. & Tech. L. 22 (2015)..................................................8, 9

Bill Melugin, *New Fox Drone Footage Shows Large Migrant Groups Crossing into Texas*, Fox News (Sept. 16, 2022),
https://perma.cc/J6BP-K634.................................................................8

*Bird's-Eye View of Houston Floods from SkyDrone13*, KTRK-TV Houston
(Aug. 8, 2017),
https://perma.cc/5UDH-H5VC...............................................................5

Chris Sadeghi (@chrissadeghi), Twitter (Feb. 11, 2021, 11:10 AM),
    https://perma.cc/NYL4-N79S ................................................................5

David A. Fischer, *Dron't Stop Me Now: Prioritizing Drone Journalism in
    Commercial Drone Regulation*,
    43 Colum. J.L. & Arts 107 (2019) ....................................................5

David Goldberg, *Dronalism: Journalism, Remotely Piloted Aircraft, Law
    and Regulation*,
    10 FIU L. Rev. 405 (2015) ..............................................................5

Dianna Wray, *A Drone's-Eye View of a Snowbound Houston*, Houstonia
    (Feb. 15, 2021),
    https://perma.cc/Y6XL-8SK2 ............................................................5

*Drone 11: Hurricane Laura Aftermath in Orange Texas*, KHOU 11 News
    (Aug. 27, 2020),
    *available at* https://fb.watch/gvMhWLZltg/ ........................................5

*Drone Video Captures Hurricane Laura Damage in Orange, Texas*,
    KMBT 12 News (Aug. 27, 2020),
    https://perma.cc/DR9H-98HC ............................................................5

House Bill Analysis for H.B. 912 (Tex. May 7, 2013) ..........................16

*Incredible Drone Video Shows I-10 Barge Crash Near Houston*,
    KHOU 11 News (Sept. 20, 2019),
    https://perma.cc/4A3A-NFKX ............................................................6

Jaclyn Ramkissoon, *Lawsuit: Protester Says He Was Running Away When
    APD Officer Shot Him in the Face with 'Less Lethal' Round*, KXAN
    (Nov. 10, 2020),
    https://perma.cc/EP5S-BYDS ............................................................6

Marc Duvoisin, *The Story Behind This Viral Photo of the San Antonio Food
    Bank During Coronavirus Shutdowns*, San Antonio Express-News
    (May 14, 2020),
    https://perma.cc/85VB-B79W ............................................................7

National League of Cities, *Cities and Drones: What Cities Need to Know
    About Unmanned Aerial Vehicles* (2016),
    https://perma.cc/Y95D-KW74 ............................................................9

Paul Livengood, *Crane Collision Injures 22, Hospitalizes 16 in East Austin*,
WFAA (Sept. 16, 2020),
https://perma.cc/2APR-TNKL ...................................................................6

Pls.' Mot. for Summary Judgment,
*Nat'l Press Photographers Ass'n v. McCraw*, No. 1:19-cv-00946
(W.D. Tex. July 9, 2021)......................................................................12, 17

Pooja Lodhia, *FREEDOM FIELD: Step Inside Alvin ISD's $41.5 Million
Football Stadium*, KTRK-TV Houston (Sept. 21, 2018),
https://perma.cc/9ET4-5WXD ...............................................................6

RJ Marquez & Valerie Gomez, *How San Antonio Food Bank Became
Lifeline for South Texas During COVID-19 Pandemic*, KSAT
(July 6, 2020),
https://perma.cc/ZL57-9G8H ................................................................7

*SkyDrone13 Gets Amazing Views of Chevron Houston Marathon*, KTRK-
TV Houston (Jan. 5, 2021),
https://perma.cc/MGG4-JPA2..............................................................6

*SkyDrone13 Sandcastle Competition*, KTRK-TV Houston (June 15, 2017),
https://perma.cc/ZN6R-BC8R ...............................................................6

*SkyDrone13: Crosby ISD's Beautiful Cougar Stadium*, KTRK-TV Houston
(Sept. 25, 2019),
https://perma.cc/6N68-A2FA ................................................................6

