No. 22-50337

# In the United States Court of Appeals for the Fifth Circuit

————

NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION; TEXAS PRESS ASSOCIATION; JOSEPH PAPPALARDO,

*Plaintiffs-Appellees/Cross-Appellants*,

*v.*

STEVEN MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE TEXAS DEPARTMENT OF PUBLIC SAFETY; DWIGHT MATHIS IN HIS OFFICIAL CAPACITY AS CHIEF OF THE TEXAS HIGHWAY PATROL; WES MAU, IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF HAYS COUNTY, TEXAS,

*Defendants-Appellants/Cross-Appellees*.

————

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

————

**REPLY BRIEF FOR PLAINTIFFS-APPELLEES/CROSS-APPELLANTS**

————

Leah M. Nicholls
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
lnicholls@publicjustice.net

James A. Hemphill
GRAVES, DOUGHERTY, HEARON &
  MOODY, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
(512) 480-5762
jhemphill@gdhm.com

*Counsel for Plaintiffs-Appellees/Cross-Appellants*

*(Additional Counsel Listed on Inside Cover)*

Mickey H. Osterreicher
General Counsel
NATIONAL PRESS PHOTOGRAPHERS
  ASSOCIATION
FINNERTY OSTERREICHER & ABDULLA
70 Niagara Street Buffalo, NY 14202
(716) 983-7800
lawyer@nppa.org

Alicia Wagner Calzada
Deputy General Counsel
NATIONAL PRESS PHOTOGRAPHERS
  ASSOCIATION
ALICIA WAGNER CALZADA, PLLC
12023 Radium Street, Suite B1
San Antonio, TX 78216
(210) 825-1449
alicia@calzadalegal.com

David A. Schulz
Kelsey Eberly
MEDIA FREEDOM AND INFORMATION
  ACCESS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
(212) 850-6103
david.schulz@yale.edu
kelsey.eberly@yale.edu

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iv

ISSUE PRESENTED ON CROSS-APPEAL .............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................1

ARGUMENT ...........................................................................................3

    I.   Federal Law Occupies the Field of Aviation Safety, So State Regulation of Aviation Safety—Including Drone Safety—Is Preempted.......................4

   II.  The No-Fly Provisions Are Preempted Because They Interfere with the Purposes and Objectives of Congress...........................................13

      A.  Plaintiffs Sufficiently Pleaded Conflict Preemption, Including Obstacle Preemption...............................................................13

      B.  Preemption Hinges on Congressional, Not Agency, Intent. .................14

      C.  The No-Fly Provisions Contravene Congressional Purposes and Intent for Federal Regulation of Drone Use.........................................15

CONCLUSION .....................................................................................20

CERTIFICATE OF COMPLIANCE.....................................................22

CERTIFICATE OF SERVICE ..............................................................23

# TABLE OF AUTHORITIES

## CASES

*Abdullah v. Am. Airlines, Inc.*,
  181 F.3d 363 (3d Cir. 1999) ..................................................................... 6

*Air Line Pilots Ass'n, Int'l v. Quesada*,
  276 F.2d 892 (2d Cir. 1960) ...................................................................... 6

*Allegheny Airlines v. Vill. of Cedarhurst*,
  238 F.2d 812 (2d Cir. 1956) ...................................................................... 7

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................ 13

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001) .................................................................................. 4

*Citizens United v. FEC*,
  558 U.S. 310 (2010) ................................................................................ 14

*City of Burbank v. Lockheed Air Terminal Inc.*,
  411 U.S. 624 (1973) .................................................................................. 5

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000) ................................................................................ 19

*Hodges v. Delta Airlines, Inc.*,
  44 F.3d 334 (5th Cir. 1995) ...................................................................... 3

*Int'l Aerobatics Club Chapter 1 v. City of Morris*,
  76 F. Supp. 3d 767 (N.D. Ill. 2014) ........................................................ 7

*Kansas v. Garcia*,
  140 S. Ct. 791 (2020) .............................................................................. 14

*Montalvo v. Spirit Airlines*,
  508 F.3d 464 (9th Cir. 2007) ................................................................. 4, 6

*Rosedale Missionary Baptist Church v. New Orleans City*,
  641 F.3d 86 (5th Cir. 2011) .................................................................... 14

*Singer v. City of Newton*,
    284 F. Supp. 3d 125 (D. Mass. 2017) .................................................. 12

*Tweed-New Haven Airport Auth. v. Tong*,
    930 F.3d 65 (2d Cir. 2019) ................................................................. 5, 8

