# 22-50337

## In the
## United States Court of Appeals
## For the Fifth Circuit

❖

NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, TEXAS PRESS
ASSOCIATION and JOSEPH PAPPALARDO,

*Plaintiffs-Appellees/Cross-Appellants,*

— v. —

STEVEN MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE
TEXAS DEPARTMENT OF PUBLIC SAFETY, DWIGHT MATHIS IN HIS
OFFICIAL CAPACITY AS CHIEF OF THE TEXAS HIGHWAY PATROL
and KELLY HIGGINS, IN HIS OFFICIAL CAPACITY AS DISTRICT
ATTORNEY OF HAYS COUNTY, TEXAS,

*Defendants-Appellants/Cross-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

---

## MOTION OF PROPOSED *AMICI* FOR LEAVE TO FILE THEIR *AMICI CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS-APPELLEES/ CROSS-APPELLANTS' PETITION FOR REHEARING *EN BANC*

---

THOMAS B. SULLIVAN
CHARLES D. TOBIN
JACQUELYN N. SCHELL
EMMY PARSONS
BALLARD SPAHR LLP
*Attorneys for Amici Curiae*
1675 Broadway, 19th Floor
New York, New York 10019
(212) 850-6139
SullivanT@ballardspahr.com
TobinC@ballardspahr.com
SchellJ@ballardspahr.com
ParsonsE@ballardspahr.com



## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that, in addition to the persons and entities listed in Plaintiffs-Appellees' Certificate of Interested Persons, the following listed persons and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification.

**Amici Curiae:**

**Advance Publications, Inc.** Advance Publications, Inc. does not have any parent corporation, nor does any publicly held corporation own more than ten percent of its stock.

**The Associated Press.** The Associated Press ("AP") is a news corporation incorporated under the Not-for-Profit Corporation Law of New York and has no parents, subsidiaries or affiliates that are publicly traded.

**Cable News Network, Inc.** Cable News Network, Inc., is ultimately a wholly-owned subsidiary of Warner Bros. Discovery, Inc., a publicly traded corporation. Warner Bros. Discovery, Inc. has no parent company and, to the best of Cable News Network, Inc.'s knowledge, no publicly held company owns 10% or more of Warner Bros. Discovery, Inc.'s stock.

**E.W. Scripps Company.** The E.W. Scripps Company is a publicly traded company with no parent company. No individual shareholder owns more than 10% of its stock.

**Fox Television Stations, LLC.** Fox Television Stations, LLC ("FTS") is an indirect subsidiary of Fox Corporation, a publicly held company. No other publicly held company owns 10% or more of the stock of Fox Corporation. FTS operates 29 full-power broadcast television stations nationally, including five in Texas: KDFW and KDFI in Dallas, KRIV and KTXH in Houston, and KTBC in Austin.

**Gray Media Group, Inc.** Gray Media Group, Inc. is held entirely by Gray Television, Inc., a publicly held corporation. No entity holds 10% or more of the equity in Gray Television, Inc. Gray Media Group, Inc. is a multimedia company headquartered in Atlanta, Georgia. It is the nation's largest owner of top-rated local television stations in the United States and serves 113 television markets, reaching approximately 36 percent of US television households. It joins amici on behalf of the following wholly-owned television broadcast stations based in or operating partially in Texas:

- KBTX, Bryan/College Station, Texas
- KCBD, KLCW, KXTQ, Lubbock, Texas
- KFDA/KEYU, Amarillo, Texas

ii

- KGNS/KYLX, Laredo, Texas

- KLTV, Tyler, Texas

- KTRE, Lufkin, Texas

- KOSA/KCWO/KTLE/KWWT, Odessa, Texas

- KSWO, Lawton, Oklahoma (Wichita Falls, Texas)

- KWTX /KNCT, Waco, Texas

- KXII, Sherman, Texas

**Gannett Co., Inc.**  Gannett Co., Inc. is a publicly traded company and has no affiliates or subsidiaries that are publicly owned.  No public company owns ten percent or more of the stock of Gannett Co., Inc.

**The New York Times Company.**  The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned.  No publicly held company owns 10% or more of its stock.

**News/Media Alliance.**  News/Media Alliance is a nonprofit, non-stock corporation organized under the laws of the Commonwealth of Virginia.  It has no parent company.

**Reporters Committee for Freedom of the Press.**  The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

**Radio Television Digital News Association.**  Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

**Sinclair, Inc.**  Sinclair, Inc. is a Maryland corporation which is publicly traded on NASDAQ under the symbol SBGI.

**TEGNA Inc.**  TEGNA Inc. has no parent company, is a publicly traded company, and has no affiliates or subsidiaries that are publicly owned.  BlackRock, Inc. and the Vanguard Group, Inc. each own ten percent or more of the stock of TEGNA Inc.  TEGNA owns 64 news brands in 51 markets and is the largest owner of Big Four affiliates in the top 25 markets among independent station groups, reaching approximately 39 percent of all TV households nationwide.  It joins amici on behalf of the following wholly-owned television broadcast stations based in Texas:

- WFAA, Dallas/Fort Worth, Texas

- KHOU, Houston, Texas

- KENS, San Antonio, Texas

- KVUE, Austin, Texas

- KCEN/KAGS, Waco and College Station, Texas

- KYTX, Tyler, Texas

- KIII, Corpus Christi, Texas

- KWES, Odessa/Midland, Texas

- KBMT, KJAC, Beaumont, Texas

- KXVA/KIDY, Abilene/San Angelo, Texas

**Texas Association of Broadcasters.**  The Texas Association of Broadcasters has no parent corporation and issues no stock.

