# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 10, 2024

Lyle W. Cayce
Clerk

No. 22-50337

---

National Press Photographers Association; Texas Press Association; Joseph Pappalardo,

*Plaintiffs—Appellees/Cross-Appellants*,

*versus*

Steven McCraw, *in his official capacity as Director of the Texas Department of Public Safety*; Dwight Mathis, *in his official capacity as Chief of the Texas Highway Patrol*; Kelly Higgins, *in his official capacity as District Attorney of Hays County, Texas*,

*Defendants—Appellants/Cross-Appellees*.

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:19-CV-946

---

Before Clement, Elrod, and Willett, *Circuit Judges*.

Don R. Willett, *Circuit Judge*:

Our prior panel opinion, *National Press Photographers Association v. McCraw*, 84 F.4th 632 (5th Cir. 2023), is WITHDRAWN and the following opinion is SUBSTITUTED therefor:

Chapter 423 of the Texas Government Code governs the operation of unmanned aerial vehicles—drones—in Texas airspace. In this case, the

No. 22-50337

plaintiffs claim a sweeping First Amendment right to use unmanned aerial drones to film private individuals and property without their consent. They also assert a constitutional right to fly drones at low altitudes over critical infrastructure facilities like prisons and large sports venues.

We disagree. Though we do not foreclose any *as-applied* constitutional defenses to any hypothetical future prosecutions under the drone laws, we hold that these *facial* challenges fail. Accordingly, we REVERSE and REMAND with instructions to enter judgment in the defendants' favor on the constitutional claims. We also reject the plaintiffs' cross-appeal claiming that federal aviation law preempts state drone regulation. Quite the contrary, federal law expressly contemplates concurrent non-federal regulation of drones, especially where privacy and critical infrastructure are concerned. On this issue, we AFFIRM the district court's dismissal of the plaintiffs' preemption claims.

## I

## A

Roughly a decade ago, the Texas Legislature enacted Chapter 423 as part of its efforts to regulate the use of drones in Texas airspace.[1] Two sets of Chapter 423's provisions are at issue in this lawsuit:

First, we have what the parties have nicknamed the "Surveillance" provisions. These provisions make it unlawful to use a drone to "capture an image" of someone or private property with an intent to surveil the subject of the image:

> A person commits an offense if the person uses an unmanned aircraft to capture an image of an individual or privately owned

---

[1] Texas Privacy Act, 83d Leg., R.S., ch. 1390, §§ 1–2 (2013), 2013 Tex. Gen. Laws 3691, 3691–3694 (codified at Tex. Gov't Code §§ 423.001–423.008).

No. 22-50337

real property in this state with the intent to conduct surveillance on the individual or property captured in the image.[2]

Depending on how you count them, there are at least twenty-one statutory exemptions to the Surveillance Provisions.[3] For instance, law enforcement and the military are allowed to conduct aerial surveillance using drones.[4] So can professors and students, if they do it for an "academic purpose."[5] It's also fine to use a drone to capture images from under eight feet—roughly the height of someone holding a camera above his or her head.[6] Importantly—it is lawful to use a drone to capture images of *public* property or persons on *public* property,[7] and one can always take drone images with the consent of the subject.[8] What is not among the twenty-one exceptions, however, is a specific exemption for the press.

Second, we have what the parties have dubbed the "No-Fly Provisions." The No-Fly provisions make it illegal to fly a drone above sensitive sites like critical infrastructure facilities, prisons, and large sports venues:

A person commits an offense if the person intentionally or knowingly:

---

[2] Tex. Gov't Code § 423.003(a).

[3] *Id.* § 423.002(a)(1)–(21).

[4] *Id.* §§ 423.002(a)(3) & (8).

[5] *Id.* § 423.002(a)(1).

[6] *Id.* § 423.002(a)(14).

[7] *Id.* § 423.002(a)(15).

[8] *Id.* § 423.002(a)(6).

No. 22-50337

(1) operates an unmanned aircraft over a critical infrastructure facility and the unmanned aircraft is not higher than 400 feet above ground level;

(2) allows an unmanned aircraft to make contact with a critical infrastructure facility, including any person or object on the premises of or within the facility; or

(3) allows an unmanned aircraft to come within a distance of a critical infrastructure facility that is close enough to interfere with the operations of or cause a disturbance to the facility.[9]

Critical infrastructure facilities include airports, petroleum refineries, power generators, and military installations, so long as they are enclosed by a fence or barrier, or otherwise indicate that entry is forbidden.[10] There is a nearly identical No-Fly provision barring flights directly above correctional facilities and detention centers,[11] and one that applies to large sports venues:

A person commits an offense if the person intentionally or knowingly operates an unmanned aircraft over a sports venue and the unmanned aircraft is not higher than 400 feet above ground level.[12]

Just like the Surveillance provisions, the No-Fly provisions contain several exemptions. Most relevant here is one that allows a drone operator to violate the No-Fly provisions "for a commercial purpose" so long as the operator

---

[9] *Id.* § 423.0045(b).

[10] *Id.* § 423.0045(a)(1-a).

[11] Tex. Penal Code § 38.115(b). The No-Fly provisions relating to correctional facilities and detention centers previously were codified in the same section of the Texas Government Code as the No-Fly provisions relating to critical infrastructure sites. Tex. Gov't Code § 423.0045. Effective September 1, 2023, however, the Texas Legislature moved those provisions to the Penal Code. *See Operation of an Unmanned Aircraft Over a Correctional Facility or Detention Facility; Creating a Criminal Offense*, 2023 Tex. Sess. Law Serv. Ch. 591 (H.B. 3075).

[12] Tex. Gov't Code § 423.0046(b).

No. 22-50337

complies with the applicable Federal Aviation Administration rules and authorizations.[13] Again, though: there is no specific exemption for the press.

Violating the Surveillance or the No-Fly provisions is a criminal offense under Texas law,[14] and it also subjects the violator to the possibility of civil liability.[15]

## B

The plaintiffs in this case are one drone-owning journalist and two media-related organizations (Plaintiffs).

Joseph Pappalardo is a self-employed journalist. He owns a small aerial drone and is qualified to operate the drone in the national airspace. He is "concerned that using a [drone] for journalistic purposes would put [him] at risk of criminal penalties and subject [him] to liability in a civil lawsuit" in Texas. In 2017, he was informed by one of his "corporate bosses" at the time that, should he take images in violation of Chapter 423, the company would not pay for a legal defense in any resulting court proceedings. After that conversation, he has refrained from using a drone for image capturing in Texas "due to [his] concern about possibly violating Chapter 423." As a result, he has missed out on opportunities to take aerial photographs to include in his reporting, including stories on Hurricane Harvey, house fires, storm damage, removal of homeless encampments, and illegal poaching in urban areas. He believes that Chapter 423 prevents him from being able to do "complete reporting that journalists in other states are able to do." "As a

---

[13] *Id.* §§ 423.0045(c)(5), 423.0046(c)(5). As of September 1, 2023, the provisions relating to correctional facilities and detention centers no longer appear to have a commercial-purpose exception. *See* TEX. PENAL CODE § 38.115(c).

[14] TEX. GOV'T CODE §§ 423.003(b), 423.0045(d), 423.0046(d); TEX. PENAL CODE § 38.115(d).

[15] TEX. GOV'T CODE § 423.006(a).

freelancer, being able to provide aerial imagery can be the difference between selling a pitch or being denied."

National Press Photographers Association (NPPA) is a national association that represents the interests of visual journalists, including news photographers in Texas. According to NPPA, drones provide its members with a cheap and safe alternative to renting a helicopter to obtain aerial images. Two NPPA members, both photojournalists, are especially relevant to this appeal.