*Skydrone13 Captures a Beautiful Sunrise in Seabrook, Texas*, KTRK-TV
Houston (Mar. 14, 2018),
https://perma.cc/4NVD-U5CV ...............................................................6

*SkyDrone13 Over the Crosby Square Apartment Fire Damage*, KTRK-TV
Houston (July 10, 2017),
https://perma.cc/L54U-RSSB ................................................................6

*Vehicles to Be Removed From Elan City Lights Parking Garage on Monday*,
NBCDFW (Oct. 5, 2019),
https://perma.cc/3XMD-KWPW ..........................................................6

**STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE**

Amici curiae are the Reporters Committee for Freedom of the Press (the "Reporters Committee"), Texas Association of Broadcasters, The Atlantic Monthly Group LLC, Cable News Network, Inc., California Broadcasters Association, The Center for Investigative Reporting (d/b/a Reveal), The E.W. Scripps Company, First Amendment Coalition, Fort Worth Report, Fox Television Stations, LLC, Freedom of Information Foundation of Texas, Freedom of the Press Foundation, Gannett Co., Inc., International Documentary Assn., The Media Institute, National Association of Broadcasters, National Public Radio, Inc., The New York Times Company, The News Leaders Association, News/Media Alliance, Pro Publica, Inc., Radio Television Digital News Association, Sinclair Broadcast Group, Inc., Society of Environmental Journalists, Society of Professional Journalists, TEGNA Inc., Tully Center for Free Speech, Vox Media, LLC, and WNET. As organizations that defend and exercise the right to gather the news, Amici have a strong interest in ensuring journalists in Texas can do so freely—including through the use of modern tools of their trade.

## SOURCE OF AUTHORITY TO FILE

Amici seek leave to file by the motion filed herewith.  *See* Fed. R. App. P. 29(a)(3).  Plaintiffs-Appellees/Cross-Appellants consent to the filing of this brief; counsel for Defendant-Appellant/Cross-Appellee Steven McCraw has represented that McCraw does not oppose the timely filing of an amicus curiae brief.  Amici contacted counsel for Defendant-Appellant/Cross-Appellee Wes Mau by email on November 15, 2022 and again on November 22, 2022 but were unable to obtain his position on the filing of this brief

## FED. R. APP. P. 29(A)(4)(E) STATEMENT

Amici declare that:

1.  no party's counsel authored the brief in whole or in part;

2.  no party or party's counsel contributed money intended to fund preparing or submitting the brief; and

3.  no person, other than amici, their members or their counsel, contributed money intended to fund preparing or submitting the brief.

2

## SUMMARY OF ARGUMENT

For journalists today, drones are vital newsgathering tools. They have enabled reporters to cover stories of obvious public concern—from natural disasters and protests to traffic and border security—when no other tool could provide the same perspective. And they provide the public with that distinctive angle on current events more safely and at lower cost than other aerial technology.

But Texas has imposed severe burdens on the use of drones by journalists for newsgathering purposes, even as it leaves other drone operators free to capture identical images in identical circumstances for a range of purposes. Those regulations, codified at Chapter 423 of the Texas Government Code, violate the First Amendment. The provisions that ban drone photography of private property but arbitrarily exempt certain favored professions (professors, real estate brokers, and engineers, for instance), *see* Tex. Gov't Code §§ 423.002, 423.003, 423.004, 423.006, directly regulate expression while discriminating on the basis of content and speaker identity. *See Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (First Amendment protects the process of capturing images). And, because drones are no more dangerous or invasive when used by a journalist than when used by a professor, these rules cannot survive the scrutiny the Constitution requires.

3

The provisions of the law that prohibit flying drones within 400 feet of correctional institutions, critical infrastructure, and sports facilities, for their part, Tex. Gov't Code §§ 423.0045, 423.0046, likewise discriminate against the press because their broad exemption for operators with commercial purposes ensures that the law's burdens will "inevitably f[a]ll disproportionately" on those using drones to gather information for the public, *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 704 (1986). Exacting scrutiny of Texas's decision to "single out the press" for that burden is therefore warranted, *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 592 (1983), and these provisions of Chapter 423 fail to satisfy it. The goal of protecting the state's critical infrastructure is not better served when an advertiser flies a drone over a stadium than when a journalist does.