*US Airways, Inc. v. O'Donnell*,
    627 F.3d 1318 (10th Cir. 2010) ...................................................... 4, 5, 8

*Virginia Uranium, Inc. v. Warren*,
    139 S. Ct. 1894 (2019) ...................................................................... 3, 14

*Witty v. Delta Air Lines, Inc.*,
    366 F.3d 380 (5th Cir. 2004) ......................................................... *passim*

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ................................................................... 3, 14, 15

*Xizmo Media Prods. LLC v. City of New York*,
    No. 21-CV-2160 (E.D.N.Y Aug. 29, 2022) ........................................ 12

## STATUTES AND CONSTITUTIONAL PROVISIONS

U.S. Const. Art. VI, cl. 2 ........................................................................ 12

47 U.S.C. § 303(r) ................................................................................. 18

49 U.S.C. § 40103(b) ............................................................................ 18

49 U.S.C. § 44802 ................................................................................. 18

49 U.S.C. § 44802(a)(1) ...................................................................... 7, 16

49 U.S.C. § 44802(a)(2)(D) ..................................................................... 16

49 U.S.C. § 44802(a)(2)(E) .................................................................. 7, 16

49 U.S.C. § 44802(a)(2)(G) ..................................................................... 16

49 U.S.C. § 44802(b)(1) ........................................................................ 16

Pub. L. No. 69-251, § 4, 44 Stat. 568, 570 ............................................. 6

Pub. L. No. 114-190, § 2207, 130 Stat. 615, 632-33 .................................... 16-17, 17

Pub. L. No. 115-254, § 370(4), 132 Stat. 3186, 3311 ........................................ 15

Tex. Gov't Code § 423.0045(a)(1-a) ..................................................................... 20

Tex. Gov't Code § 423.0045(a)(1-a)(A) ................................................................ 17

Tex. Gov't Code § 423.0045(a)(1-a)(A)(viii) ........................................................ 17

Tex. Gov't Code § 423.0045(b)(1) .................................................................... 1, 19

Tex. Gov't Code § 423.0046(a) ............................................................................. 20

Tex. Gov't Code § 423.0046(b) ............................................................................... 1

## REGULATIONS

14 C.F.R. § 91.137 ............................................................................................... 19

14 C.F.R. § 91.137(c)(5) ....................................................................................... 20

14 C.F.R. §§ 91.137-138 .................................................................................. 9, 19

14 C.F.R. § 91.141 ........................................................................................... 9, 19

14 C.F.R. § 91.145 ........................................................................................... 9, 19

14 C.F.R. § 107.37 ............................................................................................... 19

14 C.F.R. § 107.39 ............................................................................................... 19

14 C.F.R. § 107.41 ............................................................................................... 19

14 C.F.R. § 107.43 ............................................................................................... 19

14 C.F.R. § 107.45 ............................................................................................... 19

14 C.F.R. § 107.47 ............................................................................................... 19

14 C.F.R. § 107.51(b) ....................................................................................... 1, 19

Operation and Certification of Small Unmanned Aircraft Systems,
  81 Fed. Reg. 42064 (June 28, 2016) ...................................................................... 10

## OTHER AUTHORITIES

1958 U.S.C.C.A.N. 3741 ............................................................................................ 5

Fed. Aviation Admin., *Emergency Situations* (June 3, 2022) ................................. 19

Fed. Aviation Admin., *Fact Sheet* (Dec. 17, 2015) ......................................... 10, 11

Fed. Aviation Admin., NOTAM No. 0/0367 (2020) ............................................... 19

Fed. Aviation Admin. Order No. JO 7210.3CC § 21-5-4 (June 17, 2021) ................ 19

Gov't Accountability Off., *Unmanned Aircraft Systems* (Sept. 2020) ....................... 10

H.R. Rep. No. 85-2360 ............................................................................................. 5

## ISSUE PRESENTED ON CROSS-APPEAL

Whether the No-Fly Provisions of Chapter 423 are preempted by federal regulation of aviation safety.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Federal courts of appeal have unanimously held that federal law occupies the field of aviation safety, and Texas has explained that its law prohibiting drone flights over certain facilities is a law enacted to address the safety of aircraft flight. That should be the end of the inquiry: Texas's No-Fly Provisions are preempted by federal law.