**WP Company LLC d/b/a The Washington Post.**  WP Company LLC d/b/a The Washington Post is a wholly owned subsidiary of Nash Holdings LLC, which is privately held.  No publicly held company owns 10% or more of its stock.

**Attorneys of Record:**

Thomas B. Sullivan, Esq.

Charles D. Tobin, Esq.

Jacquelyn N. Schell, Esq.

Emmy Parsons, Esq.

Dated: November 27, 2023                    */s/ Thomas B. Sullivan*
                                            Thomas B. Sullivan

                                            *Counsel for Proposed Amici*

## MOTION OF PROPOSED AMICI
## FOR LEAVE TO FILE THEIR *AMICI CURIAE* BRIEF IN SUPPORT OF
## PLAINTIFFS-APPELLANTS/CROSS-APPELLEES'
## PETITION FOR REHEARING *EN BANC*

Pursuant to 5th Cir. R. 29.1 and Fed. R. App. P. 27 and 29(a)(3), Advance

Publications, Inc., The Associated Press, Cable News Network, Inc., E.W. Scripps

Company, Fox Television Stations, LLC, Gray Media Group, Inc., Gannett Co.,

Inc., The New York Times Company, News/Media Alliance, Reporters Committee

for Freedom of the Press, Radio Television Digital News Association, Sinclair,

Inc., TEGNA Inc., Texas Association of Broadcasters, and WP Company LLC

d/b/a The Washington Post (collectively, "Proposed Amici"), by and through their

undersigned counsel, respectfully move for leave to file the attached amici curiae

brief in support of Plaintiffs-Appellees/Cross-Appellants National Press

Photographers Association, Texas Press Association, and Joseph Pappalardo

("Plaintiffs") and Plaintiffs' Petition for Rehearing *en Banc*.

The Proposed Amici should be granted leave to participate as amici in this

appeal. Under Rule 29(a)(3), parties seeking leave to file an amicus brief must

state "the movant's interest" and "the reason why an amicus brief is desirable and

why the matters asserted are relevant to the disposition of the case." Each of the

Proposed Amici has a keen interest in the outcome of this matter, and the proposed

brief will aid the Court in its consideration of this appeal. Counsel for Plaintiffs

have consented to this motion, and counsel for Defendants-Appellants/Cross-Appellees do not oppose the filing of the proposed amici brief.

## I.     The Proposed Amici Have an Interest in this Appeal

The Proposed Amici are a diverse coalition of media companies and journalists that provide news and entertainment to readers, viewers, and listeners throughout the country and around the world and organizations that support such journalists and media outlets.

The Proposed Amici have harnessed the power of drones to enhance their newsgathering and reporting on matters of immense public interest, from natural disasters, to explosions, to human interest stories, and beyond.  Many of the Proposed Amici have already incorporated the use of drones into their newsrooms and business practices.

The Proposed Amici seek to submit their brief in support of Plaintiffs because they have a strong interest in ensuring that journalists in Texas can continue to rely on drones as a newsgathering instrument and means of conveying information of great public importance to the public at large.

## II.    The Proposed Amici's Brief is Desirable and Relevant

Leave to file a brief amicus curiae lies in the discretion of the Court.  *See Lefebure v. D'Aquilla*, 15 F.4th 670, 673 (5th Cir. 2021) (opinion of Ho, J. on motion for leave to file *amicus* brief), *cert. denied*, 142 S. Ct. 2732 (2022) .  This

discretion should be exercised liberally, especially where matters of public interest are involved. "Even when a party is very well represented, an amicus may provide important assistance to the court." *Neonatology Assocs. v. Comm'r of Internal Revenue*, 293 F.3d 128, 132 (3d Cir. 2002). "Some friends of the court are entities with particular expertise not possessed by any party to the case. . . . Still others explain the impact a potential holding might have on an industry or other group." *Id*. Amicus briefs are regularly accepted by courts, since a "restrictive policy with respect to granting leave to file may also create at least the perception of viewpoint discrimination." *Id*. at 133.

The Proposed Amici's brief attempts to explain how the panel's decision negatively impacts media companies and journalists that use drones to enhance their newsgathering and reporting by exposing drone journalists to civil and criminal penalties and chilling their newsgathering and protected speech on matters of great public importance, and by extension, how the panel's flawed decision negatively impacts the amount and quality of information that journalists and media companies will be able to make available to the public at large.