The first is Guillermo Calzada. In July 2018, he flew his drone near the site of an apartment fire in San Marcos, Texas, to capture images for his employer, the *San Antonio Express-News*. An unnamed federal agent at the scene approached him and told him that he was interfering with a federal investigation. The agent then called the San Marcos police. An unnamed police officer arrived and told Calzada that he had violated state law by taking pictures with his drone and that, if he published them, he would be violating the law again. The officer also told Calzada that she wouldn't cite him for the incident.

The second is Brandon Wade. He is a freelancer who, though qualified to fly a drone, does not use one for journalism due to the risk of enforcement. He believes the threat of enforcement is costing him "thousands of dollars" because one of his clients, *The Dallas Morning News*, has not given him any drone-photography assignments. In 2018, another client, the *Fort Worth Star-Telegram*, offered Wade an assignment to document the construction of a new ballpark for the Texas Rangers. Although the Rangers refused to grant permission to Wade's client, the Rangers did hire Wade to film the construction for them for public-relations purposes. As a result, Wade says, the Rangers own the copyright to the footage, and he cannot share it with the media. Wade "lost thousands of dollars" due to the Rangers' refusal.

No. 22-50337

The other organizational plaintiff is the Texas Press Association (TPA). It exists to promote the welfare of Texas newspapers, encourage higher standards of journalism, and advocate for First Amendment liberties. TPA represents approximately 400 member newspapers, and its members include *The Dallas Morning News*, the *San Antonio Express-News*, and the *Fort Worth Star-Telegram*. Some of TPA's member newspapers have enacted policies avoiding the use of drone photography in response to Chapter 423's restrictions. Its members would be able to more cheaply and safely cover the news if drone photography were permitted.

The defendants in this case are high-ranking state- and county-level officials: two Texas heads of law-enforcement agencies and one county district attorney (Defendants).

Steve McCraw is the Director of the Texas Department of Public Safety (DPS). As the "head of the Department of Public Safety," he is "the highest law enforcement official in the state of Texas."[16] The other state official is Dwight Mathis. He is the Chief of the Texas Highway Patrol (THP).[17] The record evidence indicates that, while DPS has issued warnings and citations to drone operators on a few occasions, neither DPS nor THP has ever arrested anybody for violating Chapter 423 specifically.

Kelly Higgins is the district attorney of Hays County, Texas.[18] Unlike the state defendants, the Hays County district attorney's office *has* initiated at least one prosecution "for drone-related activities" The record evidence indicates that this prosecution, which resulted in a deferred disposition, was

---

[16] *Westfall v. Miller*, 77 F.3d 868, 873 n.1 (5th Cir. 1996).

[17] Ron Joy previously was Chief of the Texas Highway Patrol and was the defendant named in the complaint. Mathis has been substituted in this litigation.

[18] Wes Mau previously was the Hays County district attorney and the county-level defendant named in the complaint. Higgins has been substituted in this litigation.

for violating Chapter 423. Though it is not in the record, at oral argument Higgins's counsel indicated that the prosecution did not involve members of the press but instead an individual who surreptitiously photographed his neighbor.

## C

Plaintiffs filed this pre-enforcement facial constitutional challenge to Chapter 423 against Defendants, seeking to enjoin them from enforcing the Surveillance and No-Fly provisions. Plaintiffs asserted five claims, arguing that the Surveillance provisions violate the First Amendment and the Due Process Clause of the Fourteenth Amendment, and that the No-Fly provisions violate the First Amendment, Due Process, and federal preemption principles. In essence, their position is that Chapter 423 unlawfully infringes on their right to film and gather news, that the statutory prohibitions are so vague that they violate Due Process, and that Texas has no authority to promulgate drone regulations because the federal government has expressly preempted all state and local drone regulations.

The district court ruled on all five claims. In 2020, the court dismissed Plaintiffs' claim that the No-Fly provisions are preempted by federal law.[19] In 2022, ruling on the parties' cross motions for summary judgment, the court entered a final judgment favoring Plaintiffs on all of their remaining theories and enjoined Defendants and all of their subordinates from enforcing Chapter 423.[20] The court held that both challenged provisions violate both the First Amendment and Due Process.

---

[19] *Nat'l Press Photographers Ass'n v. McCraw*, 504 F. Supp. 3d 568, 591 (W.D. Tex. 2020).

[20] *Nat'l Press Photographers Ass'n v. McCraw*, 594 F. Supp. 3d 789, 813 (W.D. Tex. 2022).

No. 22-50337

Both sides appealed. Defendants argue that Plaintiffs' claims fail on standing, sovereign immunity, and merits grounds. Plaintiffs, on the other hand, say the district court should have enjoined enforcement of Chapter 423 on the additional ground that it is preempted by federal law.

## II

We review summary-judgment rulings de novo, applying the same standard as the district court.[21] "Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."[22] Legal issues, including jurisdictional issues like standing and sovereign immunity, are reviewed de novo.[23]

Our discussion proceeds as follows: (A) Article III standing; (B) the *Ex parte Young* exception to sovereign immunity; (C) the First Amendment; and (D) preemption under the Supremacy Clause.[24]

## A

Defendants first argue that Plaintiffs lack standing to bring this pre-enforcement challenge to Chapter 423 against them. We agree—in part.

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"[25] "The basic inquiry is whether the conflicting contentions of the parties present a real, substantial controversy

---

[21] *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538 (5th Cir. 2004).

[22] *Id.* at 538–39.

[23] *Texas All. for Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022).

[24] *See Davis v. Sumlin*, 999 F.3d 278, 279 (5th Cir. 2021) ("[F]ederal courts must do jurisdiction first.").

[25] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting U.S. Const., art. III, § 2).

No. 22-50337

between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract."[26]

To show associational standing, NPPA and TPA must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests [each entity] seeks to protect are germane to [each] organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[27] It is undisputed that the second two elements are met, so the only question is the first: whether the individual members would have standing in their own right.[28]

For the individual members and Pappalardo "[t]o have standing, [they] must (1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision."[29] Primarily at issue here are the injury and traceability elements. As the parties invoking standing, Plaintiffs "bear the burden to demonstrate standing for each claim they seek to press."[30]

We address injury first.

1

"An injury sufficient to satisfy Article III must be concrete and particularized and actual or imminent, not conjectural or hypothetical. An

---

[26] *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (alteration accepted) (internal quotation marks omitted).

[27] *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (citation omitted).

[28] *See Speech First*, 979 F.3d at 330 (citing *Lujan v. Def's of Wildlife*, 504 U.S. 555, 560–61 (1992)).

[29] *Id.*

[30] *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011).

allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."[31]

The parties disagree on whether Plaintiffs have carried their burden to show an injury for standing purposes. After all, no Plaintiff has ever been arrested or prosecuted for violating Chapter 423. Defendants McCraw and Mathis produced evidence showing that they have not arrested or prosecuted anybody for violating Chapter 423. And while the Hays County District Attorney's office prosecuted a claim under Chapter 423, that case resulted in a deferred disposition and did not involve any members of the press. Thus, Defendants say, Plaintiffs have not been injured by any enforcement of Chapter 423 and any future injury is purely hypothetical.

Plaintiffs lack standing to bring their Due Process claims. They have never been arrested or prosecuted for violating Chapter 423. And the available evidence suggests that Defendants have never enforced Chapter 423 against Plaintiffs (or anybody else). The issue of whether the Surveillance and No-Fly provisions are unlawfully vague in their proscriptions is therefore a mere hypothetical dispute lacking the concreteness and imminence required by Article III.[32] In the absence of any imminent or even credible threat of prosecution under Chapter 423, Plaintiffs lack standing to

---

[31] *Susan B. Anthony List*, 573 U.S. at 158 (internal quotation marks and citation omitted).