Amici urge that the District Court's injunction be affirmed.

## ARGUMENT

### I. The use of drones in journalism delivers crucial public benefits.

The history of aviation is also the history of aerial journalism. Since their advent, fixed-wing aircrafts and helicopters have been used by journalists to gather the news. Unmanned Aerial Vehicles ("UAVs"), also known as drones, are the latest airborne innovation to prove its worth as a newsgathering tool; they allow news organizations to quickly and economically reach remote news scenes, follow

4

events from an elevated perspective, and inform citizens in more visual and

engaging ways.

Although drone use is relatively new, drones are an invaluable addition to

the reporter's toolbox.  *See* David A. Fischer, *Dron't Stop Me Now: Prioritizing*

*Drone Journalism in Commercial Drone Regulation*, 43 Colum. J.L. & Arts 107,

108 (2019); David Goldberg, *Dronalism: Journalism, Remotely Piloted Aircraft,*

*Law and Regulation*, 10 FIU L. Rev. 405, 414 (2015).  Indeed, broadcasters in

Texas—alone—have used drones to cover:

- Flooding, hurricanes, and other natural disasters in Houston and Central Texas;[1]

- The winter storm that wreaked havoc across the state in 2021;[2]

---

[1]     *Bird's-Eye View of Houston Floods from SkyDrone13*, KTRK-TV Houston (Aug. 8, 2017), https://perma.cc/5UDH-H5VC; *Drone 11: Hurricane Laura Aftermath in Orange Texas*, KHOU 11 News (Aug. 27, 2020), *available at* https://fb.watch/gvMhWLZltg/; *Drone Video Captures Hurricane Laura Damage in Orange, Texas*, KMBT 12 News (Aug. 27, 2020), https://perma.cc/DR9H-98HC; *Aerial Video: Central Texas Flooding Devastation From Above*, KXAN (Oct. 19, 2018), https://perma.cc/NH3W-WNVS; *3 Killed, At Least 20 Injured After Tornado Rips Through Onalaska in Polk County*, KSAT (Apr. 23, 2020), https://perma.cc/E54W-ATZQ.

[2]     Chris Sadeghi (@chrissadeghi), Twitter (Feb. 11, 2021, 11:10 AM), https://perma.cc/NYL4-N79S; Amanda McCoy, *Drone Footage Shows Cleanup Effort to Remove Dozens of Vehicles Involved in Massive Pile-Up*, Fort Worth Star-Telegram (Feb. 11, 2021), https://www.star-telegram.com/news/local/fort-worth/article249187560.html; Dianna Wray, *A Drone's-Eye View of a Snowbound Houston*, Houstonia (Feb. 15, 2021), https://perma.cc/Y6XL-8SK2.

- Crane accidents in Dallas and Austin;[3]

- Fires, explosions, and other industrial accidents;[4]

- Protests during the summer of 2020;[5]

- Structures of civic pride like a high school football stadium in Crosby;[6]

- Family events such as a sandcastle competition in Galveston[7] and the Houston Marathon;[8] and

- A sunrise in Seabrook.[9]

---

[3]    Paul Livengood, *Crane Collision Injures 22, Hospitalizes 16 in East Austin*, WFAA (Sept. 16, 2020), https://perma.cc/2APR-TNKL; *Vehicles to Be Removed From Elan City Lights Parking Garage on Monday*, NBCDFW (Oct. 5, 2019), https://perma.cc/3XMD-KWPW.

[4]    *SkyDrone13 Over the Crosby Square Apartment Fire Damage*, KTRK-TV Houston (July 10, 2017), https://perma.cc/L54U-RSSB; *Amazing Drone Video Over Site of Massive Houston Explosion at Watson Grinding and Manufacturing*, KHOU 11 News (Jan. 24, 2020), https://perma.cc/4KRL-QCCU; *Incredible Drone Video Shows I-10 Barge Crash Near Houston*, KHOU 11 News (Sept. 20, 2019), https://perma.cc/4A3A-NFKX.