The No-Fly Provisions are of part of Texas Government Code Chapter 423, which criminalizes drone journalism nearly everywhere in the state. The No-Fly Provisions prohibit drone flight below 400 feet over a broad range of facilities, including sports arenas, correctional facilities, animal feedlots, oil and gas drilling sites and pipelines, and refineries. Read alongside Federal Aviation Administration (FAA) regulations that prohibit flying drones *higher* than 400 feet above the ground, the No-Fly Provisions bar any drone photography over the sites they single out. Tex. Gov't Code §§ 423.0045(b)(1), .0046(b); 14 C.F.R. § 107.51(b). As the district court held, the No-Fly Provisions run afoul of the First Amendment. But they are also impermissible because they are preempted by federal aviation regulation.

Preemption hinges on the intent of Congress to displace state law, and six circuits have held that, in enacting the Federal Aviation Act, Congress intended to displace state law in the field of aviation safety. The text of the statute and its legislative history make evident that Congress passed the act specifically to unify air safety systems, and to make the FAA the exclusive regulator tasked with balancing aviation safety and efficiency. Every circuit to have examined the question has held that state laws addressing aviation safety are preempted.

The No-Fly Provisions are such a preempted law. In its briefing, the State explained that the No-Fly Provisions were enacted as safety measures, specifically to protect certain facilities against "risks posed by unrestricted drone flights." State Opening Br. 33. But Congress tasked the FAA with regulating the safety of drone flights in the national airspace, just as Congress did with other types of aircraft. The No-Fly Provisions fall squarely within the preempted field of aviation safety.

But even putting field preemption to the side, the No-Fly Provisions are preempted because they stand as an obstacle to the purposes and intent of Congress. In amendments to the Federal Aviation Act addressing drones, Congress mandated that the FAA create a comprehensive plan for safely integrating drones into the national airspace. In carrying out Congress's mandate, the FAA saw fit to address the same safety concerns that the No-Fly Provisions do: whether and when drones may be flown over certain categories of facilities. Because Congress intended for the

FAA to make those types of determinations in service of its comprehensive plan for safe drone flight, state laws purporting to do the same—like the No-Fly Provisions—stand as an obstacle to Congress's purposes and are preempted.

This Court should reverse the district court's dismissal of Plaintiffs' preemption claim.

## ARGUMENT

The No-Fly Provisions impermissibly regulate an area that Congress intended be governed exclusively by federal law: aviation safety. They are therefore preempted by federal law.

The touchstone of any preemption analysis is congressional intent. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). "Under the implied preemption doctrines of field preemption and conflict preemption, a state claim is preempted where 'Congressional intent to preempt is inferred from the existence of a pervasive regulatory scheme' or where 'state law conflicts with federal law or interferes with the achievement of federal objectives.'" *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 384 (5th Cir. 2004) (quoting *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 335 n.1 (5th Cir. 1995)). Conflict preemption on the basis of interference with congressional objectives is also called obstacle preemption. *See, e.g.*, *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1909 (2019) (Ginsburg, J., concurring).

Contrary to the State's argument (State Resp. Br. 39-40), the presumption against preemption does not apply here because the field of aviation safety "has long been dominated by federal interests." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 471 (9th Cir. 2007); *see US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1327 (10th Cir. 2010) (declining to apply presumption against preemption in case involving aviation safety). *See also Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 347-48 (2001) (explaining that the presumption against preemption did not apply because the field at issue was "hardly a field which the States have traditionally occupied") (internal quotation marks omitted).

## I.    Federal Law Occupies the Field of Aviation Safety, So State Regulation of Aviation Safety—Including Drone Safety—Is Preempted.

The State concedes, as it must, that every circuit—six of them—to have considered the question has held that Congress intended federal law to occupy the field of aviation safety, and that state laws addressing aviation safety are preempted. *See* State Resp. Br. 42-43; NPPA Br. 64-65 (collecting cases). The State offers no basis for this Court to become an outlier circuit with regard to that consensus legal principle. Because the No-Fly Provisions address aviation safety in an area subject to comprehensive federal regulation, they are preempted.

While this Court has not yet had occasion to address the precise question of whether federal regulation occupies the field of aviation safety in general, it has

come close. Indeed, this Court recognized that, in the Federal Aviation Act, "Congress enacted a pervasive regulatory scheme covering air safety concerns" and observed that the Act "'requires a uniform and exclusive system of federal regulation'" to achieve the "'delicate balance between safety and efficiency, and the protection of persons on the ground,'" contemplated by the Act. *Witty*, 366 F.3d at 385 (quoting *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 638-39 (1973)). With those principles in mind, *Witty* held that a state law requiring certain oral safety briefings be given to airline passengers was preempted because the FAA had carried out the Act's directive to regulate air safety by prescribing its own oral safety warnings. *Id.* at 385-86. This Court declined to address preemption more broadly. *Id.*