The brief also meets the other requirements of Rule 29. The brief does not repeat facts or legal arguments already in the Plaintiffs' petition. No party's counsel authored the brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and

no person other than the amici curiae, their members, and their counsel contributed money that was intended to fund preparing or submitting the brief. The brief contains fewer than 2,600 words. *See* 5th Cir. R. 29.3; Fed. R. App. P. 29(b)(4), 32(a)(7). The brief is being filed seven days after the filing of the petition of the party the Proposed Amici support. *See* 5th Cir. R. 29.1.

## CONCLUSION

For these reasons, amici respectfully request that the Court grant *en banc* review, amend the panel's earlier opinion to ensure that this Court's holdings comport with binding First Amendment jurisprudence, and reinstate the lower court's ruling.

Respectfully submitted,

**BALLARD SPAHR LLP**

  */s/ Thomas B. Sullivan*
Thomas B. Sullivan
Charles D. Tobin
Jacquelyn N. Schell
Emmy Parsons
1675 Broadway, 19th Floor
New York, NY 10019
Telephone: (212) 850-6139
Facsimile: (212) 223-1942
SullivanT@ballardspahr.com
TobinC@ballardspahr.com
SchellJ@ballardspahr.com
ParsonsE@ballardspahr.com

*Counsel for Proposed Amici*

## CERTIFICATE OF CONFERENCE

On November 21, 2023, undersigned counsel conferred with counsel for Plaintiffs-Appellees/Cross-Appellants and Defendants-Appellants/Cross-Appellees regarding Proposed Amici's motion for leave to file their amici curiae brief. Counsel for Plaintiffs-Appellees/Cross-Appellants advised that they consented to the motion. Counsel for Defendants-Appellants/Cross-Appellees stated that they did not oppose the participation of these organizations as amici.

Dated: November 27, 2023                    */s/ Thomas B. Sullivan*
                                             Thomas B. Sullivan
                                             *Counsel for Amici*

## CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send notice of such filing to all counsel of record.

Dated: November 27, 2023

*/s/ Thomas B. Sullivan*
Thomas B. Sullivan
*Counsel for Amici*

**CERTIFICATE OF COMPLIANCE**

1.     The forgoing Motion complies with the type-volume limitations of Fed. R. App. 29(a)(5), Fed. R. App. 29(b)(4) and Fed. R. App. 32(a)(7) because it contains 772 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Fifth Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: November 27, 2023                    */s/ Thomas B. Sullivan*
                                            Thomas B. Sullivan
                                            *Counsel for Amici*

# 22-50337

In the

## United States Court of Appeals

### For the Fifth Circuit



NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, TEXAS PRESS
ASSOCIATION and JOSEPH PAPPALARDO,

*Plaintiffs-Appellees/Cross-Appellants,*

— v. —

STEVEN MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE
TEXAS DEPARTMENT OF PUBLIC SAFETY, DWIGHT MATHIS IN HIS
OFFICIAL CAPACITY AS CHIEF OF THE TEXAS HIGHWAY PATROL
and KELLY HIGGINS, IN HIS OFFICIAL CAPACITY AS DISTRICT
ATTORNEY OF HAYS COUNTY, TEXAS,

*Defendants-Appellants/Cross-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

## BRIEF OF 15 MEDIA & JOURNALIST ORGANIZATION *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES/ CROSS-APPELLANTS' PETITION FOR REHEARING *EN BANC*

THOMAS B. SULLIVAN
CHARLES D. TOBIN
JACQUELYN N. SCHELL
EMMY PARSONS
BALLARD SPAHR LLP
*Attorneys for Amici Curiae*
1675 Broadway, 19th Floor
New York, New York 10019
(212) 850-6139
SullivanT@ballardspahr.com
TobinC@ballardspahr.com
SchellJ@ballardspahr.com
ParsonsE@ballardspahr.com

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that, in addition to the persons and entities listed in Plaintiffs-Appellees' Certificate of Interested Persons, the following listed persons and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification.

**Amici Curiae:**

**Advance Publications, Inc.** Advance Publications, Inc. does not have any parent corporation, nor does any publicly held corporation own more than ten percent of its stock.

**The Associated Press.** The Associated Press ("AP") is a news corporation incorporated under the Not-for-Profit Corporation Law of New York and has no parents, subsidiaries or affiliates that are publicly traded.

**Cable News Network, Inc.** Cable News Network, Inc., is ultimately a wholly-owned subsidiary of Warner Bros. Discovery, Inc., a publicly traded corporation. Warner Bros. Discovery, Inc. has no parent company and, to the best of Cable News Network, Inc.'s knowledge, no publicly held company owns 10% or more of Warner Bros. Discovery, Inc.'s stock.

**E.W. Scripps Company.** The E.W. Scripps Company is a publicly traded company with no parent company. No individual shareholder owns more than 10% of its stock.