[32] *See id.* at 158. We note that vagueness may be grounds for a pre-enforcement challenge insofar as it chills protected speech under the First Amendment. *See Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546–47 (5th Cir. 2008) ("Many times void-for-vagueness challenges are successfully made when laws have the capacity to chill constitutionally protected conduct, especially conduct protected by the First Amendment." (internal quotation marks omitted)). But as we explain later, *see infra* § C, Plaintiffs' challenge to the No-Fly provisions do not implicate the First Amendment, so we need not reach this issue.

No. 22-50337

preemptively challenge Chapter 423 under the Due Process Clause.[33] We therefore vacate the district court's judgment on the Due Process claims.

The First Amendment claims, however, are another matter. This is because "standing rules are relaxed for First Amendment cases so that citizens whose speech might otherwise be chilled by fear of sanction can prospectively seek relief."[34] "In pre-enforcement cases alleging a violation of the First Amendment's Free Speech Clause, the Supreme Court has recognized that chilled speech or self-censorship is an injury sufficient to confer standing."[35] In this context, "[a] plaintiff has suffered an injury in fact if he (1) has an 'intention to engage in a course of conduct arguably affected with a constitutional interest,' (2) his intended future conduct is 'arguably . . . proscribed by [the policy in question],' and (3) 'the threat of future enforcement of the [challenged policies] is substantial.'"[36] Unlike in other constitutional contexts, in the speech context, we "may *assume* a substantial threat of future enforcement absent compelling contrary evidence."[37] "Controlling precedent thus establishes that a chilling of speech because of the mere existence of an allegedly vague or overbroad statute can be sufficient injury to support standing."[38]

---

[33] *See id.* at 159.

[34] *Justice v. Hosemann*, 771 F.3d 285, 294 (5th Cir. 2014).

[35] *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021).

[36] *Speech First*, 979 F.3d at 330 (citing *Susan B. Anthony List*, 573 U.S. at 161–64).

[37] *Barilla*, 13 F.4th at 433 (emphasis added).

[38] *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006).

No. 22-50337

Here, Plaintiffs have evidence that their use of drones (which they call "speech"[39]) was chilled because of Chapter 423. Pappalardo, for instance, violated Chapter 423 but *stopped* using a drone after his boss told him he would not be provided a legal defense for violating the law. NPPA member Calzada, on assignment for the *San Antonio Express-News*, was told by San Marcos police that his use of a drone in July 2018 violated state law. Calzada continues to violate Chapter 423 but does not do so if law enforcement is around. NPPA member and freelance photojournalist Wade testified that he "often [doesn't] use [his] drone because of the risk of enforcement." As a result, he has missed money-making opportunities with *The Dallas Morning News* and the Texas Rangers because of his (and their) unwillingness to violate Chapter 423. TPA member *The Dallas Morning News* enacted policies prohibiting its photographers from using drone photography. Finally, in their briefs, Plaintiffs represent to us that, after the district court enjoined the enforcement of Chapter 423 in this litigation, *The Dallas Morning News* reversed its no-drone policy, and Pappalardo and another NPPA member began to use drones to capture images for news purposes.

The above facts are sufficient to show chill. Plaintiffs have restricted their use of drones for newsgathering purposes due to the threat of Chapter 423's enforcement, which would open them up to criminal and civil liability.[40] The facts speak for themselves. We are therefore justified in our conclusion that a substantial threat of future enforcement exists absent "compelling contrary evidence."[41]

---

[39] "In analyzing standing, we assume that [Plaintiffs are] correct on the merits . . . ." *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 309 (5th Cir. 2023) (citing *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019)).

[40] *See Speech First*, 979 F.3d at 330.

[41] *Barilla*, 13 F.4th at 433.

No. 22-50337

There's more, though. We highlight the monetary injury NPPA member Wade suffered due to his clients' compliance with Chapter 423. In *KVUE, Inc. v. Moore*, we found First Amendment standing when a plaintiff news organization "offered evidence that it suffered actual monetary losses during the time it obeyed the law and that it has in fact violated the statute" upon the challenged law's being enjoined.[42] Here, the evidence confirms that photojournalists like Wade "suffer[] actual monetary losses during the time [they] obey[] the law," and Plaintiffs represent that they have "violated the statute" upon its enjoinment.[43] Our precedent thus holds that they may file suit to challenge Chapter 423 on First Amendment grounds.

In response, Defendants stress that they have never enforced Chapter 423 and that Plaintiffs' chill is therefore a *subjective* self-chill, detached from any *objective* likelihood of the law's enforcement. But their argument does not overcome our precedent, nor does their theory match the evidence here—photojournalists and press organizations are restricting drone photography, to their financial detriment, out of fear of Chapter 423. "That the statute has not been enforced and that there is no certainty that it will be does not establish the lack of a case or controversy."[44] This is particularly so when, as here, "the State has not disavowed any intention" of invoking the law against Plaintiffs.[45] While Defendants' point is well taken, it fails in the First Amendment context.

Defendants also argue that Calzada's encounter with the San Marcos police in 2018 is legally insufficient to support standing to seek prospective injunctive relief under *City of Los Angeles v. Lyons*, which held that a single

---

[42] 709 F.2d 922, 930 (5th Cir. 1983).

[43] *Id.*

[44] *KVUE, Inc.*, 709 F.2d at 930.

[45] *Babbitt*, 442 U.S. at 302.

No. 22-50337

chokehold incident is not enough to confer standing to seek prospective relief against all future chokeholds.[46] Again, under ordinary circumstances, this is likely a winning argument—isolated incidents of *past* unconstitutional acts generally cannot confer standing to seek prospective relief against *future* unconstitutional acts.[47] But Defendants' point falls short in this First Amendment case because Plaintiffs have provided evidence of ongoing chill and financial injury. Indeed, in the speech context, past prosecutions are often "good evidence" that the likelihood of a future prosecution is not "chimerical."[48]

In sum, the injury-in-fact element is satisfied by Plaintiffs' evidence of their chilled drone usage—including lost financial opportunities and their conduct after Chapter 423 was enjoined.

On to traceability.

2

Even if Plaintiffs suffered an injury, Defendants argue that such injury is not fairly traceable to their conduct. After all, Defendants have never enforced Chapter 423. Again, we must disagree—with one small exception.

To establish traceability, Plaintiffs must show "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."[49]

---

[46] 461 U.S. 95, 105 (1983).

[47] *See id.*

[48] *Susan B. Anthony List*, 573 U.S. at 164.

[49] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up).

No. 22-50337

Traceability is satisfied with respect to McCraw and Mathis. DPS is required to "enforce the laws protecting the public safety."[50] Any chill from the threat of enforcing Chapter 423 is thus fairly traceable to McCraw, as head of DPS. Indeed, we have on more than one occasion found litigants to have standing to sue Director McCraw in federal district court when Texas statutes or DPS are alleged to have violated the federal Constitution.[51] The Highway Patrol, too, has statewide law-enforcement and arrest authority.[52] As the person in charge of the Texas Highway Patrol, Chief Mathis is thus a proper defendant as well. Neither Director McCraw nor Chief Mathis denies that they have the authority to enforce Chapter 423. Plaintiffs' chilled "speech" is thus fairly traceable to those who would arrest them for violating Chapter 423.[53] Calzada, for example, violates the statute only when law-enforcement agents are not around. Therefore, Plaintiffs' chill is fairly traceable to these defendants.

Plaintiffs' chill is also fairly traceable to District Attorney Higgins. As the district attorney, he is charged with prosecuting individuals who violate

---

[50] TEX. GOV'T CODE § 411.002(a).