[5]    Jaclyn Ramkissoon, *Lawsuit: Protester Says He Was Running Away When APD Officer Shot Him in the Face with 'Less Lethal' Round*, KXAN (Nov. 10, 2020), https://perma.cc/EP5S-BYDS.

[6]    Pooja Lodhia, *FREEDOM FIELD: Step Inside Alvin ISD's $41.5 Million Football Stadium*, KTRK-TV Houston (Sept. 21, 2018), https://perma.cc/9ET4-5WXD; *SkyDrone13: Crosby ISD's Beautiful Cougar Stadium*, KTRK-TV Houston (Sept. 25, 2019), https://perma.cc/6N68-A2FA.

[7]    *SkyDrone13 Sandcastle Competition*, KTRK-TV Houston (June 15, 2017), https://perma.cc/ZN6R-BC8R.

[8]    *SkyDrone13 Gets Amazing Views of Chevron Houston Marathon*, KTRK-TV Houston (Jan. 5, 2021), https://perma.cc/MGG4-JPA2.

[9]    *Skydrone13 Captures a Beautiful Sunrise in Seabrook, Texas*, KTRK-TV Houston (Mar. 14, 2018), https://perma.cc/4NVD-U5CV.

Often, drone images communicate realities that no other tool could capture. In the early days of the COVID-19 pandemic, for instance, a picture of staggeringly long lines at a food bank in San Antonio taken via drone garnered national attention. In the words of the local paper, "[a] single photograph . . . powerfully distilled the desperation felt by millions of Americans." Marc Duvoisin, *The Story Behind This Viral Photo of the San Antonio Food Bank During Coronavirus Shutdowns*, San Antonio Express-News (May 14, 2020), https://perma.cc/85VB-B79W; RJ Marquez & Valerie Gomez, *How San Antonio Food Bank Became Lifeline for South Texas During COVID-19 Pandemic*, KSAT (July 6, 2020), https://perma.cc/ZL57-9G8H. The picture "helped trigger millions of dollars in individual and corporate donations to the Food Bank." Duvoisin, *supra*. And as the photographer who took the picture later explained: "A helicopter would have put me much higher; a ladder wouldn't have been high enough. But the drone, flying about 150 to 200 feet off the ground, allowed me to show the scale of the need while still allowing viewers to feel connected to the people in the cars." *Id.*

Drones also have been used to ensure the free flow of information to the public in circumstances where reporters have otherwise been denied access to newsworthy locations. For example, reporters from Fox News have used drones to

capture footage of illegal border crossings in Texas.  *See, e.g.*, Anders Hagstrom & Bill Melugin, *Drone Footage Shows Streams of Migrants Cross Border into Texas 'With No Resistance'*, Fox News (Nov. 7, 2022), https://perma.cc/AV7W-C77Z; Bill Melugin, *New Fox Drone Footage Shows Large Migrant Groups Crossing into Texas*, Fox News (Sept. 16, 2022), https://perma.cc/J6BP-K634.  Fox News has used drones with thermal imaging cameras, allowing them to capture footage of border crossings at night that would not have been feasible for a reporter on the ground.  *Id.*

Journalists have also enriched their reporting through the use of drones.  For instance, CBC News, a Canadian outlet, used drone footage to illustrate the scale of the destruction caused by tropical storm Harvey in Houston, Texas in 2017. *'We're Not Done With This:' Harvey Floodwaters Continue to Wreak Havoc as Forecast Brightens*, CBC News (Aug. 29, 2017), https://perma.cc/G347-8KKV. The drone footage complemented personal stories of people living in Houston who were displaced by the storm, giving the reader a visceral sense of impact.  *Id.*

In addition to the unique perspective they can provide, drones are safer than their alternatives.  Helicopters are among the most dangerous methods of aerial transport.  *See* Avery E. Holton et al., *News from Above: First Amendment Implications of the Federal Aviation Administration Ban on Commercial Drones*,

8

21 B.U. J. Sci. & Tech. L. 22, 31–32 (2015).  But drone mishaps "represent a

miniscule fraction of drone operations."  National League of Cities, *Cities and*

*Drones: What Cities Need to Know About Unmanned Aerial Vehicles* 1 (2016),

https://perma.cc/Y95D-KW74.  Drones also are more cost effective.  The savings

relative to human-piloted aircraft come "at a time when news organizations are

struggling with economic sustainability."  Holton, *supra*, at 33.  A high-quality

consumer drone with an HD camera can cost as little as $1,000, weigh just ten

pounds, and operate at a fraction of the cost of a manned flight.  National League

of Cities, *supra*, at 1.