The six other circuits to have found state regulation of aviation safety preempted relied on the fact that the Federal Aviation Act "was enacted to create a uniform and exclusive system of federal regulation in the field of air safety[.] . . . [It] was passed by Congress for the purpose of centralizing in a single authority . . . the power to frame rules for the safe and efficient use of the nation's airspace." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 74 (2d Cir. 2019). Indeed, Congress enacted the Federal Aviation Act precisely because different, non-uniform sets of flight rules led to a series of fatal aircraft crashes. *O'Donnell*, 627 F.3d at 1326. Congress deemed it "essential that one agency of government, and one agency alone, be responsible for issuing safety regulations." H.R. Rep. No. 85-2360, at 20 (1958),

*reprinted in* 1958 U.S.C.C.A.N. 3741, 3761. It thus aimed to "centraliz[e] in a single authority—indeed, in one administrator—the power to frame rules for the safe and efficient use of the nation's airspace." *Air Line Pilots Ass'n, Int'l v. Quesada*, 276 F.2d 892, 894 (2d Cir. 1960). *See also Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 368-71 (3d Cir. 1999) (discussing intent of Congress to create uniform regulation of air safety); *see also Montalvo*, 508 F.3d at 473 ("We . . . hold that federal law occupies the entire field of aviation safety. Congress' intent to displace state law is implicit in the pervasiveness of the federal regulations, the dominance of the federal interest in this area, and the legislative goal of establishing a single, uniform system of control over air safety."). In sum, Congress enacted the Federal Aviation Act for the express purpose of eliminating competing regulation of aviation safety, which necessarily displaces any state-law attempt to do the same.[1]

Because the No-Fly Provisions seek to regulate aviation safety, they are preempted. That none of the circuit cases concerns drones is of no moment—their legal principles apply to any state regulation of aviation safety. In 2018, Congress amended the Federal Aviation Act to task the Department of Transportation, of

---

[1] The precursor statute expressly permitted state regulation of air safety—permission that was eliminated when Congress enacted the Federal Aviation Act. *See* Air Commerce Act of 1926, Pub. L. No. 69-251, § 4, 44 Stat. 568, 570 ("The several States may set apart and provide for the protection of necessary airspace reservations in addition to and not in conflict either with airspace reservations established by the President . . . or with any civil or military airway[.]").

which the FAA is a part, with developing "a comprehensive plan to safely accelerate the integration of civil unmanned aircraft systems into the national airspace system." 49 U.S.C. § 44802(a)(1). As Congress explained, safety of drones and manned aircraft are inextricably linked: The federal drone safety laws would create "a safe airspace designation for cooperative *manned and unmanned* flight operations in the national airspace system." 49 U.S.C. § 44802(a)(2)(E) (emphasis added). In other words, the safety laws applicable to drones directly protect the safety of manned aircraft. *Id*. Federal preemption of drone safety rules assures a commercial jet flying from New Orleans to Houston that its airspace is drone-free both in Louisiana and when it crosses state lines into Texas. Variations in airspace requirements between state and federal drone safety laws is patently unsafe for the manned aircraft that share the national airspace with drones. Further, like federal laws concerning manned aircraft, federal drone laws are concerned with protecting the safety of people and property on the ground as well as in the air. *See e.g.*, *Allegheny Airlines v. Vill. of Cedarhurst*, 238 F.2d 812, 817 (2d Cir. 1956) (preempting local regulation of height of flights over village); *Int'l Aerobatics Club Chapter 1 v. City of Morris*, 76 F. Supp. 3d 767, 781 (N.D. Ill. 2014) (preempting local regulation of pilots practicing aerobatic activities, even where regulation was identical to federal regulations).

Notwithstanding Congress's view that restrictions on drone flights fall within aviation safety, the State also *admits* that the No-Fly Provisions are safety regulations, particularly meant to protect people on the ground. *See* State Opening Br. 12. Under the law of the six circuits, the analysis is straightforward: Because the No-Fly Provisions address aviation safety, they are preempted.[2]

In *Witty*, this Court did not reach the question whether all aviation safety laws are field preempted, but under the decision's rationale, the No-Fly Provisions are nevertheless preempted. *Witty* held there is field preemption where congressional intent to preempt the field can be inferred from Congress mandating a pervasive regulatory scheme. 386 F.3d at 384. *Witty* reasoned that because Congress intended the FAA to have exclusive federal regulation of aviation safety, and because in carrying out its mandate, the FAA had extensively regulated the content of oral safety briefings to passengers, state laws that required additional safety warnings were preempted. *Id.* at 385.