**Fox Television Stations, LLC.** Fox Television Stations, LLC ("FTS") is an indirect subsidiary of Fox Corporation, a publicly held company. No other publicly held company owns 10% or more of the stock of Fox Corporation. FTS operates 29 full-power broadcast television stations nationally, including five in Texas: KDFW and KDFI in Dallas, KRIV and KTXH in Houston, and KTBC in Austin.

**Gray Media Group, Inc.** Gray Media Group, Inc. is held entirely by Gray Television, Inc., a publicly held corporation. No entity holds 10% or more of the equity in Gray Television, Inc. Gray Media Group, Inc. is a multimedia company headquartered in Atlanta, Georgia. It is the nation's largest owner of top-rated local television stations in the United States and serves 113 television markets, reaching approximately 36 percent of US television households. It joins amici on behalf of the following wholly-owned television broadcast stations based in or operating partially in Texas:

- KBTX, Bryan/College Station, Texas
- KCBD, KLCW, KXTQ, Lubbock, Texas
- KFDA/KEYU, Amarillo, Texas

- KGNS/KYLX, Laredo, Texas

- KLTV, Tyler, Texas

- KTRE, Lufkin, Texas

- KOSA/KCWO/KTLE/KWWT, Odessa, Texas

- KSWO, Lawton, Oklahoma (Wichita Falls, Texas)

- KWTX /KNCT, Waco, Texas

- KXII, Sherman, Texas

**Gannett Co., Inc.**  Gannett Co., Inc. is a publicly traded company and has no affiliates or subsidiaries that are publicly owned.  No public company owns ten percent or more of the stock of Gannett Co., Inc.

**The New York Times Company.**  The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned.  No publicly held company owns 10% or more of its stock.

**News/Media Alliance.**  News/Media Alliance is a nonprofit, non-stock corporation organized under the laws of the Commonwealth of Virginia.  It has no parent company.

**Reporters Committee for Freedom of the Press.**  The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

**Radio Television Digital News Association.** Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

**Sinclair, Inc.** Sinclair, Inc. is a Maryland corporation which is publicly traded on NASDAQ under the symbol SBGI.

**TEGNA Inc.** TEGNA Inc. has no parent company, is a publicly traded company, and has no affiliates or subsidiaries that are publicly owned. BlackRock, Inc. and the Vanguard Group, Inc. each own ten percent or more of the stock of TEGNA Inc. TEGNA owns 64 news brands in 51 markets and is the largest owner of Big Four affiliates in the top 25 markets among independent station groups, reaching approximately 39 percent of all TV households nationwide. It joins amici on behalf of the following wholly-owned television broadcast stations based in Texas:

- WFAA, Dallas/Fort Worth, Texas

- KHOU, Houston, Texas

- KENS, San Antonio, Texas

- KVUE, Austin, Texas

- KCEN/KAGS, Waco and College Station, Texas

- KYTX, Tyler, Texas

- KIII, Corpus Christi, Texas

- KWES, Odessa/Midland, Texas

- KBMT, KJAC, Beaumont, Texas

- KXVA/KIDY, Abilene/San Angelo, Texas

**Texas Association of Broadcasters.**  The Texas Association of Broadcasters has no parent corporation and issues no stock.

**WP Company LLC d/b/a The Washington Post.**  WP Company LLC d/b/a The Washington Post is a wholly owned subsidiary of Nash Holdings LLC, which is privately held.  No publicly held company owns 10% or more of its stock.

**Attorneys of Record:**

Thomas B. Sullivan, Esq.

Charles D. Tobin, Esq.

Jacquelyn N. Schell, Esq.

Emmy Parsons, Esq.


Dated: November 27, 2023                    */s/ Thomas B. Sullivan*
                                            Thomas B. Sullivan

                                            *Counsel for Amici*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... vii

IDENTITY AND INTEREST OF AMICI CURIAE ................................................ix

SOURCE OF AUTHORITY TO FILE ........................................................x

FED. R. APP. P. 29 (A)(4)(E) STATEMENT..........................................................x

SUMMARY OF ARGUMENT ................................................................1

ARGUMENT ......................................................................................3

I.    The Court erred by finding that drone use by journalists is not
      sufficiently expressive to warrant First Amendment strict scrutiny ..............3

II.   The Texas statute cannot survive strict scrutiny ............................................6

III.  The Court erred in holding that Plaintiffs must vindicate their First
      Amendment rights on a case-by-case basis ....................................................7

CONCLUSION ....................................................................................12

CERTIFICATE OF SERVICE ...............................................................13

CERTIFICATE OF COMPLIANCE.......................................................14

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*ACLU v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) ..................................................................5

*Animal Legal Def. Fund v. Wasden,*
  878 F.3d 1184 (9th Cir. 2018) ...............................................................5

*Barilla v. City of Houston,*
  13 F.4th 427 (5th Cir. 2021) ..................................................................8

*Brown v. Kemp,*
  2023 U.S. App. LEXIS 30112 (7th Cir. Nov. 13, 2023) ..................................4, 5

*Carey v. Brown,*
  447 U.S. 455 (1980)..............................................................................4