[51] *E.g.*, *Fontenot v. McCraw*, 777 F.3d 741, 746–47 (5th Cir. 2015) (approving litigants' standing to bring Due Process claim seeking injunctive relief against Director McCraw as head of DPS, though ultimately dismissing the claims on mootness grounds); *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 344–45 (5th Cir. 2013) (approving litigants' standing to bring pre-enforcement Second Amendment challenge to Texas firearms law).

[52] TEX. GOV'T CODE § 411.032; *Graf v. State*, 925 S.W.2d 740, 742 (Tex. App. 1996).

[53] *See Air Evac EMS, Inc. v. Tex. Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 514 (5th Cir. 2017) (finding traceability satisfied where "state defendants oversee the [challenged] process," reasoning that the "state defendants' oversight" of the challenged program "places state defendants among those who cause [the plaintiff's] injury").

No. 22-50337

criminal laws.[54] For this reason, courts have long recognized that prosecutors are "natural targets for § 1983 injunctive suits since they are the state officers who are threatening to enforce and who are enforcing the law."[55] Indeed, the Hays County DA's office prosecuted at least one drone-related case relating to Chapter 423. An injunction against future enforcement is therefore likely to redress Plaintiffs' claimed injury.

We therefore conclude that Plaintiffs have standing to bring their First Amendment claims—though not their Due Process claims—against all three Defendants. With one exception: Plaintiffs can't sue Defendants to enjoin enforcement of Chapter 423's *civil* penalties because Defendants do not enforce those provisions—only private individuals harmed by a violation of Chapter 423 may sue to enforce the civil penalties.[56] The district court lacked jurisdiction to order Defendants not to enforce § 423.006, and its order on that front must be vacated.

Satisfied on standing, at least partly, we turn to the next jurisdictional question: whether Defendants are entitled to sovereign immunity.

## B

"Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity."[57] "[S]overeign immunity also prohibits suits against state officials or agencies

---

[54] Tex. Gov't Code § 44.205(b); *cf. Lewis v. Scott*, 28 F.4th 659, 664 (5th Cir. 2022) ("[I]t is local prosecutors, not the Secretary, who are specifically charged with enforcement of the criminal prohibition on possessing a voter's mail-in ballot.").

[55] *Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 736 (1980).

[56] *See* Tex. Gov't Code § 423.006 (civil enforcement provisions); *Whole Women's Health v. Jackson*, 142 S. Ct. 522, 534 (2021) (plaintiffs cannot sue the Texas Attorney General to enjoin civil actions enforced by *private* individuals).

[57] *Whole Woman's Health*, 142 S. Ct. at 532.

that are effectively suits against a state."[58] "As an exception to the general rule of state sovereign immunity, *Ex parte Young* permits plaintiffs to sue a state officer in his official capacity for an injunction to stop ongoing violations of federal law."[59] Importantly: "The officer sued must have 'some connection with the enforcement of the [challenged] act.'"[60]

While the "some connection" test is amorphous, we have identified three guideposts to guide the analysis. "First, an official must have more than 'the general duty to see that the laws of the state are implemented."[61] Second, "the official must have 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'"[62] "Third, 'enforcement' means compulsion or constraint.'"[63]

Two of these considerations are easily met here. As heads of Texas law-enforcement agencies, Director McCraw and Chief Mathis have more than just the general duty to see that the state's laws are implemented—they are *directly* responsible for enforcing Texas's criminal laws, including those set forth in Chapter 423. DPS and THP officers arrest people for violating Texas law, exercising "compulsion or constraint" in service of the law.[64]

But one key component of the analysis is missing—Defendants lack "a demonstrated willingness to exercise [their] duty" to enforce Chapter

---

[58] *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019).

[59] *Lewis*, 28 F.4th at 663.

[60] *Id.* (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)).

[61] *Tex. All. for Retired Americans v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (quoting *City of Austin*, 943 F.3d at 999–1000).

[62] *Id.* (quoting *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020)).

[63] *Id.* (quoting *City of Austin*, 943 F.3d at 1000).

[64] *Id.*

423.[65] While the record shows that DPS issued six warnings and one citation for conduct involving drone operators, none of these incidents was for violating Chapter 423 specifically. Thus, in the decade or so that Chapter 423 has been on the books, the record evidence shows that Director McCraw, Chief Mathis, and their respective agencies have *never* enforced it. We have held that even "a scintilla of enforcement by the relevant state official with respect to the challenged law will do,"[66] but here there is not even a scintilla of enforcement. Not even an iota of a scintilla. Zilch.

We recognize, of course, that we have already concluded that Plaintiffs sustained an injury for purposes of their First Amendment pre-enforcement challenge because the *assumed* substantial threat of future enforcement has chilled their use of drones.[67] But this conclusion does not necessarily conflict with the fact that Defendants have not shown a demonstrated willingness to exercise their enforcement duties under *Ex parte Young*. To be sure, we have suggested that, in some cases, "an official's 'connection to enforcement' is satisfied when standing has been established,"[68] and we have similarly observed that there can be "significant overlap" between the standing and *Ex parte Young* inquiries.[69] Those inquiries, however, are not completely coterminous,[70] and the mere fact that

---

[65] *Id.*

[66] *Tex. Democratic Party*, 978 F.3d at 179 (quoting *City of Austin*, 943 F.3d at 1002) (internal quotation marks omitted); *see Speech First*, 979 F.3d at 335 (distinguishing between facial and as-applied challenges for purposes of addressing "pre-enforcement challenges to recently enacted . . . statutes").

[67] *See supra* § II.A.1.

[68] *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019).

[69] *E.g.*, *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 513–14 (5th Cir. 2017).

[70] *See Paxton*, 943 F.3d at 1002 (stating that they are "not identical").

No. 22-50337

standing requirements may be relaxed for First Amendment pre-enforcement challenges does not mean that "the requirements of *Ex parte Young* have in any way been relaxed or vitiated."[71] Thus, because Plaintiffs have provided no evidence that Defendants will enforce Chapter 423, we hold that the *Ex parte Young* exception does not apply to Director McCraw or Chief Mathis and that they are entitled to sovereign immunity.

We cannot, however, extend Eleventh Amendment immunity to Kelly Higgins, the Hays County District Attorney. This is because "state sovereign immunity applies only to states and state officials, not to political subdivisions like counties and county officials."[72] Indeed, we have "held that Texas district attorneys [are] not protected by the Eleventh Amendment" precisely because they are county officials, not state officials.[73] Granted, a couple of unpublished opinions have suggested that a district attorney's entitlement to Eleventh Amendment immunity may depend on whether he or she is performing in a local or state capacity.[74] But we understand our precedent to

---

[71] *Okpalobi v. Foster*, 244 F.3d 405, 417 n.17 (5th Cir. 2001) (en banc).

[72] *Russell v. Jones*, 49 F.4th 507, 512 (5th Cir. 2022).

[73] *Hudson v. City of New Orleans*, 174 F.3d 677, 682 (5th Cir. 1999).

[74] *See Spikes v. Phelps*, 131 F. App'x 47, 49 n.1 (5th Cir. 2005) ("Texas district attorneys are shielded by Eleventh Amendment immunity for acts performed as state officers in the scope of criminal prosecution, but they are not so shielded when they act with respect to local policies."); *Quinn v. Roach*, 326 F. App'x 280, 292 (5th Cir. 2009) ("[D]istrict attorneys . . . in Texas are agents of the state when acting in their prosecutorial capacities.").

employ a more categorical approach,[75] informed by various factors[76] that Higgins does not otherwise argue support his position that he is protected by the Eleventh Amendment.

Accordingly, while Defendants McCraw and Mathis are entitled to state sovereign immunity, Defendant Higgins is not.

## C

Moving to the merits, we now consider whether the Surveillance and No-Fly provisions facially violate the First Amendment. They do not.