Due to those advantages, drones have become essential to journalism.  They

provide safe access to dangerous or inaccessible scenes and an unparalleled sense

of the scale of public events, from civil unrest to natural disasters to sporting

events.  And in each case, they advance the core First Amendment interest in

expanding "the stock of information from which members of the public may

draw."  *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978).

## II.    Texas's drone regulations impermissibly discriminate against the press.

Despite the public benefits of drone journalism, Texas has imposed severe

burdens on it.  As the District Court's opinion explains, one set of provisions in

Chapter 423 bars drone photography of private property but exempts a long list of

favored professions.  *See* Tex. Gov't Code §§ 423.002, 423.003, 423.004, 423.006 (together, the "Surveillance Provisions").  Under those rules, an aerial photograph taken by a journalist would be punishable as a misdemeanor but the same photograph taken by a professor would not be.  Another set of restrictions forbids drones within a certain distance of critical infrastructure, correctional institutions, and sports arenas but exempts operators who fly drones with a commercial or law enforcement purpose.  Tex. Gov't Code §§ 423.0045, 423.0046 (together, the "No-Fly Provisions").  Under these rules, a surveyor lawfully could fly a drone over a covered facility, but a journalist could not.[10]  Because both sets of provisions discriminate against the press without justification, neither can be squared with the First Amendment.

> A.    A restriction on drone photography, like any other restriction on the <u>right to gather news and information, implicates the First Amendment.</u>

The First Amendment protects the right to gather the news.  *See Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated.").  That protection extends to

---

[10]    Regardless of the commercial structure of a newspaper—non-profit or for-profit—these provisions bar the use of drones for newsgathering.  *Cf. N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964) ("the fact that newspapers and books are sold" is "immaterial" to the extent of protection the First Amendment affords them).

journalists' right to use the tools of their trade—analog or modern. *See Turner*, 848 F.3d at 688 (right to record video); *CBS, Inc. v. Lieberman*, 439 F. Supp. 862, 866 (N.D. Ill. 1976) (right to take notes); *United States v. CBS, Inc.*, 497 F.2d 102, 106–07 (5th Cir. 1974) (right to take sketches); *Dorfman v. Meiszner*, 430 F.2d 558, 562–63 (7th Cir. 1970) (right to take photographs). And as this Court has explained, if "[the] right to gather news is . . . restricted, the government must carry the burden of demonstrating the need for curtailment," *In re Express-News Corp.*, 695 F.2d 807, 810 (5th Cir. 1982), just as it would if regulating speech or publication, *see Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 792 n.1 (2011) ("Whether government regulation applies to creating, distributing, or consuming speech makes no difference."). Here, Texas has sharply restricted the right to gather news.

There should be no question that the provisions banning the use of drones for photography implicate that right, since they directly regulate an activity—capturing images—that the First Amendment protects. *See Turner*, 848 F.3d at 688. Texas's defense that simply flying a drone is not expressive misses the point, because the Surveillance Provisions do not regulate simply flying a drone: They restrict flying a drone "to capture an image." Tex. Gov't Code 423.003(a); *see W. Watersheds Project v. Michael*, 869 F.3d 1189, 1197 (10th Cir. 2017) (restriction

on trespassing to gather information triggers First Amendment scrutiny even if generic trespassing restriction would not).  In other words, flying a drone that does not have a camera poses no concern under the law, but flying one with a camera (and using it to take pictures) does.  Accordingly, these restrictions can be justified, if at all, only if they satisfy the applicable standard of First Amendment review.