---

[2] In circuits where field preemption for aviation safety is established, the disputes often center around whether the state law at issue addresses a safety concern already addressed by federal regulation. *See, e.g.*, *Tweed-New Haven*, 930 F.3d at 74-75 (analyzing whether a state law concerning runway length was sufficiently tethered to air safety to be preempted); *O'Donnell*, 627 F.3d at 1325 (analyzing whether state law regulating alcohol served on airplanes implicated aviation safety sufficiently to be preempted). Here, there can be no serious dispute that a state law imposing drone flight safety rules falls within aviation safety in an area that is subject to extensive federal regulation.

Here, as in *Witty*, Congress tasked the FAA with creating a uniform and comprehensive regulatory scheme governing flight safety, including drone flight safety. And, similarly, the FAA has enacted extensive drone safety regulations pursuant to its congressional mandate. These regulations govern where drones can and cannot be flown, including the circumstances and procedures under which they can safely be flown over certain types of people and places. *See, e.g.*, 14 C.F.R. §§ 91.137-138 (natural disasters); *id*. § 91.141 (public figures); *id*. § 91.145 (sporting events); *see also infra* p. 17 (discussing the statute's fixed site facility mandates). Thus, because Congress intended to implement a uniform, comprehensive standard, and because federal regulations set out that standard, under *Witty*, the No-Fly Provisions are preempted.

The State's reliance on FAA statements about preemption are both irrelevant and misleading. As explained in more detail below (in Part II.B), whether state law is preempted hinges on *congressional* intent to displace it, not agency intent, and the FAA's views on preemption may be disregarded. But even if the FAA's views were relevant, they counsel in favor of preemption here.

A close examination of the federal administrative materials *supports* the conclusion that the No-Fly Provisions are state laws addressing aviation safety and are therefore preempted. The FAA recognized that there may be some state and local laws regulating drones—such as laws addressing privacy, zoning, and land use—

that are likely not preempted because they are "traditionally related to State and local police power." Operation and Certification of Small Unmanned Aircraft Systems, 81 Fed. Reg. 42064, 42194 (June 28, 2016). But on the other hand, there is a "Federal responsibility for ensuring the safety of flight as well as the safety of people on the ground as a result of the operation of aircraft. Substantial air safety issues are implicated when State or local governments attempt to regulate the operation of aircraft in national airspace." *Id.* Therefore, the FAA advises localities to consult with it when they enact "operational UAS restrictions on flight altitude [or] operational bans"—not because those types of regulations are permissible, but rather, because they may well not be. *Id.*[3] As the agency tasked with studying the preemption question put it, "non-Federal government actors may still issue ordinances affecting UAS as long as they do not touch the federally preempted field of aviation safety and the efficient management of airspace"[4]—precisely the field that Texas touches.

---

[3] *See* Off. of the Chief Couns., Fed. Aviation Admin., *State and Local Regulation of Unmanned Aircraft Systems (UAS) Fact Sheet* 3 (Dec. 17, 2015), https://www.faa.gov/sites/faa.gov/files/uas/resources/policy_library/UAS_Fact_Sheet_Final.pdf (Chief Counsel) (explaining that a city ordinance prohibiting drone flight near certain landmarks would be closely scrutinized by federal courts for preemption).

[4] *See* Gov't Accountability Off., *Unmanned Aircraft Systems: Current Jurisdictional, Property, and Privacy Legal Issues Regarding the Commercial and Recreational Use of Drones*, App. I, at 12 (Sept. 2020), https://www.gao.gov/assets/B330570_Appendices.pdf (cleaned up).

The FAA's chief counsel goes further, explaining that if municipalities regulate drone flight, a "'patchwork quilt' of differing restrictions could severely limit the flexibility of the FAA in controlling the airspace and flight patterns, and ensuring safety and an efficient air traffic flow. A navigable airspace free from inconsistent state and local restrictions is essential to the maintenance of a safe and sound air transportation system."[5]

In short, the FAA governance—which is perfectly consistent with the caselaw and congressional directives—indicates that state and local drone laws implicating flight safety, such as those prohibiting flight over certain places or aimed at protecting individuals on the ground, are preempted. While some other laws, such as privacy laws, might not be, the No-Fly Provisions fall squarely within the preempted area: They prohibit drone flights under 400 feet at certain locations in the name of safety while the FAA regulates drone flight in those same locations, also in the same of safety.