*Citizens United v. FEC,*
  558 U.S. 310 (2010)...........................................................................3, 9

*Dombrowski v. Pfister,*
  380 U.S. 479 (1965)...........................................................................8, 9

*Dorfman v. Meiszner,*
  430 F.2d 558 (7th Cir. 1970) ..................................................................5

*Gooding v. Wilson,*
  405 U.S. 518 (1972)..............................................................................8

*Irizarry v. Yehia,*
  38 F.4th 1282 (10th Cir. 2022) ...............................................................5

*Joseph Burstyn, Inc. v. Wilson,*
  343 U.S. 495 (1952).............................................................................4, 5

*Nat'l Press Photographers Ass'n v. McCraw,*
  594 F. Supp. 3d 789 (W.D. Tex. 2022) .......................................................6, 7

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015)............................................................................4, 6

*Roman Catholic Diocese v. Cuomo*,
  141 S. Ct. 63 (2020).........................................................................9, 10

*Turner v. Driver*,
  848 F.3d 678 (5th Cir. 2017) ...............................................................4

*United States v. CBS*,
  497 F.2d 102 (5th Cir. 1974) ...............................................................5

*Virginia v. Hicks*,
  539 U.S. 113 (2003).................................................................8, 9, 10

## Statutes & Other Authorities

14 C.F.R. Part 107..................................................................................1

House Bill Analysis for H.B. 912 (Tex. May 7, 2013) .............................7

*Nat'l Voluntary Best Practices for UAS Privacy, Transparency, &*
  *Accountability*, Nat'l Telecomm. & Info. Admin (May 18, 2016) ......................1

Pub. Law 112-95 § 332, 126 Stat. 11 (Feb. 14, 2012)...............................1

Tex. Gov't Code § 423.002.................................................................2, 3, 4

Tex. Gov't Code § 423.003....................................................................2, 3

## IDENTITY AND INTEREST OF AMICI CURIAE

Amici are Advance Publications, Inc., The Associated Press, Cable News Network, Inc., E.W. Scripps Company, Fox Television Stations, LLC, Gray Media Group, Inc., Gannett Co., Inc., The New York Times Company, News/Media Alliance, Reporters Committee for Freedom of the Press, Radio Television Digital News Association, Sinclair, Inc., TEGNA Inc., Texas Association of Broadcasters, and WP Company LLC d/b/a The Washington Post ("Amici").

Amici are a diverse coalition of media companies and journalists that provide news and entertainment to readers, viewers, and listeners throughout the country and around the world and organizations that support such journalists and media outlets. Amici have harnessed the power of drones to enhance their newsgathering and reporting on matters of immense public interest, from natural disasters, to explosions, to human interest stories, and beyond. Many of the Amici have already incorporated the use of drones into their newsrooms and business practices.

Amici submit this brief in support of Plaintiffs-Appellees/Cross-Appellants ("Plaintiffs") because Amici have a strong interest in ensuring that journalists in Texas can continue to rely on drones as a newsgathering instrument and means of conveying information of great public importance to the public at large.

## SOURCE OF AUTHORITY TO FILE

Amici seek leave to file by the motion filed herewith.  *See* Fed. R. App. P. 29(a)(3); Circuit Rule 29.1.  Plaintiffs-Appellees/Cross-Appellants consent to the filing of this brief; counsel for Defendants-Appellants/Cross-Appellees have represented that Defendants-Appellants/Cross-Appellees do not oppose the timely filing of an amicus curiae brief.

## FED. R. APP. P. 29(A)(4)(E) STATEMENT

Amici declare that:

1.      No party's counsel authored the brief in whole or in part;

2.      No party or party's counsel contributed money intended to fund preparing or submitting the brief; and

3.      No person, other than amici, their members, or their counsel contributed money intended to fund preparing or submitting the brief.

## SUMMARY OF ARGUMENT

While it may be true that "a picture is worth a thousand words," Texas journalists using drones in their reporting must now decide whether—even where the public interest in a photograph or film image is at its highest—a picture is worth being charged with a crime.

Nearly a decade ago, under a new federal regulation, photography from small drones weighing less than 55 pounds became lawful for those with Federal Aviation Administration certification.[1]  The FAA promulgated the drone rulemaking in response to Congress's mandate, in the FAA Modernization and Reform Act of 2012, that the agency develop regulation to facilitate the safe integration of small commercial drones into the national airspace.[2]  News photography was one of the specific end uses the FAA contemplated[3] in promulgating the rule in the public's interest and pursuant to congressional mandate.

---

[1] *See* 14 C.F.R. Part 107.

[2] Pub. Law 112-95 § 332, 126 Stat. 11 at 73-75 (Feb. 14, 2012).