### 1

We start with the No-Fly provisions, which make it unlawful to fly a drone under 400 feet above a correctional facility, detention facility, critical infrastructure facility, or sports venue—subject, of course, to numerous statutory exceptions, such as the one for commercial purposes.[77]

But Plaintiffs' First Amendment challenge to the No-Fly provisions falters because "only conduct that is 'inherently expressive' is entitled to First Amendment protection."[78] The operation of a drone is not inherently expressive—nor is it expressive to fly a drone 400 feet over a prison, sports venue, or critical infrastructure facility. And nothing in the No-Fly provisions

---

[75] *E.g.*, *Hudson*, 174 F.3d at 691 ("After carefully weighing these factors against one another, we conclude that the Orleans Parish District Attorney's Office is not an arm of the state."); *Chrissy F. Medley v. Miss. Dep't of Public Welfare*, 925 F.2d 844, 849 (5th Cir. 1991) (holding that "the Mississippi District Attorney is a state official" for Eleventh Amendment purposes because state law provides that the district attorney's office would be "primarily state-funded" and its authority would extend to "statewide concerns").

[76] *See Clark v. Tarrant Cnty.*, 798 F.2d 736, 744–45 (5th Cir. 1986) (outlining six factors to determine "whether an entity is entitled to Eleventh Amendment immunity").

[77] Tex. Gov't Code §§ 423.0045 & 423.0046; Tex. Penal Code § 38.115.

[78] *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013) (quoting *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006)).

No. 22-50337

has *anything* to do with speech or expression. These are flight restrictions, not speech restrictions.

Plaintiffs attempt to convert the No-Fly provisions into speech regulations by noting that drones are often used for photography. By making it illegal to fly drones over sensitive sites like prisons, they say, Chapter 423 *necessarily* prohibits photojournalists from capturing images from the air directly over those facilities. They claim that this prevents them from capturing newsworthy subjects cheaply and safely. Plaintiffs take issue with the absence of a specific exemption for the press and argue that "Chapter 423 directly targets speech."

We are not persuaded. The Supreme Court put it this way nearly 60 years ago:

> There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right. The right to speak and publish does not carry with it the unrestrained right to gather information.[79]

Because the No-Fly provisions have nothing to do with speech or even expressive activity, they do not implicate the First Amendment. Accordingly, we reverse the district court's judgment that the No-Fly provisions facially violate the First Amendment.

We turn next to the Surveillance provisions, which, unlike the No-Fly provisions, implicate at least *some* First Amendment protections.

---

[79] *Zemel v. Rusk*, 381 U.S. 1, 16–17 (1965).

No. 22-50337

2

To refresh, the Surveillance provisions make it unlawful to use a drone to "capture an image" of private individuals or property, without their consent, "with the intent to conduct surveillance on the individual or property captured in the image."[80] And just like the No-Fly provisions, the Surveillance provisions have several express exceptions that do not include the press.[81] Plaintiffs characterize aerial surveillance as "speech" and assert that, by letting some people use drones to capture images but not others, the Surveillance provisions violate the First Amendment.

Courts have long held that, unlike flight restrictions, restrictions on filming can implicate the First Amendment, at least to some extent. And the extent of constitutional protections for the right to film is subject to ongoing and vigorous debate—particularly when, as in this case, third parties' privacy rights are threatened. For example, the Fourth Circuit recently held that undercover animal-rights activists have a First Amendment right to infiltrate companies and clandestinely film them notwithstanding a North Carolina property-protection law.[82] JUDGE RUSHING dissented, stressing the point that, even though newsgathering is afforded some First Amendment protection, "an interest in newsworthy information does not confer a First Amendment right to enter private property . . . and secretly record" because "the mere act of recording by itself is not categorically protected speech."[83] In another recent case, the Ninth Circuit held that an Oregon law prohibiting the secret recording of conversations violates the First Amendment,

---

[80] TEX. GOV'T CODE § 423.003(a).

[81] *Id.* § 423.002(a).

[82] *People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 824–834 (4th Cir. 2023) (PETA).

[83] *See id.* at 845–47 (Rushing, J., dissenting).

reasoning that, under its clear and binding precedent, the act of recording is itself an inherently expressive activity.[84] JUDGE CHRISTEN dissented, arguing, among other things, that the right to free speech does not necessarily include an unrestrained right to record *others'* speech.[85]

These debates are not new. The Seventh Circuit in *ACLU of Illinois v. Alvarez* held more than a decade ago that "[t]he act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording."[86] That court reasoned that the "right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of *making* the recording is wholly unprotected."[87] Following that premise, the Seventh Circuit went on to hold as likely unconstitutional an Illinois anti-eavesdropping statute. JUDGE POSNER dissented, warning that such novel "interpretations" of the First Amendment have no foundation in the text or original understanding of the First Amendment,[88] and urging courts to tread carefully when elevating the right to record private individuals above the privacy rights of those individuals.[89]

In our own circuit, the leading case is *Turner v. Lieutenant Driver.* There, we held that "the First Amendment protects the right to record the

---

[84] *Project Veritas v. Schmidt*, 72 F.4th 1043, 1055 (9th Cir. 2023) (citing *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184 (9th Cir. 2018)).

[85] *See id.* at 1069 (Christen, J., dissenting).

[86] 679 F.3d 583, 595 (7th Cir. 2012).

[87] *Id.*

[88] *Id.* at 610 (Posner, J., dissenting).

[89] *Id.* at 614.

No. 22-50337

police."[90] In reaching that conclusion, we reasoned that the Supreme Court has held that newsgathering and the right to receive information are entitled to First Amendment protection, "even though this right is not absolute."[91] Citing the Seventh Circuit's decision in *Alvarez*, we also suggested that "the First Amendment protects the act of making a film, as 'there is no fixed First Amendment line between the act of creating speech and the speech itself.'"[92] Finally, in recognizing a right to film the police in the course of their public duties, we reasoned that the underlying principles of the First Amendment counseled us to safeguard the right of the people to hold government officials accountable—filming them in the course of their duties being one way to do that.[93] We emphasized, however, that the right to film the police is not unqualified. The right extends only to filming police performing their public duties in public places.[94] And even then, the right is "subject to reasonable time, place, and manner restrictions."[95] Following *Turner*'s lead, we hold that restrictions on the right to film—not just police but in general—are subject to at least *some* level of First Amendment scrutiny.

The obvious question then becomes: How *much* scrutiny?

"In an abundance of caution," "we apply the intermediate scrutiny test," "which balances the individual's right to speak with the government's power to regulate."[96] While aerial surveillance is not inherently expressive, and even though the non-expressive aspects of the Surveillance provisions

---

[90] 848 F.3d 678, 690 (5th Cir. 2017).

[91] *Id.* at 688.

[92] *Id.* at 688–89 (quoting *Alvarez*, 679 F.3d at 596).

[93] *Id.* at 699.

[94] *Id.* (citing *Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011)).

[95] *Id.* (internal quotation marks omitted).

[96] *Kleinman v. City of San Marcos*, 597 F.3d 323, 328 (5th Cir. 2010).

No. 22-50337

predominate over any expressive component, intermediate scrutiny strikes us as appropriate in this context for several reasons.