The provisions banning the use of drones over sports facilities, critical infrastructure, and correctional institutions do not repeat the error of directly regulating drones as a tool to gather information, but they are nevertheless crafted so as to have "the inevitable effect of singling out those engaged in expressive activity."  *Cloud Books, Inc.*, 478 U.S. at 706–07; *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011) (noting that the "inevitable effect of a statute on its face" informs the First Amendment standard that applies (citation omitted)).  In particular, because these provisions broadly exempt drones that are used for commercial purposes, the law's burdens "inevitably f[a]ll disproportionately" on those who instead fly drones to gather information for dissemination to the public. *Cloud Books, Inc.*, 478 U.S. at 704.[11]  These provisions too must face First

---

[11]     As the Plaintiffs explained below, "in the photography industry, the definition of 'commercial' photography excludes journalism and other editorial photography."  Pls.' Mot. for Summary Judgment at 8, *Nat'l Press Photographers Ass'n v. McCraw*, No. 1:19-cv-00946 (W.D. Tex. July 9, 2021) (ECF No. 63); *cf.*

12

Amendment scrutiny—and cannot survive it.

B.     The "Surveillance Provisions" trigger strict scrutiny because they favor select professions over journalists capturing identical images.

The First Amendment generally condemns laws that regulate expression based on the identity of the speaker—especially where speakers are singled out because of their identity as members of the news media.  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 352–53 (2010).  Such restrictions are disfavored because they "are all too often simply a means to control content."  *Id.* at 340.  As a result, speaker-based restrictions, like content-based ones, are subject to strict scrutiny.

The Supreme Court has been particularly skeptical of speaker-based restrictions that burden members of the press, because they can function "as a censor to check critical comment by the press, undercutting the basic assumption of our political system that the press will often serve as an important restraint on government."  *Minneapolis Star & Trib. Co.*, 460 U.S. at 585.  Indeed, the Supreme Court has repeatedly invalidated laws that discriminate against the press even where a statute could otherwise be characterized as regulating commerce or conduct rather than speech.  *See, e.g.*, *id.* at 575 (finding that a use tax on paper and

---

*Sullivan*, 376 U.S. at 266 ("the fact that newspapers and books are sold" does not make them commercial speech).

ink impermissibly singled out the press); *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 234 (1987) (finding a tax scheme that exempted certain journals but not general interest magazines unconstitutional); *Grosjean v. Am. Press Co.*, 297 U.S. 233, 251 (1936) (finding a tax imposed on high-circulation publications in particular unconstitutional).[12]

The provisions banning drone photography are especially stark in favoring certain speakers over others. They exempt twenty-one categories of speakers, including professors, real estate brokers, and engineers, but not journalists. Tex. Gov't Code § 423.002(a). This means "the same drone image taken legally by a professor would constitute a misdemeanor if captured by a journalist." *Nat'l Press Photographers Ass'n v. McCraw*, No. 1:19-CV-946-RP, 2022 WL 939517, at *10 (W.D. Tex. Mar. 28, 2022). And there is no "special characteristic of the press" behind the distinction: It is neither less safe nor less intrusive for a reporter to capture an image than it is for a realtor to snap the very same picture from the same place. *Minneapolis Star & Trib. Co.*, 460 U.S. at 585.

By preferring some speakers over others, then, these provisions "strike[] at the very heart of the First Amendment." *Morgan v. Swanson*, 659 F.3d 359, 401

---

[12]    As a result, Texas's effort to characterize its regulations as regulating conduct rather than newsgathering is beside the point: Even if it were true—and it isn't—the rules still offend the Constitution by discriminating against the press.

(5th Cir. 2011) (quoting *Morse v. Frederick*, 551 U.S. 393, 423 (2007) (Alito, J.,

concurring)).  They present, too, "the danger of suppressing[] particular ideas,"

because they will make reporting on many of the topics discussed above

challenging if not entirely impossible.  *Leathers v. Medlock*, 499 U.S. 439, 453

(1991).  Texas bears the burden of proving that its distinctions pass the strictest

First Amendment scrutiny.

> C.    The "No-Fly Provisions" trigger strict scrutiny because they favor
>       photographers with narrowly commercial purposes over
>       <u>photographers with journalistic reasons for capturing identical images.</u>

As described above, the "No-Fly Provisions"—which prohibit flying drones

within 400 feet of correctional institutions, critical infrastructure, and sports

facilities, *see* Tex. Gov't Code §§ 423.0045, 423.0046—notionally burden drone

photography *and* other uses of drones.  In practice, however, their broad exemption

for commercial and law enforcement purposes ensures that their "inevitable effect"

is to primarily punish speakers using drones to gather information for the public.