The State mistakenly relies on *Singer v. City of Newton* and *Xizmo Media Productions LLC v. City of New York* to support its argument that the No-Fly Provisions are field preempted. State Resp. Br. 43-44. But those cases do not address the

---

[5] Chief Counsel, *supra* n.3, at 2.

question whether state statutes governing drone flights are preempted because federal law occupies the field of *aviation safety*. Rather, those courts only analyzed whether federal occupies the field of *drone operation*. The *Xizmo* plaintiff claimed field preemption "concerning every facet of UAV operation," and the court found that the FAA did not "completely occupy" the entire field "of UAV operation." *Xizmo Media Prods. LLC v. City of New York*, No. 21-CV-2160, slip op. at 6 (E.D.N.Y Aug. 29, 2022).[6] Both cases hold that because the FAA has stated there is room for some state regulation of drones, such as in the privacy arena, there is not field preemption of drone laws entirely. *Singer v. City of Newton*, 284 F. Supp. 3d 125, 130 (D. Mass. 2017); *Xizmo*, slip op. at 6-8. But the relevant field at issue in this case is not drones; it is *aviation safety*. *See* ROA.19. And as explained above, the field of aviation safety—whether in the context of manned or unmanned aircraft—is exclusively federal. In any event, both *Singer* and *Xizmo* ultimately held that the state laws restricting drone operations were conflict preempted because the laws posed an obstacle to the purposes and objectives of Congress. *Singer*, 284 F. Supp. 3d at 132-33; *Xizmo*, slip op. at 13.

---

[6] https://storage.courtlistener.com/recap/gov.uscourts.nyed.462956/gov.uscourts.nyed.462956.24.0.pdf.

II.    **The No-Fly Provisions Are Preempted Because They Interfere with the Purposes and Objectives of Congress.**

Even if Congress had not occupied the field of aviation safety, the No-Fly Provisions would still be preempted because they serve as an obstacle to the purposes and objectives of Congress. Congress tasked the FAA with creating a comprehensive plan to safely integrate drones into the national airspace, which the FAA has done by issuing extensive regulations as to where drones may and may not fly. By imposing the State's own, conflicting, drone-flight restrictions, the No-Fly Provisions serve as an obstacle to the comprehensive federal scheme.

### A. Plaintiffs Sufficiently Pleaded Conflict Preemption, Including Obstacle Preemption.

Falling short on merits arguments, the State grasps at the straw that Plaintiffs failed to sufficiently plead conflict preemption. State Resp. Br. 44. Nonsense. Plaintiffs brought a Supremacy Clause claim and pleaded facts that support both field and conflict preemption, which includes obstacle preemption. ROA.19, 45-46 (Supremacy Clause claim); ROA.24-28 (facts about the No-Fly Provisions, the drone amendments to the Federal Aviation Act, and the FAA's regulation of drone operations). That is enough. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). At any rate, the Supreme Court has stated that "express, field, and conflict preemption" are not "rigidly distinct," but merely "different labels to describe the different ways in which

federal statues may displace state laws." *Virginia Uranium*, 139 S. Ct. at 1901. Further, "once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise argument they made below." *Citizens United v. FEC*, 558 U.S. 310, 330-31 (2010) (brackets omitted). The parties briefed—and the district court ruled on—conflict preemption below, and the claim is preserved for appeal. ROA.181-82, 422-24; *see Rosedale Missionary Baptist Church v. New Orleans City,* 641 F.3d 86, 89 (5th Cir. 2011).

### B. Preemption Hinges on Congressional, Not Agency, Intent.

The State's next tactic is to argue that preemption hinges on the intent of the agency, not that of Congress. State Resp. Br. 45-46. That is simply wrong as a doctrinal matter. As the Supreme Court's recent preemption jurisprudence has made clear, arguments that state law poses an obstacle to the purposes and objectives of Congress must be grounded in the text and structure of the federal *statute*. *Kansas v. Garcia*, 140 S. Ct. 791, 801, 804 (2020); *see Wyeth*, 555 U.S. at 573-74 (looking to statutory text for evidence of Congress's purposes and rejecting an agency-focused preemption argument that involved "an untenable interpretation of congressional intent").

To be clear, Plaintiffs are *not* contending that the FAA's view on preemption of state drone laws is inconsistent with congressional intent. Far from it. As explained above, FAA materials indicate that aviation safety laws, such as those that

govern where drones can be flown—including altitude limits—likely *are* preempted. But even if there were inconsistency, Plaintiffs would not be obligated to bring an action under the Administrative Procedure Act (APA) to ask the Court to apply the correct preemption standard. *See Wyeth*, 555 U.S. at 573-74 (rejecting argument that federal purposes and intent can be based on agency decisions, without requiring an APA action).