[3] In 2015, in contemplation of the FAA's promulgation of these rules, the White House convened a multi-stakeholder process under the auspices of the Department of Commerce National Telecommunications and Information Administration.  The resulting report explicitly recognized that journalists are a distinct category of drone end-users, as "[n]ewsgathering and news reporting are strongly protected by United States law, including the First Amendment to the Constitution."  *See Nat'l Voluntary Best Practices for UAS Privacy, Transparency, & Accountability*, Nat'l Telecomm. & Info. Admin (May 18, 2016) at 7, https://www.ntia.doc.gov/files/ntia/publications/uas_privacy_best_practices_6-21-16.pdf.

Despite this, under Texas statutory law, some—but not all—drone operators are criminally barred from capturing images of private property or people on private property "with the intent to conduct surveillance[.]"  *See* Tex. Gov't Code § 423.003(a).  Under this law, journalists—unlike academics, land surveyors, or real estate brokers—are prohibited from gathering this entire category of content.  *Id.* § 423.002.  For example, under the panel decision in this matter, journalists using drones are at risk of arrest if they:

- Record images of manufacturing plant discharge while flying a drone over public property;

- Capture aerial images of a faulty dam that poses risks to surrounding neighborhoods;

- Publish photographs of a public park ribbon-cutting ceremony if adjacent houses can also be seen.

The panel's flawed decision leaves journalists vulnerable to criminal and civil penalties by concluding that the statute does not regulate speech and is not subject to strict scrutiny.  To the contrary, the statute unquestionably regulates speech and is subject to strict scrutiny, but it does not satisfy this exacting standard.  The panel also erred in holding that the statute does not facially violate the First Amendment.  As the statute has already chilled public-interest visual journalism in Texas, a facial challenge is appropriate, and the Court erred in requiring journalists to bring challenges on a case-by-case basis.

Amici respectfully request that the Court grant *en banc* review to ensure that this Court's holdings comport with binding First Amendment jurisprudence.

## ARGUMENT

## I.    The Court erred by finding that drone use by journalists is not sufficiently expressive to warrant First Amendment strict scrutiny

The panel departs from settled law in construing the Texas drone statute as simply regulating "the means" used to capture images, as opposed "what images can be captured."  Having set up a false dichotomy between the instrument of news gathering and the images journalists gather, the panel erroneously concludes that the surveillance provision "do[es] not directly regulate the content of speech," "pose[s] a less substantial risk of excising certain ideas or viewpoints from the public dialog, and therefore need only "survive[] intermediate scrutiny."  Op. at 19-20, 24, 31.

But the statute *does* regulate "what images can be captured," as it criminalizes only images captured by certain speakers.  *See generally Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (First Amendment prohibits "restrictions distinguishing among different speakers, allowing speech by some but not others.").  Relevant here, it criminalizes the use of drones "to capture an image," Tex. Gov't Code § 423.003(a), but exempts from criminal liability images captured by certain drone operators *other than journalists*, including images captured for an "academic purpose," for "the marketing, sale, or financing" of real estate, or for

3

"mapping," *id.* § 423.002. In other words, if a journalist captures an image for a breaking news story about homes destroyed in a wild fire, that journalist could be subject to criminal penalty; if a realtor captures that same image to list the destroyed property for sale, that realtor is exempt from criminal penalty. A statute that draws such explicit content-based distinctions is a restriction on speech that must satisfy strict scrutiny.

As the Supreme Court explained, "defining regulated speech by its function or purpose" draws a distinction "based on the message a speaker conveys" and is subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015) (invalidating city ordinance imposing different restrictions on yard signs based on category of yard sign). As the Texas statute "discriminates between lawful and unlawful conduct based upon the content of the [operator's] communication," it must, but cannot, survive strict scrutiny. *See Carey v. Brown*, 447 U.S. 455, 460 (1980).

What's more, even if the statute regulates the "means," rather than the "image," as this Court previously recognized, "there is no fixed First Amendment line between the act of creating speech and the speech itself." *Turner v. Driver*, 848 F.3d 678, 688-89 (5th Cir. 2017) (right to record video is entitled to strict scrutiny protection). As the Seventh Circuit just held, "First Amendment protection extends to activities necessary to produce and disseminate speech within

a protected 'medium for the communication of ideas,'" and "the 'act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording.'" *Brown v. Kemp*, 2023 U.S. App. LEXIS 30112, at *27-28 (7th Cir. Nov. 13, 2023) (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) and *ACLU v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012)); *see Irizarry v. Yehia*, 38 F.4th 1282, 1289 (10th Cir. 2022) ("videorecording is unambiguously speech-creation, not mere conduct").

Several other federal appellate courts have held that the *instruments* used by journalists to gather and report the news are, themselves, protected by the First Amendment as "organ[s] of public opinion" and as a "significant medium for the communication of ideas." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018) (quoting *Burstyn*, 343 U.S. at 501 (creation of audiovisual recordings entitled to First Amendment protection)); *United States v. CBS*, 497 F.2d 102, 106-07 (5th Cir. 1974) (same as to an artist making sketches); *Dorfman v. Meiszner*, 430 F.2d 558, 562-63 (7th Cir. 1970) (same as to using a camera to photograph or broadcast).