First, it is the default level of scrutiny applicable to laws like the Surveillance provisions, which do not directly regulate the content of speech and which "pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue."[97] This is particularly appropriate given the reality that the Surveillance provisions do not directly or even primarily regulate speech and expression—nor do they target any particular message, idea, or subject matter—but neither are they pure drone-operating laws. Second, it is the level of scrutiny suggested in our landmark right-to-film case, *Turner v. Lieutenant Driver*.[98] Third, it is the level of scrutiny we applied in an analogous case. In *Peavy v. WFAA-TV, Inc.*, we considered a First Amendment challenge to anti-wiretapping laws prohibiting the disclosure of illegally intercepted telephone conversations.[99] Reasoning that the laws were content-neutral and restricted communication based solely on the means by which it was acquired, we held that intermediate scrutiny applied.[100]

The Surveillance provisions here are similar to the anti-wiretapping laws in *Peavy* in that they regulate not what images can be captured but instead the means by which those images can be captured. They are also similar in that they call for us to balance First Amendment values against third parties' right to privacy. Finally, while the Surveillance provisions no doubt have an incidental effect on speech, they more closely resemble conduct regulations (aerial surveillance), not regulations of expression, or time, place, and manner restrictions (using a drone from a height above eight

---

[97] *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994).

[98] *See* 848 F.3d at 690.

[99] 221 F.3d 158, 188 (5th Cir. 2000)

[100] *Id.* at 191.

feet)—both of which fall under the umbrella of intermediate scrutiny.[101] Intermediate scrutiny thus respects the First Amendment values attached to photography while remaining cognizant of the obvious fact that recording from the sky—something the average private person cannot avoid and from where the average photographer would not be able to reach—is simply not the same thing as expressing one's views.

Plaintiffs argue that strict scrutiny should apply. So, before we apply intermediate scrutiny, we explain why we disagree with Plaintiffs' position. They offer three "paths" to strict scrutiny, none of which is persuasive.

First, like the district court, they reason the Surveillance provisions are content-based restrictions on speech (filming, more precisely) because they "require the enforcing official to inquire into the contents of the image to determine whether it is prohibited."[102] "An official must first ascertain the subject matter of the drone image to determine whether it is permissible under the statute. Therefore, it is the content of the image that determines its permissibility—the definition of a content-based restriction."[103] But the Surveillance provisions are not content-based. They classify images as lawful or unlawful based not on *what* is in the picture, but on the basis of *how* the picture is taken. The very same aerial image can be *unlawfully* captured using a drone but *lawfully* captured using a helicopter, a tall ladder, a high building, or even a really big trampoline. Indeed, the same image could be captured

---

[101] *See United States v. O'Brien*, 391 U.S. 367, 376 (1968) (holding that intermediate scrutiny applies to regulations "when 'speech' and 'nonspeech' elements are combined in the same course of conduct"); *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607 n.17 (1982) ("Of course, limitations on the right of access that resemble 'time, place, and manner' restrictions on protected speech would not be subjected to such strict scrutiny." (citation omitted)).

[102] *McCraw*, 594 F. Supp. 3d at 805.

[103] *Id.* at 806.

using a drone, so long as the drone is flown at a height below eight feet—roughly the height of a person standing on the ground holding a camera above his or her head.[104]

Separately, the district court's analysis cannot be upheld in light of recent developments in First Amendment law. At the time it issued its decision in this case, the district court did not have the benefit of *City of Austin v. Reagan National Advertising of Austin, LLC*, which held that a law is not content-based simply because one must read a sign to determine whether it is lawful under the challenged rule.[105] Here, the district court concluded that the Surveillance provisions are content-based simply because one must look at the image to determine whether it violates Chapter 423.[106] That is (now) an incorrect conclusion of law. We thus reject the notion that the Surveillance provisions are content-based restrictions on speech.

Second, Plaintiffs take the position, as did the district court, that the Surveillance provisions discriminate on the basis of content because they are speaker-based, again triggering strict scrutiny.[107] They argue that Chapter 423 impermissibly favors certain speakers—well, drone operators—and disfavors others by excepting some operators from the Surveillance provisions. For instance, despite the blanket no-drone-surveillance rule, the law exempts scholars who use drones for their academic research and the military for its exercises and missions.[108]

---

[104] Tex. Gov't Code § 423.002(a)(14).

[105] 142 S. Ct. 1464, 1474 (2022).

[106] *Nat'l Press Photographers Ass'n*, 594 F. Supp. 3d at 805.

[107] *See id.* at 806.

[108] Tex. Gov't Code §§ 423.002(a)(1), (3).

No. 22-50337

While the law certainly favors some drone operators over others, the Surveillance provisions are not for that reason automatically subject to strict scrutiny. The reason that speaker-based distinctions often trigger strict scrutiny is that restricting speakers can be a facially content-neutral loophole to suppress certain content or viewpoints disfavored by the government.[109] But concerns over content and viewpoint discrimination are not present in the Surveillance provisions' preference for certain drone operators. While the law distinguishes among photographers, it does not distinguish among *photographs*—Chapter 423 cares not for the content of the image. For Chapter 423, what's in the photograph is irrelevant. It is not enough to say that the law distinguishes between speakers; to trigger strict scrutiny, the distinction must be based on the speaker's message, not just the manner in which the speaker communicates.[110] The latter situation applies here. "Thus, the fact that the provisions benefit [some photographers] and not [others] does not call for strict scrutiny under our precedents."[111]

Finally, Plaintiffs argue that the Surveillance provisions are subject to strict scrutiny because the law imposes a direct burden on newsgathering and journalism. Drones, they say, "have become quintessential tools for documenting newsworthy events." Indeed, the undisputed record evidence shows that photojournalists like Calzada and Wade find drones to be a very helpful technology in their trade.

---

[109] *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015).

[110] *Turner Broad. Sys.*, 512 U.S. at 645 ("It is true that the [challenged] provisions distinguish between speakers in the television programming market. But they do so based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry. . . . So long as they are not a subtle means of exercising a content preference, speaker distinctions of this nature are not presumed invalid under the First Amendment.").

[111] *Id.* at 659.

No. 22-50337

But this argument also fails to trigger strict scrutiny. The Supreme Court has stated, in no uncertain terms, that "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally."[112] In *Branzburg*, the High Court refused to create a First Amendment privilege for journalists to keep them from having to participate in grand jury investigations on the ground that revealing confidential informants would hinder the press's ability to gather news. In rejecting that claimed privilege, the Court reasoned that "the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability."[113] "The Court has emphasized that" the press "has no special immunity from the application of general laws. . . . no special privilege to invade the rights and liberties of others."[114] "Although stealing documents or private wiretapping could provide newsworthy information, neither reporter nor source is immune for conviction for such conduct, whatever the impact on the flow of news."[115] And journalists "have no constitutional right of access to the scenes of crime or disaster when the general public is excluded."[116] Thus, while drones are no doubt a helpful tool in the journalist's toolkit, restrictions on drone usage do not trigger strict scrutiny. "From the beginning of our country the press has operated without constitutional protection for [drones], and [yet] the press has flourished."[117]

---

[112] *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972); *see also Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 928 (5th Cir. 1996) ("[T]he news media have no right to discover information that is not available to the public generally.").

[113] *Branzburg*, 408 U.S. at 682.

[114] *Id.* at 683 (quoting *Associated Press v. NLRB*, 301 U.S. 103 (1937)).

[115] *Id.* at 691.

[116] *Id.* at 684–85.

[117] *Id.* at 698–99.

No. 22-50337

In short, "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news."[118] While newsgathering is no doubt critical to a free society, the right to gather news affords no right to compel *others* to supply information.[119] Here, Plaintiffs claim a First Amendment right to use aerial drones to conduct "surveillance" on private persons and property without consent.[120] But in light of the authorities above, no such right exists. The press "has no special privilege to invade the rights and liberties of others."[121] We stress that the Surveillance provisions protect only *private* individuals and property.[122] They expressly permit using drones to capture images on "public real property or a person on that property."[123] This makes good sense because there is an important and obvious "distinction between recording in public spaces and unauthorized recording on private property."[124]

At most, then, intermediate scrutiny applies to the Surveillance provisions. After all, the Surveillance provisions regulate not *what* image is captured, but *where* it is taken from (above eight feet in the air) and *how* it is taken (from a drone, without permission, and with the intent to conduct surveillance).[125] Such an approach comports not just with *Turner* but also

---

[118] *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991).