*Cloud Books, Inc.*, 478 U.S. at 706–07.  And as the District Court recognized,

statutes that "condition[] the legality of images based on their purpose" in this way

discriminate on the basis of content.  *McCraw*, 2022 WL 939517, at *10 (citing

*Reed v. Town of Gilbert*, 576 U.S. 155, 156 (2015)).  After all, a restriction that

permits a public relations firm but not a reporter to film a stadium—or official

videographers but not journalists to document a natural disaster—raises an obvious

risk that the regulations "will skew the public's debate" in a direction the

government favors. *Reed*, 576 U.S. at 183 (Kagan, J., concurring in the judgment).

Such content-based restrictions offend a core premise of the First

Amendment that "government has no power to restrict expression because of its

message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559

U.S. 460, 468 (2010) (quoting *Ashcroft v. Am. C.L. Union*, 535 U.S. 564, 573

(2002)). Texas's No-Fly Provisions are likewise subject to strict scrutiny.

    D.    <u>Texas has no valid justification for discriminating against the press.</u>

To survive strict scrutiny, both sets of provisions must be "justified by a

compelling government interest and [be] narrowly drawn to serve that interest."

*Ent. Merchants Ass'n*, 564 U.S. at 799. Both fall far short.

When enacting the law, Texas legislators claimed it "would protect private

property, individual privacy, and the safety of critical infrastructure facilities."

*McCraw*, 2022 WL 939517, at *11 (citing House Bill Analysis for H.B. 912 (Tex.

May 7, 2013) at 5). But the statute is wildly over- and under-inclusive. For one,

no evidence exists that journalists have caused any of the harms the enactors of the

statute say the law is intended to prevent—the law fails to cite a single incident of

harm caused by drone photography in the state. *See* Pls.' Mot. for Summary

Judgment, *supra* note 11, at 31–32. But just as fundamentally, there is no reason in practice or in principle to think journalists pose a *greater* risk of harm than the many actors who, under the statute, are allowed to take pictures using drones under identical circumstances. Drones are not more dangerous when used by journalists to cover a protest than when used by an educator to obtain footage of the same scene for research purposes.

The core flaw of Texas's drone regulations, then, is that their extensive exemptions do not track the reasons that the Texas legislature cited in enacting them. The statute discriminates against the press but fails to meaningfully protect either privacy or critical infrastructure. As the District Court recognized, the restrictions—if not enjoined—will place a direct and heavy burden on the use of drones for newsgathering and with it encumber the free flow of information to the public. This Court should affirm the District Court's careful decision.

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to affirm the District Court's preliminary injunction.

Dated: November 23, 2022                          Respectfully submitted,

                                                  /s/ Bruce D. Brown
                                                  Bruce D. Brown
Paul C. Watler                                    *Counsel of Record for Amici Curiae*
State Bar No. 20931600

17

pwatler@jw.com
Emily M. Rhine
State Bar No. 24110812
erhine@jw.com
Alexander V. Leseny
State Bar No. 24131456
aleseny@jw.com
JACKSON WALKER L.L.P.
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone: (214) 953-6000
Fax: (214) 953-5822

Katie Townsend
Gabe Rottman
Grayson Clary
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Fed. R. App. 29(a)(5) and Fed. R. App. P. 32(a)(7) because it contains 3526 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: November 23, 2022                    /s/ Bruce D. Brown
                                            Bruce D. Brown

                                            *Counsel of Record for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2022, I caused the foregoing Brief of the Reporters Committee for Freedom of the Press, Texas Association of Broadcasters, and 27 News Media Organizations as Amici Curiae in Support of Plaintiffs-Appellees/Cross-Appellants to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send notice of such filing to all counsel of record.

Dated: November 23, 2022          /s/ Bruce D. Brown
                                  Bruce D. Brown

                                  *Counsel of Record for Amici Curiae*