### C. The No-Fly Provisions Contravene Congressional Purposes and Intent for Federal Regulation of Drone Use.

State laws restricting where drones may fly for safety reasons so interfere with the purposes and intent of Congress that they are preempted. *See Witty*, 366 F.3d at 384. As established above, the Federal Aviation Act tasked the FAA with creating uniform aviation safety regulations, and in the Act's drone-specific amendments, Congress explicitly mandated that the FAA develop comprehensive, uniform rules for incorporating drones into the national airspace. Congress emphasized that "integrating unmanned aircraft systems safely into the national airspace . . . should remain a top priority for the Federal Aviation Administration." FAA Reauthorization Act of 2018, Pub. L. No. 115-254, § 370(4), 132 Stat. 3186, 3311 (2018 Act). The FAA has

carried out that mandate by promulgating rules governing drone flight—the exact subject of Texas's No-Fly Provisions.[7]

In its 2012 amendments to the Act, Congress mandated that the agency "*shall develop a comprehensive* plan to safely accelerate the integration of civil unmanned aircraft systems into the national airspace system." 49 U.S.C. § 44802(a)(1) (emphasis added). Among other specific requirements, Congress required the plan to include "a timeline for the phased-in approach," § 44802(a)(2)(D), "creation of a safe airspace designation for cooperative manned and unmanned flight operation in the national airspace system," § 44802(a)(2)(E), and "the best methods to ensure the safe operation of civil unmanned aircraft systems and public unmanned aircraft systems simultaneously in the national airspace," § 44802(a)(2)(G). The statute goes on to require the FAA, within eighteen months, to publish "a final rule on small unmanned aircraft systems that will allow for civil operation of such systems in the national airspace system." § 44802(b)(1).

That is not all. In 2016, Congress required the FAA to allow exemptions or waivers for drone use in emergencies where they would normally not be permitted, recognizing that drones play an increasingly important role in crisis management. FAA Extension, Safety, and Security Act of 2016, Pub. L. No. 114-190, § 2207, 130

---

[7] Of course, the No-Fly Provisions also impermissibly regulate speech. *See* NPPA Br. 32-35.

Stat. 615, 632-33 (2016 Act); *see also* 2018 Act § 353(b). Critically, in that same amendment, Congress also directed the Agency to establish a case-by-case process for prohibiting drone flights around certain "fixed site facilities," which include *only* "[c]ritical infrastructure, such as energy production, transmission, and distribution facilities and equipment," "[o]il refineries and chemical facilities," "[a]musement parks," and "[o]ther locations that warrant such restrictions." 2016 Act § 2209(a)-(b)(1)(C). To decide whether drone flights should be restricted around fixed site facilities, Congress directed the FAA to consider "aviation safety," "protection of persons and property on the ground," and security. § 2209(b)(2)(C).

The No-Fly Provisions cover this same territory that Congress specifically tasked to the federal agency. The Texas statute governs drone flight near identical critical infrastructure facilities including "petroleum [] refiner[ies]," "power generating facilit[ies]," natural gas plants, and oil and gas drilling sites. Tex. Gov't Code § 423.0045(a)(1-a)(A). The No-Fly Provisions go so far as to govern drone operation over "a public or private airport." Gov't § 423.0045(a)(1-a)(A)(viii). In other words, Congress directed the FAA to regulate in the exact area of drone safety that Texas has also attempted to regulate.

In short, the Federal Aviation Act, including the drone-specific amendments, evinces a specific congressional purpose and intent to have a comprehensive and uniform system of drone regulation, including how to determine whether drones may

fly over certain facilities and when exemptions to those restrictions are appropriate. The No-Fly Provisions cover the same ground but regulate the area differently, posing an obstacle to congressional purposes and intent.[8]

The FAA regulations crystallize the extent to which the No-Fly Provisions interfere with Congress's vision for federal drone regulation. The grant of rulemaking authority in the Federal Aviation Act and its drone-specific amendments is no ordinary, generic grant of rulemaking authority. *Compare, e.g.*, 47 U.S.C. § 303(r) (directing the Federal Communications Commission to enact implementing rules consistent with the statute), *with* 49 U.S.C. § 44802 (directing the Secretary of Transportation to determine and prepare regulations regarding "best methods," "priorities," and "specific tasks" related to drone integration, in addition to implementing those regulations). Rather, Congress has directed the Agency to promulgate specific types of regulations and instructed the Agency as to what factors (aviation and ground safety) it should consider. 49 U.S.C. §§ 44802, 40103(b). Where, as here, Congress mandates that an agency make certain determinations and how, the

---

[8] To be clear, Plaintiffs are not arguing the No-Fly Provisions are preempted because it would be impossible to comply with both state and federal drone law—though it may, in fact, be impossible to so without forgoing use of a drone. Rather, because Congress's intent is for the federal agency to comprehensively regulate in this space, the No-Fly Provisions are preempted because they pose an obstacle to that intent.

preemptive import of agency decisions is at its zenith—even as the relevant objectives remain those of Congress. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 872 (2000).