Drones afford journalists an irreplaceable vantage point and a safe, economical means of reporting. Whereas news organizations once had to rely on expensive helicopters to report from the sky, journalists can now use drones to

capture everything from industrial accidents,[4] to natural disasters,[5] to close shark encounters,[6] and beyond.  The panel dismisses the impact of its decision on speech by characterizing its holding as merely restraining the "means" by which images are captured.  That characterization fails to confront the constitutional significance of those means, in contrast to the holdings of these other courts.  To make the law consistent, this Court should grant *en banc* review, reverse the panel's holding, and affirm that regulations on the images captured by journalists using drones and the means for gathering those images are content-based regulations that must satisfy strict scrutiny.

## II.    The Texas statute cannot survive strict scrutiny

As the statute "imposes content-based restrictions on speech," the state must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."  *Reed*, 576 U.S. at 171.  The state suggested the law "would

---

[4] *Amazing drone video over site of massive Houston explosion at Watson Grinding and Manufacturing*, KHOU.com (Jan. 24, 2020), https://www.khou.com/video/news/amazing-drone-video-over-site-of-massive-houston-explosion-at-watson-grinding-and-manufacturing/285-ff997f0c-b35c-47e3-a87b-7a852d1c5412.

[5] *Drone footage shows devastating wildfires in Maui*, CNN.com (Aug. 9, 2023), https://www.cnn.com/videos/weather/2023/08/09/wildfires-maui-hawaii-drone-contd-orig-no.cnn.

[6] Liz Gonzalez, *Drone footage reveals close encounters between Great White Sharks and surfers along Central Coast*, KTXS.com (Aug. 30, 2023), https://ktxs.com/news/nation-world/drone-footage-reveals-close-encounters-between-great-white-sharks-and-surfers-along-central-coast-pismo-beach-san-luis-obispo-county-surfing.

protect private property, individual privacy, and the safety of critical infrastructure facilities," but it failed to produce any evidence that these are more than speculative harms or that already-existing privacy and trespass statutes in Texas are insufficient to address any supposed risk. *Nat'l Press Photographers Ass'n v. McCraw*, 594 F. Supp. 3d 789, 807 (W.D. Tex. 2022) (citing House Bill Analysis for H.B. 912 (Tex. May 7, 2013) at 5), *vacated and reversed in part*, 2023 U.S. App. LEXIS 28050 (5th Cir. Oct. 23, 2023). Even if the state could somehow produce such evidence, the law clearly is not narrowly tailored to address that risk: as the trial court correctly pointed out, criminalizing the use of drones to capture images of any private property—even when drones are flown over public land— would "effectively outlaw[] the use of UAVs for newsgathering" over 95 percent of the state. *Id*. at 808.

## III. The Court erred in holding that Plaintiffs must vindicate their First Amendment rights on a case-by-case basis

The panel also erred in ruling that Plaintiffs have not carried their burden of bringing a facial challenge to the statute, suggesting instead that Plaintiffs should raise their First Amendment challenges on a case-by-case basis. Op. at 37. This holding disregards decades of Supreme Court precedent recognizing that the chilling effect of the potential enforcement of an unconstitutional law—before any sanctions have been issued—is sufficient grounds for a facial challenge under the First Amendment. Further, as the panel explicitly recognized, Plaintiffs have

proven that the drone law has already chilled their journalism. Thus, a facial

challenge is appropriate, as the panel's proposal would do nothing to remedy the

chilling effect that the First Amendment seeks to prevent.

Facial challenges are allowed, and are especially appropriate, in First

Amendment cases. *See Barilla v. City of Houston*, 13 F.4th 427, 434 n.4 (5th Cir.

2021) ("facial challenges are allowed in the First Amendment context"). Courts

allow facial challenges in First Amendment contexts "out of concern that the threat

of enforcement of an overbroad law may deter or 'chill' constitutionally protected

speech—especially when the overbroad statute imposes criminal sanctions."

*Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

The Supreme Court has repeatedly recognized that, when faced with the

threat of sanctions, many individuals "will choose simply to abstain from protected

speech" rather than risk facing those sanctions or bearing the burdens of fighting

them individually. *Id.*; *see Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965) ("A

criminal prosecution under a statute regulating expression usually involves

imponderables and contingencies that themselves may inhibit the full exercise of

First Amendment freedoms."); *Gooding v. Wilson*, 405 U.S. 518, 521 (1972)

("persons whose expression is constitutionally protected may well refrain from

exercising their rights for fear of criminal sanctions provided by a statute

susceptible of application to protected expression").

Chilled speech and self-censorship are of grave concern because they harm not only the individual who would engage in activities protected by the First Amendment, but also "society as a whole, which is deprived of an uninhibited marketplace of ideas." *Hicks*, 539 U.S. at 119; *see also Dombrowski*, 380 U.S. at 486 (where a chilling effect exists, "free expression – of transcendent value to all society, and not merely to those exercising their rights – might be the loser").