[119] *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (plurality op.).

[120] Tex. Gov't Code § 423.003(a).

[121] *Branzburg*, 408 U.S. at 683.

[122] Tex. Gov't Code § 423.003(a) ("individual or privately owned real property").

[123] *Id.* § 423.002(a)(15).

[124] *PETA*, 60 F.4th at 845 (Rushing, J., dissenting) (collecting cases).

[125] Tex. Gov't Code §§ 423.003(a), 423.002(a)(14), 423.002(a)(6).

No. 22-50337

with *Peavy v. WFAA-TV, Inc.*, where we held that a First Amendment challenge to anti-wiretapping statutes were subject to intermediate scrutiny by reasoning along similar lines—that the anti-wiretapping laws regulated "the *manner* in which the information is acquired."[126]

We now apply that standard.

Under intermediate scrutiny, "[a] content-neutral regulation will be sustained if it furthers an important governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.[127] "To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests."[128] "Rather, the requirement of narrow tailoring is satisfied 'so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'"[129] "Narrow tailoring in this context requires, in other words, that the means chosen do not 'burden substantially more speech than is necessary to further the government's legitimate interests.'"[130]

*Peavy* is particularly pertinent. As previously discussed, there we held that anti-wiretapping statutes—laws prohibiting surreptitious surveillance—survived intermediate scrutiny.[131] Relevant here, we held that the government has "a substantial interest in protecting the confidentiality of

---

[126] *Peavy*, 221 F.3d at 188–89 (emphasis added).

[127] *Turner Broad. Sys.*, 512 U.S. at 662 (internal quotation marks omitted).

[128] *Id.*

[129] *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)) (alteration accepted).

[130] *Id.* (quoting *Ward*, 491 U.S. at 799).

[131] 221 F.3d at 193.

No. 22-50337

private wire, oral, and electronic communications," that this privacy interest is "unrelated to the suppression of free expression," and that by making unlawful the interception and disclosure of private wire transmissions, the anti-wiretapping acts were narrowly tailored to the governmental interest in protecting privacy.[132]

We follow *Peavy* here. As that case held, the government has a substantial interest in protecting the privacy rights of its citizens. Indeed, we noted that the privacy interests at stake "are of constitutional dimension."[133] Though most drone operators harbor no harmful intent, drones have singular potential to help individuals invade the privacy rights of others because they are small, silent, and able to capture images from angles and altitudes no ordinary photographer, snoop, or voyeur would be able to reach. And as for tailoring—as in *Peavy*, the government's ability to accomplish its goal of protecting privacy rights would be "achieved less effectively" absent the Surveillance provisions.[134] The law is also tailored to bar only surveillance that could not be achieved through ordinary means—the law contains an exception for images captured "from a height no more than eight feet above ground level in a public place, if the image was captured without using any electronic, mechanical, or other means to amplify the image beyond normal human perception."[135] We therefore conclude that the law survives intermediate scrutiny.

For similar reasons, we reject Plaintiffs' catchall contention that the Surveillance provisions violate the overbreadth doctrine. "To show overbreadth, plaintiffs must establish that [the Surveillance provisions]

---

[132] *Id.* at 192–93.

[133] *Id.* at 192.

[134] *See id.* at 192–93.

[135] Tex. Gov't Code § 423.002(a)(14).

No. 22-50337

encompass[] a substantial number of unconstitutional applications 'judged in relation to the statute's plainly legitimate sweep.'"[136] Plaintiffs have not done so. To the contrary, as we have explained, the Surveillance provisions are narrowly tailored to Texas's substantial interest in protecting her citizens' right to privacy. Plaintiffs have identified no unlawful applications of Chapter 423, and their arguments to the contrary simply assume Chapter 423 is unlawful to begin with. We therefore reverse the district court's holding that Chapter 423 is facially overbroad.[137]

In sum, the district court erred in holding that Chapter 423 facially violates the First Amendment. We hasten to emphasize that the Surveillance provisions are geared only toward protecting *private* individuals and property—they expressly permit aerial surveillance and photography of *public* property and persons thereon.[138] This distinction between public and private subjects is critical, because there is a key "distinction between recording in public spaces and unauthorized recording on private property."[139] It is where we drew the line in *Taylor*—there is a qualified right to film public officials performing public duties in public places. And it is why a different outcome exists both in *Peavy* and in this case, where the subject of the surveillance is private. We are more likely to find the government's interest in privacy to be substantial where the subject is private rather than public.

Having resolved Defendants' appeal, we turn now to Plaintiffs' cross-appeal, which challenges the dismissal of their field-preemption claim.

---

[136] *Seals v. McBee*, 898 F.3d 587, 593 (5th Cir. 2018), *as revised* (Aug. 9, 2018) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)).

[137] *See Nat'l Press Photographers Ass'n*, 594 F. Supp. 3d at 808.

[138] Tex. Gov't Code § 423.002(a)(15).

[139] *PETA*, 60 F.4th at 845 (Rushing, J., dissenting).

No. 22-50337

D

Plaintiffs argue that the district court erred in dismissing their claim that the No-Fly provisions are preempted by federal regulation of the national airspace.[140] Plaintiffs offer two theories of preemption: field preemption and obstacle preemption. We find that neither applies here.

Before proceeding to the merits of these claims, though, we must first assure ourselves that Plaintiffs have standing to challenge the No-Fly provisions on preemption grounds.[141] Ordinarily, Plaintiffs' preemption challenge to Chapter 423's enforcement would meet the same fate as their Due Process challenge: dismissal for lack of any imminent or concrete threat of enforcement or prosecution. In a recent opinion, however, we held that ongoing pecuniary harm—specifically, paying more than others because of the challenged law—can confer standing to challenge a state regulation on preemption grounds, since enjoining the state law "erases" future pecuniary harm resulting from the challenged law.[142]

Here, at least one Plaintiff has an ongoing pecuniary injury similar to that in *Young Conservatives*. NPPA member Wade testified that Chapter 423 is costing him "thousands of dollars" in lost photojournalism opportunities, as his clients are unwilling to violate Chapter 423 or pay for him to do so. Chapter 423 places law-abiding Texas photojournalists like Wade at a disadvantage to competitors from out of state and those who do not know of or do not follow Chapter 423. As Pappalardo testified, for freelance journalists like him, the ability to enhance a story with "aerial imagery can be the difference between selling a pitch or being denied." Plaintiffs'

---

[140] *See Nat'l Press Photographers Ass'n*, 504 F. Supp. 3d at 591.

[141] *See Keyes v. Gunn*, 890 F.3d 232, 235–36 (5th Cir. 2018).

[142] *Smatresk*, 73 F.4th at 310.

No. 22-50337

compliance with Chapter 423 is costing them real money. Because this ongoing financial injury is fairly traceable to the likelihood of Chapter 423's enforcement, and because an injunction is likely to redress the injury, we hold that Plaintiffs have standing to raise their preemption claim.[143]

Nevertheless, Plaintiffs' preemption claims fail on the merits.

We start with field preemption. "Field preemption occurs when States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."[144] "Although the Supreme Court has recognized field-preemption claims, it has indicated that courts should hesitate to infer field preemption unless plaintiffs show that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress."[145] When Congress has not *expressly* preempted state law, as here, field preemption may still "be inferred from a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, or where an Act of Congress touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."[146]

Field preemption of state law is disfavored. Courts should not infer field preemption in "areas that have been traditionally occupied by the states," in which case congressional intent to preempt must be "clear and

---

[143] *See id.*

[144] *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (internal quotation marks omitted).