In promulgating regulations pursuant to these congressional directives, the Agency has restricted drone flights where those flights could pose a threat to public safety and infrastructure. For starters, the FAA prohibits drone flights above 400 feet for safety reasons, 14 C.F.R. § 107.51(b)—at the same time the Texas No-Fly Provisions prohibit drone flights *under* 400 feet, also purportedly for safety reasons, Gov't § 423.0045(b)(1). Federal regulations also restrict flight near aircraft, 14 C.F.R. § 107.37, over people, *id.* § 107.39, in controlled airspace, *id.* § 107.41, near airports, *id.* § 107.43, in prohibited or restricted areas, *id.* § 107.45, and near areas designated by a notice to airmen, *id.* § 107.47. Under these regulations, the agency restricts flights over natural disaster areas, *id.* §§ 91.137-138, public figures such as the president, *id.* § 91.141, sporting events, *id.* § 91.145, and other temporary restrictions as needed, *id.* § 91.137. *See also, e.g.*, Fed. Aviation Admin., NOTAM No. 0/0367 (2020) (temporary flight restrictions during sporting events). And as directed by Congress, those restrictions provide for exemptions in emergencies, including for journalists to fly when the aircraft is carrying or flown by "properly accredited news

representatives," 14 C.F.R. § 91.137(c)(5), or by a waiver for, among other things, "Media Coverage Providing Crucial Information to the Public."[9]

The Texas No-Fly Provisions govern drone flight in some of the exact same locations, but in different ways than the FAA does. *See* Gov't §§ 423.0045(a)(1-a), .0046(a). They are therefore preempted. As this Court held in *Witty*, where Congress has directed the FAA to issue comprehensive safety regulations, and the Agency has regulated in the specific area the state seeks to also govern—here, restrictions on where drones can operate—differing state law poses an obstacle to congressional intent and is preempted. *See Witty*, 366 F.3d at 385.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's order dismissing Plaintiffs'/Cross-Appellants' Supremacy Clause claim and find that federal law preempts the No-Fly Provisions.

---

[9] *Emergency Situations*, Fed. Aviation Admin. (June 3, 2022), https://www.faa.gov/uas/advanced_operations/emergency_situations; *see* FAA Order No. JO 7210.3CC § 21-5-4 (June 17, 2021).

Dated: February 7, 2023

Respectfully Submitted,

*/s/ Leah M. Nicholls*

James A. Hemphill
GRAVES, DOUGHERTY, HEARON &
  MOODY, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
(512) 480-5762
jhemphill@gdhm.com

Mickey H. Osterreicher
General Counsel
NATIONAL PRESS PHOTOGRAPHERS
  ASSOCIATION
FINNERTY OSTERREICHER & ABDULLA
70 Niagara Street, Buffalo, NY 14202
(716) 983-7800
lawyer@nppa.org

Alicia Wagner Calzada
Deputy General Counsel
NATIONAL PRESS PHOTOGRAPHERS
  ASSOCIATION
ALICIA WAGNER CALZADA, PLLC
12023 Radium Street, Suite B1
San Antonio, TX 78216
(210) 825-1449
alicia@calzadalegal.com

Leah M. Nicholls
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
lnicholls@publicjustice.net

David A. Schulz
Kelsey Eberly
MEDIA FREEDOM &
  INFORMATION ACCESS CLINIC
YALE LAW SCHOOL[10]
127 Wall Street
New Haven, CT 06520
(203) 436-5824
david.schulz@yale.edu
kelsey.eberly@yale.edu

*Counsel for Plaintiffs-
Appellees/Cross-Appellants*

---

[10] This brief does not purport to represent the institutional views of Yale Law School, if any.

**CERTIFICATE OF COMPLIANCE**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(C) because it contains 4,584 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Leah M. Nicholls*
Leah M. Nicholls
*Attorney for Plaintiffs-Appellees/Cross-Appellants*

Date: February 7, 2023

**CERTIFICATE OF SERVICE**

On February 7, 2023, this document was served via CM/ECF on all registered

counsel and transmitted to the Clerk of the Court.

*/s/ Leah M. Nicholls*
Leah M. Nicholls