In this case, the panel explicitly recognized that Plaintiffs proved that their journalistic activities have already been chilled by the prospect of enforcement of this statute. Op. at 12 ("Here, Plaintiffs have evidence that their use of drones (which they call "speech") was chilled because of Chapter 423."); *id.* at 12-13 (reviewing individual examples and concluding, "[t]he above facts are sufficient to show chill"). Thus, under the First Amendment, the statute should be invalidated. *Citizens United*, 558 U.S. at 336 ("a statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated").

Having recognized the chilling effect that the drone law is already having, the panel erred in rejecting a facial challenge and in suggesting that a case-by-case determination would be preferable. Chilled speech is a real injury, requiring immediate redress. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020); *see also* Op. at 12-14 (summarizing

injuries in the form of chilled speech and financial losses).  There is simply no reason to require that Plaintiffs continue to suffer that injury and wait until they are faced with sanctions to assert their First Amendment rights.

Moreover, requiring case-by-case challenges to the drone law would also fail to correct the chilling effect on the broader population.  The panel seems to suggest that the statute would only impact a limited number of drone flights, pointing out that the law allows for audiovisual recording by drones over public lands and framing Plaintiffs' case as seeking to allow individuals to "film his neighbor in the privacy of her own home."  Op. at 37.  Respectfully, this misunderstands the issue. The concern is not that drone journalists seek to peer over their neighbors' fences, but rather, that in peering down at a public space from 400 (or even 50) feet in the air, in the course of newsgathering, they might incidentally capture a portion of private land and thereby commit a crime.  The statute is so broad that it would require all journalists to assess before every drone flight whether they might unintentionally expose themselves to liability.  Many journalists may simply choose—as the Plaintiffs have in this case—not to assume this risk and instead to limit or chill their speech.  *See Hicks*, 539 U.S. at 119.

Take for example, a few recent events in other states: a train derailment and related chemical concern in Ohio[7]; wildfires in Hawaii[8]; or Hurricane Idalia in Florida and South Carolina[9].  All are undeniably events of great public importance and, relevant here, events that impacted both public and private property.  In these instances, drone journalism allowed access and provided the public with images and information that would not otherwise have been available, with less risk to reporters and no real risk to property or individual privacy.  If similar events occurred in Texas, journalists would have to risk criminal penalties to report on them, as footage of the developing conditions might incidentally capture private property.

Even if a journalist prosecuted under this law successfully relied on the First Amendment to avoid conviction, as the panel suggests they might, the journalist would still have faced arrest or citation, incurred the costs of defense or civil litigation, and endured the stress of an unconstitutional prosecution or suit.  Seeing an individual journalist prevail after such efforts is unlikely to ease the chilling effect on other drone journalists evaluating whether to risk facing these same

---

[7] Brad Brooks & Lisa Baertlein, *Ohio cleaning up toxic train derailment as pollution 'plume' moves downstream*, Reuters.com (Feb. 15, 2023), https://www.reuters.com/world/us/ohio-cleaning-up-toxic-train-derailment-pollution-plume-moves-downstream-2023-02-15/.

[8] *See* n.4, *supra.*

[9] *See, e.g., Hurricane Idalia's wrath seen from the skies*, ABCNews.com (Aug. 30, 2023), https://abcnews.go.com/US/video/hurricane-idalias-wrath-skies-102673795.

challenges. Only a facial invalidation of the law will remedy the chilling effect on speech that the panel has already recognized the law creates.

## CONCLUSION

For these reasons, amici respectfully request that the Court grant *en banc* review, amend the panel's earlier opinion to ensure that this Court's holdings comport with binding First Amendment jurisprudence, and reinstate the lower court's ruling.

Respectfully submitted,

**BALLARD SPAHR LLP**

*/s/Thomas B. Sullivan*
Thomas B. Sullivan
Charles D. Tobin
Jacquelyn N. Schell
Emmy Parsons
1675 Broadway, 19th Floor
New York, NY 10019
Telephone: (212) 850-6139
Facsimile: (212) 223-1942
SullivanT@ballardspahr.com
TobinC@ballardspahr.com
SchellJ@ballardspahr.com
ParsonsE@ballardspahr.com

*Counsel for Amici*

## CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send notice of such filing to all counsel of record.

Dated: November 27, 2023                    */s/ Thomas B. Sullivan*
                                             Thomas B. Sullivan

                                        *Counsel for Amici*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitations of Fed. R. App.

29(a)(5), Fed. R. App. 29(b)(4) and Fed. R. App. 32(a)(7) because it is an amicus

brief that contains 2598 words, excluding the parts of the brief exempted by Fed.

R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and Fifth Cir. R. 32.1 and the type-style requirements of Fed. R. App. P.

32(a)(6) because it has been prepared in a proportionally spaced typeface using

Microsoft Word in 14-point Times New Roman font, with footnotes in 12-point

Times New Roman font.


Dated: November 27, 2023                  */s/ Thomas B. Sullivan*
                                          Thomas B. Sullivan

                                          *Counsel for Amici*