[145] *Id.* (internal quotation marks omitted).

[146] *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (cleaned up).

manifest."[147] States' police powers, including those necessary to safeguard the protection of citizens, fall into this category.[148] Additionally, "where, as in this case, Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, as part of the preemption analysis we must consider whether the *regulations* evidence a desire to occupy a field completely. Preemption should not be inferred, however, simply because the agency's regulations are comprehensive."[149] And importantly, field preemption is not to be found where federal "regulations, while detailed, appear to contemplate some concurrent state regulation."[150]

Here, Plaintiffs have not shown that Congress or the relevant agency, the Federal Aviation Administration,[151] intended to occupy the entire field of drone regulation. They point out—correctly—that there are some federal regulations relating to unmanned aerial vehicles. But as the district court astutely observed, "federal law has not *completely* preempted the field regarding [drones] flying over certain buildings and structures."[152]

In fact, the FAA has expressly declined to preempt all state regulation of drones. In promulgating a final agency rule on drone regulation, the agency stated, "The FAA . . . reviewed the comments and . . . decided that specific

---

[147] *Id.* (cleaned up).

[148] *Cipollone v. Ligget Grp., Inc.*, 505 U.S. 504, 518 (1992); *City of Erie v. Pap's A.M.*, 529 U.S. 277, 296 (2000) ("[E]fforts to protect public health and safety are clearly within the city's police powers").

[149] *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 149 (1986) (emphasis added) (internal citation omitted).

[150] *Id.*

[151] *See* 49 U.S.C. § 40103.

[152] *Nat'l Press Photographers Ass'n*, 504 F. Supp. 3d at 589 (emphasis added).

regulatory text addressing preemption is not required in the final rule."[153] "The FAA is not persuaded that including a preemption provision in the final rule is warranted at this time. Preemption issues involving small UAS necessitate a case-specific analysis that is not appropriate in a rule of general applicability. Additionally, certain legal aspects concerning small UAS use may be best addressed at the State or local level. For example, State law and other legal protections for individual privacy may provide recourse for a person whose privacy may be affected through another person's use of a UAS."[154] These statements unequivocally show that the applicable federal "regulations, while detailed, appear to contemplate some concurrent state regulation."[155] That is sufficient, but there is more.

Shortly before oral argument, the parties alerted the court to a recently issued "Fact Sheet" from the FAA. The fact sheet, though it reasserts federal sovereignty over issues of "aviation safety or airspace efficiency," nonetheless confirms our conclusion today.[156] For in it, the FAA again expressly contemplates concurrent regulation with States and localities. That ends the matter.[157] But even more importantly, as an example of a *permissible* concurrent state regulation, the fact sheet states that "security-related restrictions over open-air water treatment facilities or certain types of critical infrastructure" are likely *not* to be preempted, particularly if the restrictions are "limited to the lower altitudes." The No-Fly provisions, which prohibit

---

[153] Operation and Certification of Small Unmanned Aircraft Systems, 81 FR 42064-01, 42194 (June 28, 2016).

[154] *Id.*

[155] *R.J. Reynolds*, 479 U.S. at 149.

[156] *State and Local Regulation of Unmanned Aircraft Systems (UAS) Fact Sheet*, Fed. Aviation Admin. (July 14, 2023), https://www.faa.gov/sites/faa.gov/files/State-Local-Regulation-of-Unmanned-Aircraft-Systems-Fact-Sheet.pdf.

[157] *See R.J. Reynolds*, 479 U.S. at 149.

drone flights less than 400 feet over critical infrastructure, are thus expressly permitted, not preempted, even under the fact sheet.

Plaintiffs' other theory of preemption, that Chapter 423 poses an obstacle to federal objectives,[158] fails for similar reasons.[159] So-called obstacle preemption exists when "the state law 'stands as an obstacle to the accomplishment and execution of the full purposes of and objectives of Congress.'"[160] Plaintiffs contend that Chapter 423 meets that formulation here because it undermines the federal government's twin goals of uniformity and exclusivity in the national airspace. As we have already observed, however, the FAA expressly contemplates concurrent state regulation of drones. So, as far as we can tell, Chapter 423 cannot pose any obstacle to national uniformity or exclusivity with respect to drone regulation because the FAA has never pursued such goals.[161]

---

[158] According to Defendants, Plaintiffs forfeited this theory of preemption because it was not raised in their complaint below. Legal theories, however, need not be raised in a complaint to be considered. Plaintiffs raised their obstacle-preemption argument to the district court, and that is sufficient to preserve it for our review. *See Thomas v. Aneritas Life Ins. Corp.*, 34 F.4th 395, 402 (5th Cir. 2022); *see also Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam) ("The federal rules effectively abolish the restrictive theory of pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief." (quoting 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 1219, at 277–78 (3d ed. 2004)).

[159] This is perhaps unsurprising given that "the categories of preemption are not rigidly distinct." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 n.6 (2000).

[160] *Oneok v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100 (1989)). Another way in which obstacle preemption can exist is if "compliance with both state and federal law is impossible." *Id.* Plaintiffs do not argue that compliance with Chapter 423 and FAA regulations is impossible, however, so we do not address it.

[161] *See Skysign Int'l, Inc. v. City & Cnty. of Honolulu*, 276 F.3d 1109, 1117 (9th Cir. 2002) ("[S]tate law cannot by its mere existence stand as such an obstacle when the federal government contemplates coexistence between federal and local regulatory schemes.").

No. 22-50337

Accordingly, Chapter 423 is not preempted, and we affirm the district court's dismissal of Plaintiffs' preemption claims.

### III

Plaintiffs picked an uphill battle by styling this litigation as a facial, pre-enforcement challenge. "A facial challenge . . . is, of course, the most difficult challenge to mount successfully."[162] And the "speech" right they demand is sweeping: an unqualified First Amendment right to conduct aerial surveillance on non-consenting private individuals on private property, and a First Amendment right to fly drones at low altitudes directly over critical infrastructure.

Nothing in the original understanding of the First Amendment or in our binding precedent permits such a result. In fact, nothing in the Constitution permits an individual to film his neighbor in the privacy of her own home—stealthily from the air—for purposes of conducting "surveillance." Under Plaintiffs' novel theory of the First Amendment, laws prohibiting stalking—and even voyeurism—would fall in the name of "free speech."

We emphasize that our holding today does not foreclose *all* First Amendment and Due Process challenges to Chapter 423. It is possible that, in an as-applied challenge, a plaintiff or defendant may persuasively show that a particular enforcement of Chapter 423 runs afoul of free speech or fairness principles. But it is not this case.

We therefore

- VACATE the portion of the district court's order that enjoins Defendants from enforcing the civil provisions of Chapter 423 and REMAND with instructions to dismiss

---

[162] *United States v. Salerno*, 481 U.S. 739, 745 (1987).

No. 22-50337

that portion of Plaintiffs' claim for lack of Article III standing;

- VACATE the portion of the district court's order that enjoins Defendants from enforcing Chapter 423 on Due Process grounds and REMAND with instructions to dismiss the Due Process claims for lack of Article III standing;

- VACATE the portion of the district court's order that enjoins Director McCraw and Chief Mathis from enforcing Chapter 423 on First Amendment grounds and REMAND with instructions to dismiss Plaintiffs' First Amendment claims against them on grounds of sovereign immunity.

- REVERSE the portion of the district court's order that enjoins Defendant Higgins from enforcing Chapter 423 on First Amendment grounds and REMAND with instructions to enter judgment in favor of Defendant Higgins on Plaintiffs' First Amendment claims; and

- AFFIRM the district court's dismissal of Plaintiffs' preemption claims.